IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

-------------------------------------------------------------- x
                                )

ADVANCE TRADING, INC., an Illinois     )
Corporation,                          )   Case No. 1:23-cv-01390-MMM-JEH
                                )
            Plaintiffs,        )
                                )
v.                                )
                                )
CRAIG BARONE, CRAIG ROBERTSON, FRED )
DIETZ, BRIAN JACOB, ERIC MEYER, JASON )
STRAHM, BRENT KIESER, AUSTIN ENDRESS, )
APALIS, LLC, and APALIS COMMODITIES, LLC, )
an Illinois Limited Liability Company,     )
                                )
            Defendants.     )
-------------------------------------------------------------- x

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' BARONE,
ROBERTSON, DIETZ, JACOB, MEYER, STRAHM, AND KIESER'S MOTION TO
DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO RULE 12(B)(6)**

# TABLE OF CONTENTS

                                                                                    **Page**

TABLE OF AUTHORITIES ................................................................................ iii

I.      INTRODUCTION .............................................................................................1

II.     ARGUMENT .....................................................................................................1

        A.      Counts I and II Properly State Claims For Securities Fraud....................................1

                1.      Proximate Causation Was Adequately Alleged. ...........................................3

                2.      Fraud Was Pled With Particularity. ............................................................8

                3.      Scienter Was Adequately Alleged. ...........................................................11

                        a.      Each Defendant's Scienter Is Sufficiently Set Out. ......................11

                        b.      The Allegations Are of Actual Knowledge. ..................................12

        B.      Count III (against Dietz) States a Claim Upon Which Relief Can Be
                Granted.....................................................................................................................14

                1.      The Complaint Adequately Alleges a Breach of Fiduciary Duty
                        Under ERISA. ...........................................................................................14

                2.      ATI Has Standing to Bring Count III. ......................................................16

                3.      Count III Is Ripe. ......................................................................................17

        C.      Count IV (against Dietz, Barone, Strahm and Kieser) States a Claim Upon
                Which Relief Can Be Granted. ...............................................................................18

        D.      ATI Sets Out A Claim For Breach of Contract.......................................................20

                1.      The Non-Compete Provisions Are Reasonably Tied to ATI's
                        legitimate interests ...................................................................................20

                2.      Dismissal on the Pleadings of Agreements At Issue Would Be
                        Premature ..................................................................................................22

                3.      While Plaintiff Has Set Out A Breach of Contract Claim, Any
                        Allegedly Improper Restrictions On Those Contracts Can Be "Blue
                        Penciled"....................................................................................................24

        E.      Counts VI And VII Should Not Be Dismissed ........................................................25

i

1. The Complaint Meets the Requirements of Rule 9(b) ..............................25

2. Dietz's Statements Referred to Past and Present Conduct, and the Future Events Fell Within the Exceptions to Promissory Fraud................25

3. Defendants' Had a Duty to Disclose Their Impending Departure, Or Refrain From Engaging in Shares Transactions ...................................26

F. Count VIII Sets Out A Breach of Fiduciary Duty by Dietz................................28

G. Counts IX and X Should Not Be Dismissed As The Conduct Alleged In The Complaint Is Not Lawful Under Illinois Law................................................29

H. Count XI Should Not Be Dismissed Because The Enforceability Question Is Premature, And A Breach Has Been Pled............................................................30

I. Count XII States A Claim For Civil Conspiracy ...................................................31

J. The Constructive Trust Is Sufficiently Pleaded ...................................................32

K. Any Potential Pleading Defects Are Curable.......................................................33

III. CONCLUSION...........................................................................................................34

# TABLE OF AUTHORITIES

Page(s)

Cases

*Aaron v. SEC*,
   446 U.S. 680 (1980) ................................................................................................ 13

*ABC Trans Nat. Transp., Inc. v. Aeronautics Forwarders, Inc.*,
   90 Ill. App. 3d 817, 413 N.E.2d 1299 (1st Dist. 1980) ..................................... 30, 31

*Advantage Marketing Group, Inc. v. Keane*,
   2019 IL App (1st) 181126 ₧ 25, 143 N.E.3d 139, 148, 436 Ill.Dec. 644, 652  (1ˢᵗ Dist.
   2019) ......................................................................................................................... 29

*Affiliated Ute Citizens v. United States*,
   406 U.S. 128 (1971) ................................................................................................... 7

*Akorn, Inc, Sec. Litig.*,
   240 F.Supp.3d 802 (N.D. Ill. 2017) ..................................................................... 8, 13

*Allen v. GreatBanc Trust Co.*,
   835 F. 3d 670 (7th Cir. 2016) .................................................................................. 14

*American Transport Group, LLC v. Power*,
2018 WL 19993204 (N.D. Ill. Apr. 27, 2018) ............................................................22

*AnchorBank, FSB v. Hofer*,
   649 F.3d 610 (7th Cir. 2011) .................................................................................... 5

*AptarGroup, Inc. v. Chamulak*,
   2019 WL 2425175 (N.D. Ill. June 10, 2019) ........................................................... 22

*Arpac Corp. v. Murray*,
   226 Ill.App.3d 65, 589 N.E.2d 640, 168 Ill.Dec. 240 (1st Dist. 1992) .................... 24

*Arthur v. Maesk, Inc.*,
   434 F.3d 196 (3rd Cir. 2006) ................................................................................... 33

*AssuredPartners, Inc. v. Schmitt*,
   2015 IL App (1st) 141863 ₧32, 44 N.E.3d 463, 398 Ill.Dec. 434 (1st Dist. 2015) ........... 21, 24

*Atkore Int'l v. Fay*,
   2018 WL 6248767 (N.D. Ill. Nov. 29, 2018) ........................................................... 23

iii

*Baker v. Twitter*,
2023 WL 6932568 (C.D. Cal. Aug. 25, 2023) ........................................................... 5

*Blumenthal v. Brewer,*
2016 IL 118781 ₱45 (Sup. Ct. 2016) ...................................................................... 32

*Burke v. Boeing Co.*,
42 F.4th 716 (7th Cir. 2022) ................................................................................... 15

*Cahnman v. Timber Court*, LLC,
2021 IL App (1st) 200338 ₱ 75, 196 N.E.3d 151, 166-167, 458 Ill.Dec. 37, 52-53 (1st Dist.
2021) ......................................................................................................................... 27

*Cambridge Engineering, Inc. v. Mercury Partners 90 BI, Inc.,*
378 Ill.App.3d 437, 879 N.E.2d 512 (1st Dist. 2007) ........................... 20, 21, 23, 24

*Chambers v. Time Warner, Inc*.,
282 F.3d 147 (2d Cir. 2002) .................................................................................... 14

*Charles Hester Enterprises, Inc. v. Illinois Founder Ins. Co.,*
114 Ill.2d 278 (1986) .............................................................................................. 32

*Chinese Consol. Benev. Ass'n. v. Chicago Chinatown Bridgeport Alliance*,
2023 WL 6388099 (N.D. Ill. Sept. 30, 2023) ......................................................... 29

*Coleman Clinic, Ltd. v. Massachusetts Mut. Life Ins. Co.*,
698 F. Supp. 740 (C.D. Ill. 1988) ........................................................................... 16

*Comprehensive Mktg., Inc. v. Huck Bouma P.C*.,
2023 WL 6143510 (App. Ct. 1st Dist. Sept. 20, 2023) .......................................... 26

*Duberville v. WMG, Inc*.,
2015 WL 186834, (N.D. Ill Jan. 13, 2015) ............................................................. 30

*Dura Pharmaceuticals v. Broudo*,
544 U.S. 336 (2005) .................................................................................................. 4

*Ed Miniat, Inc. v. Globe Life Ins. Grp., Inc.*,
805 F.2d 732 (7th Cir. 1986) .................................................................................. 16

*Elipas v. Jedynak*,
2011 WL 1706059, Fed. Sec. L. Rep. P 96,309 (N.D. Ill. May 5, 2011) .................. 7

*Elliott Assoc., L.P. v. AbbVie, Inc*.,
2017 WL 4547919 (N.D. Ill. Oct. 12, 2017) ........................................................... 27

*Everen Secs., Inc. v. A.G. Edwards & Sons, Inc*.,
308 Ill. App.3d 268, 719 N.E.2d 451 (3d Dist. Oct. 5, 1999) ................................. 30

iv

*Experiential Systems, Inc. v. Reddish*,
   2023 WL 6311694 (N.D.Ill. Sept. 28, 2023) ...................................................... 22

*First Financial Bank, N.A., v Bauknecht*,
   71 F. Supp.3d 819 (C.D. Ill. 2014) ................................................................... 29

*Fish v. GreatBanc Trust Co.*,
   109 F. Supp. 3d 1037 (N.D. Ill. 2015) ...................................................... 18, 19, 20

*Fryman v. Atlas Financial Holdings, Inc.*,
   2022 WL 1136577 (N.D. Ill. 2022) ............................................................... 7, 10

*Fryman v. Atlas Financial Holdings, Inc.*,
   462 F. Supp.3d 888 (N.D. Ill. 2020) ........................................................... 8, 9, 10

*Griffin Asset Mgmt. LLC v. Clark*,
   2023 WL 6276551 (N.D. Ill. Sept. 26, 2023) ..................................................... 29

*Hafferkamp v. Llorca*,
   2012 WL 6965102 (Ill. App. Ct.Feb. 3,. 2012) .................................................. 22

*Harris Trust & Savings Bank v. Solomon Smith Barney, Inc.*,
   530 U.S. 238 (2000) ................................................................................. 19, 20

*Hecht v. Summerlin Life and Health Ins. Co.*,
   536 F. Supp 2d 1236 (D. Nev. 2008) ............................................................ 17, 18

*Illinois Cent. Gulf R. Co. v. Dep't of Local Gov't Affairs*,
   169 Ill.App.3d 683, 523 N.E.2d 1048 (1st Dist. 1998) ........................................ 26

*Indeck Energy Services, Inc. v. Depodesta*,
   2021 IL 125733 ‖ 60, 183 N.E.3d 746, 762, 451 Ill.Dec. 289, 305 (2021) ............... 33

*Integrated Genomics, Inc. v. Kyrpides*,
   2008 WL 630605 (N.D. Ill. Mar. 4, 2008) ........................................................ 30

*Jackson v. Callan Publishing, Inc.*,
   2021 IL App (1st) 191458 ‖203, 198 N.E.3d 1099, 1146, 459 Ill.Dec. 722, 769 (1st Dist.
   2021) ..................................................................................................... 33

*Ladenberger v. Gen. Signal Pump Group/ Aurora Pump, a div. of Gen. Signal Corp.*,
   2001 WL 709488,  (N.D.Ill. June 22, 2001) ...................................................... 30

*Lebahn v. Nat'l Farmers Union Unif. Pension Plan*,
   828 F. 3d 1180 (10th Cir. 2016) .................................................................... 15

*Levine v. Futransky*,
   636 F.Supp. 899 (N.D.Illl. 1986) ..................................................................... 7

*Lillien v. Peak6 Investments, L.P.*,
   417 F.3d 667 (7th Cir. 2005) ............................................................... 26

*Macovski v. Groupon*,
   553 F. Supp.3d 460 (N.D. Ill. 2021) ............................................... 5, 8

*McRand v. Beelen*,
   138 Ill. App.3d 1045, 486 N.E.2d 1306 (App.Ct. 3d Dist. 1985)............................................. 23

*Medix Staffing Solutions, Inc. v. Dumrauf*,
   U.S. Dist. LEXIS 64813 (N.D. Ill. Apr. 17, 2018) ......................................21

*Mertens v. Hewitt Associates*,
   508 U.S. 248 (1993)............................................................... 14

*Mitchell v. Skubiak*,
   248 Ill.App.3d, 1000, 1005, 618 N.E.2d 1013, 1017, 188 Ill.Dec.443, 447 (1ˢᵗ Dist. 1993).... 27

*Northwest Podiatry Center, Ltd. v. Ochwat*,
   2013 IL App (1st) 120458 ⁋ 56, 990 N.E.2d 347, 361, 371 Ill.Dec. 447, 461 (1ˢᵗ Dist.
   2013) ............................................................................... 24

*Ong v. Sears*,
   459 F.Supp.2d 729 (N.D. Ill. 2006) ............................................... 4, 5, 6

*Peoria Union Stock Yards Co. v. Penn Mut. Life Ins. Co.*,
   698 F.2d 320 (7th Cir. 1983) ............................................................ 15

*Phil Dressler & Associates, Inc. v. Old Oak Brook Inv. Corp.*,
   192 Ill.App.3d 577, 548 N.E.2d 1343, 139 Ill.Dec. 629 (2nd Dist. 1989) ............................. 26

*Phoenix Ins. Co. v. ATI Physical Therapy, Inc.*,
   2023 WL 5748359 (N.D. Ill. Sept. 6, 2023) ............................................... 4, 13, 17

*Preferred Meal Sys. Inc. v. Guse*,
   199 Ill.App.3d 710, 557 N.E.2d 506, 145 Ill.Dec. 736 (1st Dist. 1990)................................. 29

*PrimeSource Building Products, Inc. v. Felten*,
   2017 WL 11500971 (N.D. Ill. July 6, 2017)........................................................... 29

*Reliable Fire Equip. Co. v. Arredondo*,
   965 N.E.2d 393, 358 Ill. Dec. 322 (2011)........................................................... 22

*Rubinstein v. Gonzalez*,
   241 F.Supp.3d 841(N.D. Ill. 2017) ............................................................... 13

*SCB Derivatives v. Bronson*,
   2023 WL 6388229 (N.D. Ill. Sept. 29, 2023) ............................................... 24, 25

*Scheffel Financial Services, Inc. v. Heil,*
  2014 IL App (5th) 130600 ⁋11, 16 N.E.3d 385, 384 Ill.Dec. 289 (5th Dist. 2014) ................ 22

*Schrager v. North Community Bank,*
  328 Ill.App.3d 696, 767 N.E.2d 376 (2002) ............................................................................. 27

*SEC v. Bauer,*
  723 F.3d 758 (7th Cir. 2013) ............................................................................................. 13, 14

*Suttles v. Vogel,*
  126 Ill.2d 186, 533 N.E.2d 901, 127 Ill.Dec. 819 (1988) ....................................................... 33

*Swain v. Wilmington Trust, N.A.,*
  2018 WL 9344598 (D.Del. Feb. 16, 2018) ................................................................................. 5

*Time Savers, Inc. v. Lasalle Bank*, N.A.,
  371 Ill.App.3d 759, 863 N.E.2d 1156, 309 Ill.Dec. 259 (2nd Dist. 2007) .............................. 31

*Tummelson v. White,*
  2015 IL App (4th) 150151 ⁋ 9-11 (4th Dist. 2015; *Blumenthal v. Brewer,* 2016 IL 118781 ⁋45
  (Sup. Ct. 2016) ..................................................................................................................... 32, 33

*Varity v. Howe,*
  516 U.S. 489 (1996) ................................................................................................................. 15

*Veco Corp. v. Babcock,*
  243 Ill.App.3d 153, 611 N.E. 1054, 183 Ill.Dec 406 (1st Dist. 1993) ......................... 28, 31, 33

*Washtenaw Cty. Employees' Ret. Sys. v. Walgreen Co.,*
  2019 WL 4597518 (N.D. Ill. Sept. 23, 2019) ............................................................................. 4

*Wigod v. Wells Fargo Bank, N.A.,*
  673 F.3d 547 (7th Cir. 2012) ............................................................................................. 25, 27

*Wright v. Assoc. Ins. Cos., Inc.,*
  29 F.3d 1244 (7th Cir. 1994) ................................................................................................... 14

Statutes

29 U.S.C. § 1132(a)(3) ............................................................................................................... 18

Rules

Fed.R.Civ.P. 5(a) ....................................................................................................................... 35

NOW COMES the Plaintiff, ADVANCE TRADING, INC. ("Plaintiff' or "ATI"), an Illinois Corporation, by and through its attorneys, Wood, DeVary, Armstrong & Houska, P.C., and provide their Memorandum of Law in Opposition to Defendants' Barone, Robertson, Dietz, Jacob, Meyer, Strahm, and Kieser's Motion to Dismiss Plaintiff's Complaint Pursuant to Rule 12(B)(6) ("MTD").

## I.     INTRODUCTION

The Complaint in this action ("Compl.") alleges claims for violations of the federal securities laws, ERISA, breach of contract, Illinois common law fraud and fraudulent concealment, breach of fiduciary duty and inducement to breach fiduciary duty, breach of employee duty of loyalty, tortious interference with contract, civil conspiracy, and is seeking the imposition of a constructive trust.  These claims stem from a concealed undertaking by seven of its former employees and Defendant Endress, to form competing entities and take clients from Plaintiff to be serviced by Apalis, LLC and Apalis Commodities, LLC (collectively, "Apalis"). Movants' attempt to have these claims dismissed for pleading deficiencies must be rejected.

## II.     ARGUMENT

### A.     Counts I and II Properly State Claims For Securities Fraud

In its Complaint, Plaintiff set out how various employees, including many senior and long-tenured employees (among them a member of the Board of Directors), misrepresented their intentions and concealed their impending departure and intent to steal a sizeable portion of Plaintiff's clients. These defendants, Fred Dietz ("Dietz"), Craig Barone ("Barone"), Jason Strahm ("Strahm") and Brent Kieser ("Kieser") (the "Securities Fraud Defendants") not only conspired to breach their contractual obligations and their fiduciary duties, they also tendered shares in ATI while concealing their intent to abscond with corporate assets. *See, e.g.*, Compl. ¶¶ 1, 29, 44, 80.

This was in connection with the annual December offer by ATI to its employees to tender their existing shares for repurchase by the company. Compl. ¶¶ 45, 51.

On December 21, 2022, Defendants Barone, Kieser, Dietz, and Strahm tendered approximately a third of their shares, both inside and outside the ESOP. Compl. ¶ 54 and Ex. E. The Board of Directors met on December 22, 2002, and approved the transactions, including the repurchase of shares from the Tendering Defendants as well as others, plus sales to current employees. Compl. ¶¶ 55-58. In connection with these securities transactions, the Securities Fraud Defendants knowingly obtained payments from ATI for their shares without disclosing material information about ATI, information known only by Dietz, Barone, Strahm and Kieser.

At this Board meeting, Dietz was asked multiple times at this meeting if there was reason for concern, given the number of senior employees asking to redeem a large portion of shares. Compl. ¶ 59. Dietz responded that there was no reason for concern regarding the tenders by Barone, Dietz, Kieser and Strahm of a significant portion of their shares for repurchase. Compl. ¶ 60. *See also* Compl. ¶¶ 107, 110.

At the same time as these transactions were tendered and executed, Dietz knew, but failed to disclose, that he and other employees were planning on leaving shortly thereafter, going to a new company, and absconding with as many ATI clients as possible. Compl. ¶ 61-63. Similarly, Barone, Strahm and Kieser, who had a duty to disclose these plans, failed to do so when tendering their shares. Compl. ¶¶ 54(a), (b), and (d); 59(a), (b) and (d); 71-72; 99-100, 119-24.

Count I of the Complaint set out violations of SEC Rule 10b-5(a), (b) and (c) against Dietz, for both his affirmative misstatements and omissions regarding the circumstances of his share tender and that of other employees. Compl. ¶¶ 102-115. Count II set out violations of SEC Rule 10b-5(a) and (c) against Barone, Strahm and Kieser, relating to their failure to disclose the material

fact of their impending departure prior to the consummation of the securities transaction. Compl. ¶¶ 116-24.

In response, while inartfully set out, Defendants Dietz, Barone, Strahm and Kieser argue that the securities claims fail to state a claim on the basis that Plaintiff (1) failed to adequately allege Defendants proximately caused a loss, (2) failed to plead fraud with the required particularity, and (3) failed to adequately allege that Defendants acted with scienter. These arguments must be rejected.

### 1.  Proximate Causation Was Adequately Alleged.

The Securities Fraud Defendants seek to dismiss based on the purported absence of proximate loss. First, they assert, while ATI might have repurchased the tendered shares at an artificially inflated price, it suffered no loss because it simultaneously sold these shares to others (or a majority of them) at the same artificially inflated valuation. Thus, they contend, the fraud they committed is balanced out by the fact that the Plaintiff overcharged others. In effect, they assert there is no loss in connection with the sale to other employees of ATI's securities at the same time of their tender, absent a showing that other employees asserted a claim or that ATI has paid any claim to them.[1]

Second, they contend that there are no facts alleged to show Defendants' misconduct was the sole or primary cause of the loss (MTD 5-6), since the damages claim is based on an appraisal conducted six months later, which assumed a valuation date of March 31, 2023, not the date of the tender redemption. "The Complaint fails to allege facts to support ATI's claim that the March, 31,

---

[1] In effect, Defendants are conflating two separate sets of transactions. In the first, they tendered shares to ATI at a price inflated by their misconduct, causing a loss to ATI. In the second, other employees purchased shares at an inflated price to them, for which ATI might be liable. In addition, shares were sold to employees from both inside and outside the ESOP, and these sales were not the same shares repurchased from defendants, nor were they allocated from the ESOP and outside the ESOP in the same amounts. *See, e.g.*, Compl. ¶¶ 53-54.

2023 value was in fact 'reflective' of the value on December 30, 2022, or that March 31 was the earliest date for which a valuation was 'practically ascertainable.'" (MTD 6).

Neither of these arguments bears up to scrutiny.

The Securities Fraud Defendants rely heavily upon *Dura Pharmaceuticals v. Broudo*, 544 U.S. 336 (2005), for the argument that merely alleging a misrepresentation caused a loss is insufficient to state a claim, where other factors might account for a lower price at a later date when the truth becomes known. The *Dura* court simply required "a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. 336 at 347. Movants' reliance on *Dura* is misplaced.

Importantly, ATI's pleading burden is a light one. *Ong v. Sears*, 459 F.Supp.2d 729, 742 (N.D. Ill. 2006) in instructive. First, *Ong* noted that "the Court in *Dura* applied a notice-pleading standard to these elements; there, the complaint failed because the plaintiffs alleged no loss at all. . . . Moreover, courts in this district and elsewhere have interpreted *Dura* as imposing no heightened pleading standard for loss and causation." *See also Phoenix Ins. Co. v. ATI Physical Therapy, Inc*., 2023 WL 5748359, *21 (N.D. Ill. Sept. 6, 2023) ("the loss causation element of a securities fraud claim under § 10(b) requires only ordinary notice pleading, meaning that the plaintiff's burden is not great."); *Washtenaw Cty. Employees' Ret. Sys. v. Walgreen Co*., 2019 WL 4597518, at *7 (N.D. Ill. Sept. 23, 2019) ("As the Seventh Circuit instructs, the requirement of loss causation 'ought not place unrealistic burdens on the plaintiff at the initial pleading stage.' ").

Movants contend (*see* MTD 3) that ATI "concedes that ATI has no evidence of the true value of the shares at the time of the transaction." Defendants are attempting to confuse the Court. The fact that the nature and size of the loss became apparent later, as the consequences of their fraud and misconduct were felt, does not mean somehow that there was no securities fraud at the

4

earlier date. Defendants are trying to benefit from the fact that their fraud and concealment of their intent was not knowable by ATI at the time of the transaction. They ignore that it was precisely ***because*** of that fraud that the damages could not have been measured at that time. Indeed, as was held in *Macovski v. Groupon*, 553 F. Supp.3d 460, 475 (N.D. Ill. 2021), "[d]epending on the problem alleged, its existence at a later date "may support an inference that it was present ... months earlier.'" The appraisal measured appropriately the reduction in ATI's value by the attrition caused by the Securities Fraud Defendants' departure, thus establishing proximate cause and loss causation directly tied to the concealment of the undisclosed plans of the Securities Fraud Defendants. *See* Compl. ¶¶ 48-50, 70-73.[2]

Nor is there any requirement that Plaintiff plead that the Defendants' acts are the sole cause of any loss. As *Ong* held, a plaintiff need not allege defendant's misconduct was the sole cause of loss to satisfy the causation element. "A plaintiff need not prove that all its loss can be attributed to the defendant's misrepresentation, and a complaint is not rendered infirm because the loss could have been caused by other, undisclosed wrongful conduct of the defendant or other factors that influenced the price of the plaintiff's securities." *Id.*, at 747. *See also AnchorBank, FSB v. Hofer*, 649 F.3d 610, 618 (7th Cir. 2011) (citations omitted) ("[W]e do not require that a plaintiff plead that all of its loss is necessarily attributed to the actions of the defendant, only that it plead that the defendant is at least one plausible cause of the economic loss.")[3]

---

[2] Case law further provides that the damages need not be concretized in a realized loss at the time of the lawsuit for the causation element to be satisfied. *See, e.g., Baker v. Twitter*, 2023 WL 6932568, * 11 (C.D. Cal. Aug. 25, 2023); *Swain v. Wilmington Trust, N.A.*, 2018 WL 9344598, *3 (D.Del. Feb. 16, 2018).

[3] Not only is the question of what portion of loss can be attributed to defendants' misconduct a fact issue inappropriate for resolution on a motion to dismiss on the pleadings, this defense simply ignores multiple paragraphs in the Complaint that plead how this misconduct was misleading and caused the losses suffered. *See, e.g.*, Compl. ¶¶ 70-73, 114-15, 123-24.

Moreover, with respect to the stock ATI sold to its employees, which is a distinct and separate transaction from the shares tendered by Tendering Defendants (and do not involve the same shares tendered), Plaintiff is not required to currently plead an actual, realized loss, either through having to pay back other employees or that other employees who bought shares have asserted any claims. As *Ong* held, "Nothing in *Dura* suggests, however, a requirement that § 10(b) securities fraud plaintiffs must sell their securities in order to suffer the requisite economic loss. As discussed, *Dura* held that a plaintiff must show economic loss and causation; the Court nowhere stated that the loss must be realized through a sale. . . The court thus declines to read into *Dura* a requirement that a § 10(b) plaintiff alleging fraud in connection with the purchase of securities must sell the securities to realize a loss before being allowed to sue." *Id*. at 743-44. Similarly, here ATI has exposure to potential claims of overcharging its employees for the shares it sold at the same time .

The pleadings in the case at bar also stand in stark contrast to the facts alleged to be defective in *Dura*, which simply stands for the proposition that the mere fact that loss follows the alleged fraud is, in and of itself, not sufficient to allege causation. But that is not *this* case; here, the Complaint alleges that the departure of the Securities Fraud Defendants was the primary factor in the loss suffered. "The independent appraisal report as March 31, 2023, cited the departure of Resigning Defendants, their actions in taking customers, and the impact it will have on long term profits as the primary reason for the decrease in share value." Compl. ⁋ 70. Whether or not there may be other, smaller contributing factors to the loss is not, under *Dura*, a basis for dismissal.

Nor does ATI need to allege, at this time, that any loss was suffered contemporaneously with the securities transactions at issue, or immediately measurable on that date (and *Dura* demands nothing of the sort). Indeed, *Dura* is a "stock drop" case, where inherently the measure

of damages is done by comparing the value of the stock at the later date when the truth is disclosed to the market, against the value of the stock at the time of the earlier omission or misrepresentation. The law merely requires that the loss was causally connected to the securities violation, regardless of when that loss was suffered and capable of being measured. The fact that damages became known at a later date or are not measurable at the time of the fraud does not preclude a claim for securities fraud for acts undertaken at an earlier date causing the later damage. See *Elipas v. Jedynak*, 2011 WL 1706059, Fed. Sec. L. Rep. P 96,309 (N.D. Ill. May 5, 2011) (damages suffered some time after transaction but was viewed as having been caused by the initial fraud); *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1971) (holding that in assessing damages for thinly traded securities, inferences can be drawn to measure the difference between the fair value of what the plaintiff received and the fair value of what the plaintiff would have received had there been no fraudulent conduct); *Levine v. Futransky*, 636 F.Supp. 899, 900 (N.D.Illl. 1986) (even where plaintiff made a profit at time of sale at a later date, plaintiff may be entitled to recover the greater amount plaintiffs would have received had they not been defrauded). Here, the March 31, 2023 appraisal measured damages caused by the omissions and misrepresentations made on the date of tender.[4]

Finally, not only is loss causation something that need not be attributed solely to defendant (*Fryman v. Atlas Financial Holdings, Inc.*, 2022 WL 1136577, 33 (N.D. Ill. 2022) ("Plaintiffs do not have to plead that all of their loss is attributed to the actions of the Defendants, only that Defendants' actions are a plausible cause of Plaintiffs' economic loss"), it is a fact-based issue that

---

[4] Citing *Levine v. Futransky*, Louis Loss stated in his treatise, *Fundamentals of Securities Regulation*, " Normally that [out-of-pocket] measure may be expected to yield the difference between the value of the security (not necessarily market value at the time of the defendant's purchase but presumably value at that time as judged in the light of the issuer's subsequent history) and the price paid [by] the plaintiff for it (or the value of anything that the defendant may have given in exchange)." Page 967-Loss, Fundamentals of Securities Regulation, 1988

need not be determined until the latter stages of litigation. *Macovski v. Groupon, Inc*., 553 F.Supp.3d 460 (ND Ill. 2021)("Loss causation is a fact-based inquiry that need not be proven until later stages of litigation.") (citation omitted); *Akorn, Inc, Sec. Litig*., 240 F.Supp.3d 802 (N.D. Ill. 2017) (same). As the *Macovski* court held, even if the connection between the decline in share value and defendants' misconduct proves ultimately to be attenuated, that conclusion is only appropriately reached at a "later stage" after a "highly fact intensive inquiry." *Macovski*, 553 F.Supp.3d at 489.[5]

### 2.    Fraud Was Pled With Particularity.

Defendants argue that the security claims should be dismissed based on a failure to allege fraud with particularity, on the basis that (1) plaintiff failed to adequately allege that Defendants departure was a certainty (MTD 7); (2) plaintiff failed to allege Defendants knew the impact of their departure was quantifiable, in that plaintiff failed to allege that Defendants knew of specific customers that would leave, when they would leave, and what effect that would have (MTD 7-8); or (3) that allegations that Dietz misled the Board of Directors failed to sufficiently set out "what Dietz allegedly said in response to particular questions" (MTD 9).

In support, with respect to the first defense, Defendants rely on *Fryman v. Atlas Financial Holdings, Inc*., 462 F. Supp.3d 888 (N.D. Ill. 2020). In *Fryman*, Plaintiffs alleged that Defendant made false and misleading statements about insurance company loss reserves, and a trend of increasing claim severity, which, ultimately, resulted in the share price declining. In dismissing

---

[5] Defendants also contend (MTD 6) that ATI failed to comply with the applicable requirements of the Shareholder Agreement (Complaint, Ex. D, at § 11) because it did not request an updated appraisal within 30 days of defendants' tender, the relevant time period under the Shareholder Agreement for a voluntary tender. Of course, ATI did not know of defendants' fraud within that 30 day period, and did not have possession of the relevant facts – facts solely in the possession of defendants – that would have indicated a need to conduct a new appraisal. Defendants cannot now seek shelter by claiming shelter in a contractual provision when it is their own fraud that prevented the exercise of ATI's appraisal in a more timely fashion.

the claim for failure to adequately allege causation, the *Fryman* court noted that defendant "was disclosing incorrect information about the severity of the non-modeled claims, but there is nothing in the [pleading] to suggest that Defendants knew the information was wrong at the time the statements were made."

Thus, the issue in *Fryman* was not that the disclosure was wrong when made, but the absence of allegations that Defendant **knew** it was wrong at that time. But, it is precisely that allegation which was made by Advance Trading in the case at bar, and these allegations are throughout the Complaint. *See, e*.g., Compl. ¶¶ 1, 29, 36, 41-42, 59-61, 80-82.

Defendants imply, implausibly, that at the time of the tender, Defendants did not know of their own intentions. But it is their own intent, and the circumstances surrounding the tender, that indicate that the Securities Fraud Defendants knew they were planning on leaving and stealing customers. Moreover, the Complaint specifically alleges circumstances and facts that would establish, if true, that the moving parties had an intent to leave when they tendered their shares and that they concealed that intent, *e.g*., the defendants announced their departure the day after Apalis received NFA approval (Compl. ¶ 36), and that defendants actively recruited other employees of Plaintiff to leave and join a new enterprise starting in October of 2022, months before the tender and their departure. (Compl. ¶¶ 40-43.) This is in sharp contrast to the facts of *Fryman*, where plaintiff sought to infer knowledge at one time from a subsequent event of a fact that was not in the particular knowledge of any person. In contradistinction, the Complaint at issue at bar contains numerous allegations that "Defendants knew the information was wrong at the time the statements were made."[6] The issue in *Fryman* was a contrary one: that there were no allegations that

---

[6] Movants only address issues relating to Dietz's explicit misrepresentations, but have failed to reference or address allegations relating to the material omissions by Barone, Strahm or Kieser. These omissions claims are not subject to this standard. *See, e.g*., Compl. ¶¶ 116-124.

management believed the statements to be false when made. *Fryman* simply involved a situation where plaintiffs alleged that management should have known something was amiss. *Id*. at 897-98.

Furthermore, while Defendants rely on a 2020 decision in the *Fryman* litigation, they ignore another decision in that case two years later: *Fryman v. Atlas Financial Holdings, Inc.*, 2022 WL 1136577 (N.D. Ill. Apr. 18, 2022). There, the Court specifically held that allegations that defendants *knew* reserves were deficient based on facts known to them, and only them, would satisfy the pleading standard. *See id.* at *12. Thus, to the extent that the *Fryman* litigation is apposite, it establishes that allegations – such as in the case at bar – that the Defendants actually knew of the falsity of their representations (or of the impression their omissions created) satisfy the pleading requirements for securities fraud.

With respect to the second defense, Movants cite no requirement that ATI allege the specific number of customers that would leave, or that ATI be able to predict immediately the ultimate harm caused by Defendant's misconduct. Moreover, notwithstanding the claimed absence of any quantification of the effect of customers leaving, the Complaint does in fact allege the size of that loss. Compl. ¶¶ 159, 188(d), 191, 207(d), 220(b), 230(b), 234(d), 239-242. For securities fraud claims, what is important is that ATI allege some quanta of damage due to a security's diminution of value, which the Complaint does repeatedly. *See, e.g*., Compl. ¶¶ 94-101, 114-15, 123-24; *see also* at ¶¶ 166-67, 181-83, 220(a), 230(a), 234(a), (b) and (c). As these allegations establish, the movants knew and understood the size of the business they controlled, its value, its contribution to ATI's profits, and what portion of those total profits this stolen business constituted, as they were long-tenured employees in senior positions (including Dietz, who was on the Board), who had lengthy experience with the clients that they stole.

Nor, finally, can movants assert that the Complaint insufficiently sets out Dietz's misrepresentations to the Board, as it states that there was a meeting on December 22, 2022, that Dietz was "asked directly" and on "multiple occasions" at this meeting if there was anything of concern relating to "so many employees asking to redeem such a large portion of their shares" or whether "there was anything they needed to be made aware of regarding Tendering Defendants all tendering significant portions of their stock" and that he responded "each time in the negative, providing multiple reassurances." Compl. ¶¶ 58-60, 107-13; *see also* Compl. ¶ 61 (alleging Dietz knew these statements were false when made).

### 3.    Scienter Was Adequately Alleged.

Defendants assert that the requisite allegations of scienter have not been sufficiently pled with respect to Count II.[7] *See* MTD 9-10. Defendants present two arguments: (1) that the defendants' scienter is not set out individually, but collectively, and (2) that there are no allegations of actual knowledge, just recitations that defendants "should have known." Each of these attacks fail.

### a.    Each Defendant's Scienter Is Sufficiently Set Out.

In claiming that individual scienter is not set out adequately, Barone, Strahm and Kieser ignore the actual allegations. The Complaint alleges that each of these three defendants had a duty to disclose (Compl. ¶¶ 74-91) and that each of them had knowledge not available to Plaintiff (Compl. ¶ 122) regarding their impending departures. Compl. ¶¶ 118-24.  Plaintiff is not relying on collective pleading.

The fact that there are commonalities in the omissions made by each of these defendants is simply a consequence of the fact that they collectively planned and executed their plan to conceal

---

[7] This attack appears to be only asserted against Defendants Barone, Strahm and Kieser, since it only references Count II, and refers to the "three Defendants."

their departure and abscond with corporate assets. Thus, as the Complaint alleges, each of them submitted their resignation on January within a day of each other (Compl. ¶¶ 9, 14, 15, 28), each met to discuss leaving for Apalis while employed by ATI (Compl. ¶ 26), each tendered their shares on the same day (Compl. ¶¶ 54(a), (b), (d); 56(a), (b) and (d)); and each concealed their intent to leave and take clients with them. Compl. ¶¶ 99-101, 120-21. The Complaint also alleged that the defendants "coordinated with each other to tender a similar portion of their stock prior to their resignations." Compl. ¶ 62.

### b.   The Allegations Are of Actual Knowledge.

This defense relies on reference to language in the Complaint that Defendants "reasonably should have known" and thus it claims that ATI is applying a negligence standard as opposed to the "mandatory recklessness standard required to allege scienter in the absence of evidence of allegations of actual knowledge."

Defendants here misstate what is alleged. The actual knowledge is not the effect their fraudulent redemptions would have, but that they knew, and Plaintiff did not, that they were shortly to depart. As noted, at the December 22, 2022 Board meeting, Dietz lied multiple times, stating the Board should not be concerned about so many senior employees tendering such a large portion of their shares. Compl. ¶¶ 59, 60, 107, 110. Dietz, Barone, Strahm and Kierer conspired to breach their contractual obligations and their fiduciary duties, to conceal their intent to abscond with corporate assets, all while tendering shares in ATI during ATI's annual December offer to employees. Compl. ¶¶ 1, 29, 44, 45, 51, 80. Contemporaneously, Dietz knew that he and other employees were planning on leaving shortly thereafter, going to a new company, and absconding with as many ATI clients as possible. Compl. ¶ 61-63.

Movants takes one quotation (without attribution) out of context, and ignores specific references to actual knowledge. Indeed, the language taken out of context by defendants reads in

fuller part that "These Defendants *knew*, or reasonably should have known" (Compl. ⁋ 121) (emphasis added). But this paragraph refers not to the knowledge of their intent, but the consequences of their misconduct. There is no legal requirement to plead that a securities fraud defendants anticipate the specific consequences of their misconduct.

Scienter is a mental state requirement that encompasses an intent to deceive, manipulate, or defraud." *Phoenix Ins. Co. v. ATI Physical Therapy, Inc*., 2023 WL 5748359, *14, (N.D. Ill. Sept. 6, 2023); *Aaron v. SEC*, 446 U.S. 680 (1980). Scienter can be satisfied "by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Rubinstein v. Gonzalez*, 241 F.Supp.3d 841, 854(N.D. Ill. 2017) (involving cases of omissions where pleading showed "strong circumstantial evidence").

All a plaintiff has to do is allege facts that show that an inference of intentional or reckless misconduct is plausible and at least as compelling as the opposing inference. This requirement is satisfied here. *See, e.g., Macovski v. Groupon*, 553. F.Supp.3d 460, 487 (N.D. Ill. 2021) (scienter requirement satisfied where allegations regarding scienter are "cogent and at least as compelling as any opposing inference of nonfraudulent intent"); *In Re Akorn, Inc. Sec. Litig*., 240 F. Supp.3d 802, 821 (N.D. Ill. 2017).

Defendants' case law is not to the contrary. In *SEC v. Bauer*, 723 F.3d 758, 775 (7th Cir. 2013) the issue was the reason why someone redeemed assets. *Bauer* was an insider trading case in which Bauer, a senior person at a mutual fund company, redeemed her shares in the company while in possession of information that would affect its economic prospects. The court reversed a decision in favor of the SEC for summary judgment, holding that while there was enough evidence of scienter, there was also evidence of potentially innocent reasons for offering her shares at the

time, stating it was an issue of fact. In the case at bar the allegations of fraud are far stronger and indeed is the only plausible explanation for the Securities Fraud Defendants' actions. If summary judgment was inappropriate in *Bauer*, then dismissal on the pleadings is even more unwarranted in the case at bar.

**B.    Count III (against Dietz) States a Claim Upon Which Relief Can Be Granted.**

**1.    The Complaint Adequately Alleges a Breach of Fiduciary Duty Under ERISA.**

Count III is a claim brought by ATI as a fiduciary under ERISA Section 502(a)(2).  To make a claim for breach of fiduciary duty under ERISA, a plaintiff must plead that (i) the defendant is a fiduciary, (ii) the defendant breached his fiduciary duty, and (iii) the breach resulted in harm. *E.g., Allen v. GreatBanc Trust Co.,* 835 F. 3d 670, 678 (7th Cir. 2016).  Here, the Complaint alleges that Dietz was an active Board member at the time of the December 2022 stock transactions. Compl. ¶ 127. The Complaint further alleges that as a Board member, Dietz was an ERISA fiduciary and therefore had fiduciary duties imposed on him under ERISA.  Compl. ¶ 128; *see also* ESOP § 13.8 (stating that the ATI Board of Directors is a named fiduciary).[8]

Movants assert that Count III should be dismissed because (i) Dietz was not acting in a fiduciary capacity; (ii) there was no breach of fiduciary duty causing loss to the ESOP; (iii) plaintiff lacks standing to assert this claim; (iv) a damages claim is not ripe; and (v) Dietz did not breach a fiduciary duty by not disclosing future contingencies. MTD 10-17.

With respect to the first two arguments, not only was Dietz a named fiduciary under the ESOP, but by participating in the ESOP share purchase process, he was functioning as a fiduciary. There are two types of fiduciaries, named fiduciaries and functional fiduciaries.  *Mertens v. Hewitt*

---

[8] Although the ESOP is not an exhibit to either the Complaint or the MTD, it is referenced so frequently therein, especially by Movants, that it is appropriate for the Court to consider the entire document as part of the determination of this motion. *See, e.g, Wright v. Assoc. Ins. Cos., Inc.,* 29 F.3d 1244, 1248 (7th Cir. 1994); *Chambers v. Time Warner, Inc.* 282 F.3d 147 (2d Cir. 2002). A copy of the ESOP is attached hereto as Exhibit A.

*Associates*, 508 U.S. 248, 262 (1993).   A functional fiduciary exercises discretionary control or authority over the plan's management, administration or its assets.  *Burke v. Boeing Co.*, 42 F.4[th] 716, 724 (7th Cir. 2022) (citations omitted). Stated plainly, discretion "entails the freedom to decide what should be done in a particular situation."   *Lebahn v. Nat'l Farmers Union Unif. Pension Plan*, 828 F. 3d 1180, 1184 (10th Cir. 2016).

Here, the ATI Board, acting through its individual members, including Dietz, had discretionary authority and control over whether the ESOP should purchase stock from ESOP participants and other shareholders.  Contrary to Defendants' argument, the ESOP Plan document does not prohibit the Board from retaining this fiduciary responsibility.  None of the ESOP provisions Defendants cite in support of their position prohibit the Board from retaining this critical function.  MTD 10-11; ESOP Sections 1.8, 5.1(b), 5.2, 11.1, 11.2 and 12.2(b).  Indeed, the Board in fact retained this function because in accordance with ATI standard practice, it is the body that acted on behalf of ATI in approving the stock purchases and sales that are at issue in this case.  To the extent the Committee is involved at all in the stock sale and purchase process, its role is purely ministerial.  The ESOP itself supports this practice.  Section 11.2 sets forth the Committee's non-exclusive powers.  None of these include the authority to approve stock transactions.  Accordingly, Diez was acting as a fiduciary during the Board vote in question.

Paragraph 132 of the Complaint alleges that Dietz breached his fiduciary duty by misrepresenting to the Board that he was not aware of anything that the Board should know in light of the Defendants' pre-resignation stock tenders.  *See Varity v. Howe*, 516 U.S. 489, 506 (1996) (quoting *Peoria Union Stock Yards Co. v. Penn Mut. Life Ins. Co.*, 698 F.2d 320, 326 (7th Cir. 1983)) (stating that "lying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in Section 404(a)(1) of ERISA").  Paragraphs 134 and 135 of the Complaint allege that

Dietz's breach caused harm to the ESOP by causing it and ESOP participants to overpay for the purchase of ESOP shares. There is no doubt that had Dietz been truthful and acknowledged his and the other Defendants' imminent departure, ATI and the ESOP would have never purchased stock in December 2022 because of the risk, which ultimately became fact, that Defendants' departures would result in a material decline of stock value.

Using Defendants own technical construct of what constitutes a cause of action here (MTD 14), ATI provides notice to Defendants in Paragraph 18 of the Complaint that it is bringing a claim pursuant to ERISA Section 502(a)(2), and ATI asserts that by lying to the Board while discharging his fiduciary duties, Dietz breached the duty of loyalty found in ERISA Section 404 of ERISA, which creates in ATI the right to recover losses pursuant to ERISA Section 409(a). Accordingly, this Court should deny Defendants' motion to dismiss on this ground.

### 2. ATI Has Standing to Bring Count III.

Defendants attempt to argue that Plaintiff lacks standing to sue as a fiduciary. In doing do, they rely on *Coleman Clinic, Ltd. v. Massachusetts Mut. Life Ins. Co.*, 698 F. Supp. 740, 742 (C.D. Ill. 1988). However, Coleman certainly does not stand for the proposition that an employer in its role as ERISA plan administrator can never have standing to bring suit on behalf of the plan. *Id.*, 698 F. Supp. at 743 (citing *Ed Miniat, Inc. v. Globe Life Ins. Grp., Inc.*, 805 F.2d 732, 736 (7th Cir. 1986)). Rather, the *Coleman* court determined that an amendment to the plan delegated administrative duties to the plan's pension committee so that the committee and not the employer was the fiduciary with respect to the plan's administration and management, thus relieving the employer from the liability and responsibility for administering the plan. 698 F. Supp. at 743.

There is no allegation of such sweeping delegation here (and movants do not allege that a delegation occurred). ATI did not delegate authority to initiate litigation on behalf of the ESOP. Further, the ESOP itself states that Plaintiff is the Administrator under Section 3(16)A of ERISA.

16

ESOP § 11.2.  As Administrator, ATI has the duty and responsibility to initiate litigation on behalf of the ESOP and, as such, standing to bring this Count.  If ATI chooses to appoint an administrative committee, the committee "serves at the pleasure of" and acts on behalf of ATI.  *Id*.  There is no legal distinction between ATI and the Administrative Committee.  Delegation to a part of oneself is not delegation at all.  *Coleman* is inapplicable here, and ATI has standing to sue on behalf of the ESOP.

### 3.    Count III Is Ripe.

Defendants' argument that the fiduciary claim against Dietz is somehow not ripe must also fail.  Paragraphs 134 and 135 of the Complaint allege specific losses resulting to ATI and the ESOP as a result of Dietz's breach. Movants do not contest that the claim relating to the overpayments to them (*see* Compl. ⁋ 134) is ripe.

Movants cannot claim that the ESOP losses are not ripe, because Paragraph 135 specifically alleges that Dietz's breach caused the ESOP and ESOP participants to suffer losses by overpaying $648,128 for ATI shares in December, 2022.  ERISA Section 502(a)(2) provides ATI as a fiduciary with the right to seek this Court's assistance with recovering these losses to the Plan. ATI acknowledges that it may have a duty to seek this Court's relief.

The fact that ATI may also have responsibility to compensate shareholders for the stock overpayments resulting from Dietz's breach does not relieve Dietz from his liability to do so in the first instance.[9]  Nor does the doctrine of ripeness preclude ATI from seeking a judicial determination that Dietz is liable to ATI for any losses that ATI may suffer in the event the ESOP and ESOP participants recover the amount they overpaid for their shares from ATI.  In *Hecht v.*

---

[9] ATI is in no way definitively acknowledging that it has any liability to any shareholder or any other person resulting from Dietz's breach or otherwise.

*Summerlin Life and Health Ins. Co.*, 536 F. Supp 2d 1236, 1241 (D. Nev. 2008), the court noted that several courts of appeal have indicated that a party may pursue a contribution and indemnification claim against a third party even though the claim is purely "inchoate"—*i.e.,* has not yet accrued under the governing substantive law--so long as the party seeking relief may become liable for all or part of a judgment.   According to the court, this principle avoids having to re-litigate in another court the issues heard and adjudged in the action between the party seeking relief and the third party, provides protection from inconsistent verdicts, and enables the parties to settle all related claims in a single suit. *Id*.

Here, for the same reasons noted in *Hecht*, all involved would benefit from a determination that if Dietz is liable for breach of fiduciary duty, he is also responsible for making ATI whole for any amount ATI pays to shareholders as a result of their overpaying for their stock. The acts resulting in fiduciary breaches have been performed, and the losses have occurred.   There is nothing "nebulous" or "contingent" here that affects the current validity of this claim. Accordingly, this Court should deny Dietz's motion to dismiss this Count.

**C.    Count IV (against Dietz, Barone, Strahm and Kieser) States a Claim Upon Which Relief Can Be Granted.**

Defendants argue that Count IV – for equitable relief pursuant to ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3), should be dismissed because Dietz violated no fiduciary duty, and the other Defendants cannot be liable for the claim alleged.   However, this argument is without merit, because as indicated above and below, Dietz did in fact breach his fiduciary duty.   As to him and the other Defendants named in Count IV,   *Fish v. GreatBanc Trust Co.,* 109 F. Supp. 3d 1037 (N.D. Ill. 2015), is instructive.   In that case, the plaintiffs alleged that breaching fiduciaries caused proceeds arising from their breach to be distributed to a third party.   The plaintiffs brought an action against the third party under ERISA 502(a)(3) asking the court to impose a constructive

trust on the proceeds sent to the third party. The court, quoting *Harris Trust & Savings Bank v. Solomon Smith Barney, Inc.*, 530 U.S. 238, 246 (2000), stated that 502(a)(3) "admits of no limit (aside from the 'appropriate equitable relief' caveat…) on the universe of possible defendants and may be used to sue a non-fiduciary for violations of ERISA." *Fish*, 109 F. Supp. 3d at 1041. The *Fish* court went on to hold that the third party had not demonstrated why requiring it to disgorge the proceeds arising from a breach of fiduciary duty and render the disgorged proceeds to the ESOP that was harmed by the transaction is not "appropriate equitable relief." Id. at 1042. The court therefore denied the third party's motion to dismiss.

Stated another way, as the Supreme Court stated in *Harris*, "[w]henever the legal title to property is obtained through means or under circumstances which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest, equity impresses a constructive trust on the property thus acquired in favor of the one who is truly and equitably entitled to the same…." 530 U.S. at 250-51.

Here, as alleged in the Complaint, Defendants received proceeds from the sale of stock that were improperly inflated as a result of Dietz's breach of fiduciary duty. As a result, equity demands that they not benefit from Dietz's breach and that any proceeds in excess of the price that would have been paid for the stock in the absence of Dietz's breach be returned to the parties harmed by the tainted transaction, which are ATI and the ESOP.

Defendants argue that in order to state a claim in this context for equitable relief, ATI must allege that they knew of Dietz's breach. This is not the case. Without conceding that Defendants were mere unknowing bystanders, *Fish* illustrates that knowledge is not needed. In that case, the third party claimed it should not be required to disgorge because it did not participate in the transaction. 109 F. Supp. 3d at 1043. The court rejected this argument, stating that the fact that

the third party was "a stranger to the deal" did not prevent the plaintiff from seeking equitable relief against it. *Id.* That a transferee was not "the original wrongdoer" does not insulate him from liability for restitution. *Id.* (citing *Harris*, 530 U.S. at 250). "The constructive trust is based on property, not wrongs." *Harris*, 530 U.S. at 250 (citation omitted).

Accordingly, Count IV states a cause of action for appropriate equitable relief under ERISA 502(a)(3), and this Court should deny Defendants' motion to dismiss.

## D.     ATI Sets Out A Claim For Breach of Contract

### 1.     The Non-Compete Provisions Are Reasonably Tied to ATI's legitimate interests

As set out in the Complaint, Count V, Dietz, Meyer and Jacobs breached the non-compete and non-solicit provisions of their employment agreements. Compl. ¶¶ 155-60.[10] These defendants do not contest their breach. Moreover, they concede that post-employment restrictions cannot be challenged on a motion to dismiss unless they are 'patently unreasonable.' MTD 19. Defendants have failed to shoulder the burden or demonstrating the restrictions at issue are "patently unreasonable."

For a restrictive covenant to be valid and enforceable in Illinois, all that is required is that its terms be "reasonable and necessary to protect a legitimate business interest of the employer." *Cambridge Engineering, Inc. v. Mercury Partners 90 BI, Inc.,* 378 Ill.App.3d 437, 447, 879 N.E.2d 512, 522 (1st Dist. 2007)  The reasonableness of a restrictive covenant can only be decided after consideration of all relevant factors. *Id.* Because of the importance of these factors, reasonableness is not something that can be determined in the abstract. Rather, it necessarily depends on the unique

---

[10] Dietz had a noncompete provision, limited to a 100 mile radius, as well as a non-compete provision (Compl. Ex. A at 2; Meyer and Jacobs had non-solicit provisions. Compl. Exs. B and C.

facts and circumstances of each case. *Id.*[11] As *Cambridge Engineering* held, reasonableness can only be assessed by weighing the unique facts and circumstances of each case. As such, it is a fact-intensive inquiry not suitable for disposition under Rule 12(b)(6).

Moreover, movants mischaracterize narrowly drafted non-compete provisions, which include 18 month sunset clauses, as overbroad, when they compare them to far more sweeping prohibitions found invalid in other cases. Thus, contrary to what Movants imply in citing *Medix Staffing Solutions, Inc. v. Dumrauf*, U.S. Dist. LEXIS 64813 (N.D. Ill. Apr. 17, 2018) (MTD 20) the contracts at issue do not prevent them from "being employed in any capacity" but solely from "engag[ing] in any business competitive with that of ATI" within a set geographical area and for a limited time period. Compl. ⁋ 21; *see also id.* ⁋⁋ 22-23.

"Whether a legitimate business interest exists is based on the totality of the facts and circumstances of the individual case." *AssuredPartners, Inc. v. Schmitt,* 2015 IL App (1ˢᵗ) 141863 ⁋32, 44 N.E.3d 463, 471, 398 Ill.Dec. 434, 442 (1ˢᵗ Dist. 2015). Factors considered to be relevant to this analysis "include, but are not limited to, the near-permanence of customer relationships, the employee's acquisition of confidential information through his employment, and time and place restrictions." *Id*. No single factor bears greater value in our assessment, and we must weigh each factor depending upon "the specific facts and circumstances of the individual case." *Id.*

Courts routinely find a legitimate business interest where "(1) the employee acquired confidential information through his employment with the plaintiff and later attempted to use it for his own gains or (2) by the nature of the plaintiff's business, its customer relationships are near permanent and the employee would not have had contact with the customer absent his

---

[11] It is also worth noting that, contrary to what Movants imply in citing *Medix Staffing Solutions, Inc. v. Dumrauf*, U.S. Dist. LEXIS 64813 (N.D. Ill. Apr. 17, 2018) (MTD 20) the contracts at issue do not prevent them from "being employed in any capacity" but solely from "engag[ing] in any business competitive with that of ATI" within a set geographical area and for a limited time period. Compl. ⁋ 21; *see also id.* ⁋⁋ 22-23.

employment." *Scheffel Financial Services, Inc. v. Heil,* 2014 IL App (5[th]) 130600 ¶11, 16 N.E.3d 385, 390, 384 Ill.Dec. 289, 294 (5th Dist. 2014). These allegations are present here. *See, e.g*., Compl. ¶¶ 70, 86-101.

In this matter the Court will likely be presented evidence concerning, among other things, the time and money spent on recruiting clients, the efforts taken to protect client's identities, as well as the number of competitors available to service the clients. Absent a weighing of these facts and circumstances, disposition of this claim on a motion to dismiss is premature.

## 2. Dismissal on the Pleadings of Agreements At Issue Would Be Premature

Movants contend that the non-compete and non-solicit agreements they entered into willingly are overbroad because they forbid soliciting customers with whom they did not directly interact. However, whether or not the customers stolen by movants were the ones that any of them actively dealt with is a fact issue, not appropriately resolved on a motion to dismiss. Due to the fact-specific nature of the analysis and the limited information often available, federal district courts have declined, in similar circumstances, to rule on whether a non-competition clause is reasonable at the Rule 12(b)(6) stage." *Experiential Systems, Inc. v. Reddish*, 2023 WL 6311694, * 10 (N.D.Ill. Sept. 28, 2023). *See, also, Reliable Fire Equip. Co. v. Arredondo*, 965 N.E.2d 393, 358 Ill. Dec. 322 (2011) (totality of "facts and circumstances" must be taken into account); *Hafferkamp v. Llorca*, 2012 WL 6965102, * 5 (Ill. App. Ct.Feb. 3,. 2012) (determination of reasonableness of noncompete agreement requires "a full opportunity to develop the necessary evidentiary record"); *AptarGroup, Inc. v. Chamulak*, 2019 WL 2425175, * 6-7 (N.D. Ill. June 10, 2019).

Indeed, federal courts construing Illinois law have denied motions to dismiss in almost identical circumstances. Thus, in *American Transport Group, LLC v. Power*, 2018 WL 19993204, *5 (N.D. Ill. Apr. 27, 2018), the court denied a motion to dismiss breach of contract claim relating

to noncompete that prohibited solicitation of any customer of former employer. This court held that "a non-solicitation provision's lack of limitations on the customers to which it applies does not render it per se unreasonable" as it depends on "specific facts and circumstances of this individual case".

Movants' case cites are not to the contrary. In *Atkore Int'l v. Fay*, 2018 WL 6248767, *3 (N.D. Ill. Nov. 29, 2018), the issue was a prohibition against contacts with *potential* customers, which the court held could include "any person or entity anywhere in the world." In stark contrast to the facts of *Atkore*, in this case the contracts at issue were limited to actual customers or customers only "if such customers are or were identified through leads or contacts developed" while defendant was at ATI. Compl. ⁋ 21, *see also* at Ex. A, § 4(c); Ex. B, §§ 13(b), 15; Ex. C, §§ 13(b), 15.

In *McRand v. Beelen*, 138 Ill. App.3d 1045, 486 N.E.2d 1306 (App.Ct. 3d Dist. 1985), which was an appeal from a denial of an injunction to enforce a restrictive covenant, the appellate court reversed the denial of the injunction and upheld a restrictive covenant barring doing business with former clients, finding a protectible interest in that relationship (even if that client stated it did not want to do business with its former service provider), determining that the enforceability of that restriction was a fact issue best resolved by the trial court. Notably, the *McRand* court, in construing similar facts as those alleged in the case at bar, ruled that it was "wholly unfair when employees secretly start and operate a company competing with their present employers . . . lie about their future plans when they resign knowing that they will be violating the restrictive covenants; [and]solicit and furnish services to customers of their employer. . . ." Finally, in *Cambridge Eng., Inc. v. Mercury Partners 90 BI, Inc*., 378 Ill.App.3d 437, 447, 879 N.E.2d 512,523 (App. Ct. 1st Dist. 2007), the court held that the reasonableness of a restrictive covenant

"depends on the unique facts and circumstances of each case." Indeed, in that case the court held that the prior employer would have a right to prevent solicitation by its former employee. *Id*. at 459, 526.

> **3.     While Plaintiff Has Set Out A Breach of Contract Claim, Any Allegedly Improper Restrictions On Those Contracts Can Be "Blue Penciled".**

As set out above, the non-compete provisions are enforceable. At the very least, the scope of enforceability depends on facts and circumstances that foreclose disposition on this motion.

Nonetheless, should the non-competes at issue be found unnecessarily restrictive, at a later, more appropriate juncture the Court can, in its discretion, modify or "blue pencil" it. That is especially the case where, as here, these agreements contain severability clauses. Compl. Exs. B and C, ⁋ 28.

Since Dietz's, Meyer's and Jacobs' non-solicitation agreements contain severability clauses, modification is appropriate, if necessary. *Arpac Corp. v. Murray,* 226 Ill.App.3d 65, 80, 589 N.E.2d 640, 652, 168 Ill.Dec. 240, 252 (1st Dist. 1992); *Northwest Podiatry Center, Ltd. v. Ochwat,* 2013 IL App (1st) 120458 ⁋ 56, 990 N.E.2d 347, 361, 371 Ill.Dec. 447, 461 (1st Dist. 2013).   In determining whether modification is appropriate, "the fairness of the restraints contained in the contract is a key consideration." *AssuredPartners, Inc. v. Schmitt*, 2015 IL App (1st) 141863 ⁋ 50, 44 N.E.3d 463 (Ill. App. Ct. 2015). As the manner in which a restrictive covenant can or needs to be modified entails a fact specific inquiry into its scope and effect, resolution of that issue on a motion to dismiss is inappropriate.

As noted above, the enforceability question is premature, as each case is unique and requires examination of a number of factors on a case by case basis.  The Court has not had the opportunity to do so. *SCB Derivatives v. Bronson*, 2023 WL 6388229, * 6 (N.D. Ill. Sept. 29, 2023) (denying motion to dismiss).

**E.      Counts VI And VII Should Not Be Dismissed**

**1.      The Complaint Meets the Requirements of Rule 9(b)**

Notwithstanding Defendants' claim that the heightened pleading standard for fraud has not been met, the fraud claim (Count VI) against Dietz is well-pleaded. The Complaint states who made the statement (Compl ⁋ 59-60, 107), to whom it was made (*id*.), that it was made with wilfully and with knowledge of its falsity (*id*. ⁋ 61, 108), that it was made with the intent to induce reliance (*id*. ⁋110), and that it caused damages.*Id*. ⁋⁋ 63, 114-15. The motion to dismiss should be denied on this ground alone.

**2.      Dietz's Statements Referred to Past and Present Conduct, and the Future Events Fell Within the Exceptions to Promissory Fraud**

Defendants' claim that Dietz's statement at the December 28, 2022 board meeting cannot sustain a claim for fraud because it refers to future conduct mischaracterizes the Complaint. The Complaint sets out a scheme that was underway at the time of the misrepresentation, a scheme that was concealed. *See, e.g.,* Compl. ⁋⁋ 1, 4, 40-42 (while employed Dietz and others met with other current ATI employees regarding scheme); 62; *see also* ⁋⁋ 34, 36 (noting that as soon as Apalis received NFA approval, defendants resigned, indicating that this was a scheme already in process). It was not speculative future conduct, it was present conduct being undertaken.

In the instance of a promise related to future conduct, the plaintiff must allege and then prove that at the time the promise was made, the defendant did not intend to fulfill it.  *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 569 (7th Cir. 2012).

Here Dietz lied to the board, while owing a fiduciary duty to ATI, in stating that there was nothing concerning the substantial block of shares he and his co-conspirators tendered.  This was not only part of a larger scheme to keep the departure concealed for the benefit of the future enterprise, but to obtain a payout on shares at an inflated price.  Dietz would have known not only

that the share price would decrease upon their departure, but that if the board learned information that indicated the current price did not reflect fair market value, there would not be any transactions approved, and the Defendants would not be paid out.  These statements were false at the time they were made.

Dietz was asked plainly if there was anything the board needed to be aware of concerning the large scale tenders of shares.  Dietz responded there was not.  That statement was not a statement of future intent or opinion.  It was a statement of current fact.  As such, Dietz's statement are actionable as fraudulent misrepresentations.[12]

### 3. Defendants' Had a Duty to Disclose Their Impending Departure, Or Refrain From Engaging in Shares Transactions

Nor is there any merit to the claim that, with respect to Count VII, the fraud by concealment claim is defective due to movants being at-will employees with no duties to disclose their scheme to abscond with corporate assets to their new employer. To the contrary: a duty to disclose arises due to several factors.

First, as Dietz was a board member he owed ATI a fiduciary duty to disclose all material facts. As a fiduciary, Dietz had an obligation to disclose these material facts. *Comprehensive Mktg., Inc. v. Huck Bouma P.C.*, 2023 WL 6143510 (App. Ct. 1st Dist. Sept. 20, 2023).

Second, a duty to disclose may arise when there is an imbalance in access to material information, that is, one party has superior knowledge and access to material facts, and fails to disclose them, and the other party does not have access to the same information. *Illinois Cent. Gulf*

---

[12] Further, "while misrepresentations as to something to be done in the future generally do not constitute fraud, a statement of matters in the future, if affirmed as a fact, may amount to a fraudulent misrepresentation if it amounts to an assertion of fact." *Phil Dressler & Associates, Inc. v. Old Oak Brook Inv. Corp.*, 192 Ill.App.3d 577, 585, 548 N.E.2d 1343, 1347, 139 Ill.Dec. 629, 633 (2nd Dist. 1989). *See also Lillien v. Peak6 Investments, L.P.* 417 F.3d 667, 671 (7th Cir. 2005) ("A statement about matters in the future may be actionable if it is presented as a fact about which the speaker has special knowledge.")

*R. Co. v. Dep't of Local Gov't Affairs*, 169 Ill.App.3d 683, 689-690, 523 N.E.2d 1048 (1st Dist. 1998).

Third, Defendants were long time employees of ATI and Board members.  They were high producers, one was a current member of the board of directors, and trust had been reposed in them. These allegations can create a duty to disclose. *See, e.g.*, *Wigod*, 673 F.3d 547; Compl. ¶ 88-93. A duty to disclose material facts can arise from a confidential relationship in which one party is placed "in a position of influence and superiority over [plaintiff]."  *Schrager v. North Community Bank*, 328 Ill.App.3d 696, 708-709, 767 N.E.2d 376 (2002).   This relationship could exist by reason of "friendship, agency or experience."  *Cahnman v. Timber Court*, LLC, 2021 IL App (1st) 200338 ¶ 75, 196 N.E.3d 151, 166-167, 458 Ill.Dec. 37, 52-53 (1st Dist. 2021)  ATI has pled facts that show they placed the Defendants in a position of trust and confidence based off their long employment relationship, their status as large producers within the company, and their history of operating independently.  As such a duty to disclose had properly been pled.

Finally, a duty to disclose material facts arises where, as here, one party to a transaction takes active steps to conceal material facts.  *Mitchell v. Skubiak,* 248 Ill.App.3d, 1000, 1005, 618 N.E.2d 1013, 1017, 188 Ill.Dec.443, 447 (1st Dist. 1993). Thus, for example, Dietz was directly asked if the simultaneous tender of large blocks of shares was something to worry about, and he simply lied about it. Moreover, Defendants made employees they were recruiting sign NDA's, while they were all still employed by ATI.   Compl. ¶83. These are all acts of affirmative concealment. *See Elliott Assoc., L.P. v. AbbVie, Inc*., 2017 WL 4547919 (N.D. Ill. Oct. 12, 2017) ("Under Illinois law governing fraudulent concealment claims, "[t]he concealment of a material fact during a business transaction is actionable if 'done with the intention to deceive under circumstances creating an opportunity and duty to speak.') (citation omitted)

**F.    Count VIII Sets Out A Breach of Fiduciary Duty by Dietz**

Count VIII sets out a breach of fiduciary duty by Dietz in connection with his concealment of the impending departure of himself and other key employees, conspiring with other employees and recruiting ATI customers, lying to the Board, and using his position on the Board to approve of transactions he knew were not in ATI's best interests. *See, e.g*., Compl. ⁋ 187. Notably, movants do not even attempt to argue that this misconduct was not a breach of fiduciary duty. Instead, they argue that the tender of shares was in the ordinary course of business, was lawful, and that the particularity requirements of Rule 9(b) apply. Neither argument holds much water.

Movants mischaracterize the breach of duty claim by asserting that the tender of shares was not out of the ordinary. This ignores the actual allegations of the Complaint, which states that the amount was so "unusual" that Dietz was asked about it at the board meeting (approximately a third of Tendering Defendants' shares were tendered). Compl. ⁋⁋ 59-62.[13] Movants also ignore the other elements of the breach of fiduciary duty claim which do not relate to the tendering of stock, notably, that Dietz recruited customers to leave ATI prior to his departure, lied to the Board, conspired with coworkers to steal business, and conspired to recruit ATI employees while Dietz was still employed. *See, e.g.,* Compl. ⁋ 187.

The Rule 9(b) argument also fails, as a matter of well-established Illinois law. Illinois courts have upheld a breach of fiduciary duty under similar circumstances, holding that "corporate officers are liable for breaching their fiduciary duties where, while still affiliated with the company, they solicit fellow employees to join a rival business or orchestrate a mass exodus of employees to follow shortly the officer's resignation from the company." *Veco Corp. v. Babcock*, 243 Ill.App.3d 153, 163, 611 N.E. 1054, 1061, 183 Ill.Dec 406, 413 (1ˢᵗ Dist. 1993) (noting also that

---

[13] *See also* Compl. ⁋⁋ 53-56.

the "law governing the right of former employees to compete is distinct from and irrelevant to a breach of fiduciary duty claim against officers"). *See also Chinese Consol. Benev. Ass'n. v. Chicago Chinatown Bridgeport Alliance*, 2023 WL 6388099 * 6 (N.D. Ill. Sept. 30, 2023) (alleging involvement by officer in creating competing entity states claim for fiduciary duty breach). As this district has recognized, acts taken while an employee to enable competition with the employer after the end of employment constitute a breach of fiduciary duty. *Preferred Meal Sys. Inc. v. Guse*, 199 Ill.App.3d 710, 725, 557 N.E.2d 506, 515, 145 Ill.Dec. 736, 745 (1st Dist. 1990) (corporate officer violates fiduciary duty while, when still employed, fails to notify employer that he and/or other employees were forming a rival company); *First Financial Bank, N.A., v Bauknecht*, 71 F. Supp.3d 819, 838 (C.D. Ill. 2014); *see also Griffin Asset Mgmt. LLC v. Clark*, 2023 WL 6276551, * 5 (N.D. Ill. Sept. 26, 2023). Whether or not Dietz actually engaged in this conduct is a matter of fact, and that cannot be determined on a motion to dismiss. *PrimeSource Building Products, Inc. v. Felten*, 2017 WL 11500971, *8-9 (N.D. Ill. July 6, 2017).

**G.    Counts IX and X Should Not Be Dismissed As The Conduct Alleged In The Complaint Is Not Lawful Under Illinois Law**

Counts IX and X (for inducement to breach fiduciary duty and breach of employee loyalty) set out valid claims. In defense, movants simply mischaracterize the conduct alleged as amounting to "preparation to compete."  This defense fails.

If it were simply that all conduct taken while still employed by one employer to compete with it was legal, that would negate a significant body of Illinois case law. That case law specifically defines as unlawful the various acts alleged in the Complaint:

- "commenc[ing] business as a rival concern while still employed," *Advantage Marketing Group, Inc. v. Keane*, 2019 IL App (1st) 181126 ⁋ 25, 143 N.E.3d. 139, 148, 436 Ill.Dec. 644, 652 (1st Dist. 2019);

- coordinating with other employees to leave and immediately join a competing business, *ABC Trans Nat. Transp., Inc. v. Aeronautics Forwarders, Inc.,* 90 Ill. App. 3d 817, 826, 413 N.E.2d 1299, 1307 (1st Dist. 1980); or

- extending offers of employment from your prospective employer to other employees. *Id.*; *see also Everen Secs., Inc. v. A.G. Edwards & Sons, Inc*., 308 Ill. App.3d 268, 276, 719 N.E.2d 451, 457 (3d Dist. Oct. 5, 1999)

Movants do not controvert any of the factual allegations underlying these claims. Since Plaintiff has alleged conduct that is unlawful and actionable under Illinois law, as set forth above, this defense fails. *See also Ladenberger v. Gen. Signal Pump Group/ Aurora Pump, a div. of Gen. Signal Corp*., 2001 WL 709488, *5,  (N.D.Ill. June 22, 2001) ( "Under Illinois law, an employee breaches a duty of loyalty to his employer when he takes advantage of knowledge and/or property acquired in the employer's business to make a profit for themselves at the employer's expense."); *Duberville v. WMG, Inc*. 2015 WL 186834, *10-11, (N.D. Ill Jan. 13, 2015)  (same); *Integrated Genomics, Inc. v. Kyrpides*, 2008 WL 630605, *11 (N.D. Ill. Mar. 4, 2008) (denying motion to dismiss breach of loyalty claim on the pleadings).

## H.  Count XI Should Not Be Dismissed Because The Enforceability Question Is Premature, And A Breach Has Been Pled

Count XI sets out a a scheme for tortious interference with contract. Defendants assert the claim fails because the underlying contracts (the employment contracts with non-compete/non-solicit provisions) are unenforceable, and because the Complaint fails to allege conduct in violation of the non-compete/non-solicit provisions. MTD 29-30. Movants are in error as to both prongs of its argument.

First, as set forth above, the provisions at issue are enforceable. Second, as noted above, the Complaint sets out in detail which specific acts breached the relevant provisions. Compl. ¶¶ 29-31, 39-43, 63-65. Movant ignores these allegations, and notes instead that there were clients that did not leave ATI to go with Defendants, seemingly arguing that the fact that Defendants did

not steal *every* client somehow indicates that did not violate their non-competes in connection with the ones they did steal. This argument is as ludicrous as it is bereft of legal support.

## I.    Count XII States A Claim For Civil Conspiracy

Movants' defense against the civil conspiracy claims (Count XII) is simple. They do not argue that there was no concerted action. Or that no injury was suffered. Instead, they merely contend that there were no underlying wrongs committed, relying on the other components of their motion. MTD at 30. But, as set out above, the fact that those claims are well pleaded dooms this argument as well

Moreover, with respect to conspiracy claims, Plaintiff's pleading burden is a light one. *Time Savers, Inc. v. Lasalle Bank*, N.A., 371 Ill.App.3d 759, 771, 863 N.E.2d 1156, 1167, 309 Ill.Dec. 259, 270 (2nd Dist. 2007) (because "[c]onspiracies are often intentionally 'shrouded in mystery,' which by nature makes it difficult for the plaintiff to allege with complete specificity all of the details of the conspiracy . . . , a plaintiff is not required to plead with specificity and precision the facts that are within the defendant's control and knowledge.")

Moreover, Illinois courts have held that the conduct set out above, regarding disloyal employees, can also be the basis of a conspiracy claim. *Veco Corp.*, 243 Ill. App. 3d at 164, 611 N.E.2d at 1061–62 (1st Dist. 1993) ("plaintiff can recover for conspiracy when officers intentionally act in concert to breach their fiduciary duties and cause injury to their employer; no actual malice or ill will is required"); *ABC Trans Nat. Transp., Inc. v. Aeronautics Forwarders, Inc.*, 90 Ill. App. 3d 817, 826, 413 N.E.2d 1299, 1307 (1st Dist. 1980).

Consequently, Movants' failure to justify dismissal of the underlying tort claims mandates denial of the motion to dismiss the conspiracy claim as well.

**J.      The Constructive Trust Is Sufficiently Pleaded**

Finally, Movants assert that Count XIII, for imposition of a constructive trust, is premised on two grounds: (i) that there is no independent cause of action therefor; and (ii) that the elements that would justify such a constructive trust are not adequately alleged. MTD 30-31.

As a matter of Illinois law, Movants are simply wrong. In Illinois courts, it is standard practice to plead a request for relief seeking the imposition of a constructive trust in a separate count. *Charles Hester Enterprises, Inc. v. Illinois Founder Ins. Co.,* 114 Ill.2d 278, 282 (1986); *Tummelson v. White,* 2015 IL App (4th) 150151 ⁋ 9-11 (4th Dist. 2015; *Blumenthal v. Brewer,* 2016 IL 118781 ⁋45 (Sup. Ct. 2016).

Defendants' rely on *3Com Corp. v. Electronics Recovery Specialists, Inc.* in arguing that a constructive trust is a remedy, and not an independent claim.  104 F.Supp.2d 932, 942 (N.D. Ill 2000) *3Com* cites one Illinois case in its reasoning, *Senese v. Climatemp, Inc.*  In *Senese* a separate count was brought seeking the imposition of a constructive trust, with the court specifically stating "in an action for a constructive trust, the complaint must allege a fiduciary relationship existed and must allege facts charging actual or constructive fraud." 222 Ill.App.3d 302, 315 (1st Dist. 1991) The appellate court upheld the dismissal, because the plaintiffs had failed to adequately plead a breach for fiduciary duty, but ruled the plaintiff in the underlying action should be given leave to refile the count seeking a constructive trust after discovery if they could then adequately plead a breach of fiduciary duty. *Id.*  Here, however, Plaintiff has pled a breach of fiduciary duty, fraud, and that Defendants have been unjustly enriched as a result of their malfeasance.

Plaintiff's count seeking the imposition of a constructive trust incorporates all other claims within its Complaint, and seeks an equitable remedy opposed to the remedies at law sought in the other counts. It satisfies the elements of the *Senese* case to sufficiently claim a constructive trust as an independent claim, in that it includes allegations of fraud and fiduciary relationships.

Should ATI succeed on its claims, a constructive trust would be warranted. *Veco Corp.,* 243 Ill.App.3d at 165; *Suttles v. Vogel,* 126 Ill.2d 186, 193, 533 N.E.2d 901, 904, 127 Ill.Dec. 819, 822 (1988) (constructive trust justified where either actual or constructive fraud is considered as equitable grounds for raising the trust and, second, where there is a fiduciary duty and a subsequent breach of that duty); *Jackson v. Callan Publishing, Inc.* 2021 IL App (1st) 191458 ¶203, 198 N.E.3d 1099, 1146, 459 Ill.Dec. 722, 769 (1st Dist. 2021) (constructive trust imposed when unjust enrichment has occurred due to duress, coercion, or mistake); *Indeck Energy Services, Inc. v. Depodesta,* 2021 IL 125733 ¶ 60, 183 N.E.3d 746, 762, 451 Ill.Dec. 289, 305 (2021) ("A constructive trust is an equitable remedy that may be imposed to redress unjust enrichment caused by a party's wrongful conduct."); *Tummelson,* 2015 IL App (4th) 150151 ¶27 ("A constructive trust rectifies unjust enrichment, not just wrongdoing. "When a person has obtained money to which he is not entitled, under such circumstances that in equity and good conscience he ought not retain it, a constructive trust can be imposed to avoid unjust enrichment.")

As stated throughout the Complaint, sufficient facts have been pled concerning Defendants' breaches of fiduciary and employee duties, their fraud and fraudulent concealment, and that they and remaining Defendants are being unjustly enriched as a result of their actions. Even if the Court were to dismiss Count XIII on the basis that it should not be a separate claim, the allegations within it should be allowed to be moved elsewhere within the Complaint, and ATI should have the right to continue seeking appropriate equitable relief as a remedy under other counts.

## K.    Any Potential Pleading Defects Are Curable

Should the Court find any claim asserted deficient, ATI should be granted leave to replead to cure any such deficiencies. *Arthur v. Maesk, Inc*., 434 F.3d 196, 202 (3rd Cir. 2006) (Federal Rule 15 encourages and embodies a liberal approach to pleading, to ensure that an inadvertent

error in a pleading does not prevent a party from the opportunity to seek relief on their merits of their claims).

### III.    CONCLUSION

WHEREFORE, the Plaintiff, Advance Trading, Inc., respectfully requests this Court to deny Defendants Motion to Dismiss, or in the alternative to grant Plaintiff leave to amend its Complaint, and for such other and further relief as this Court deems just and appropriate.


Dated: March 19, 2024

            Respectfully submitted,
            ADVANCE TRADING, INC.,
            an Illinois Corporation

            /s/  Michael G. Butts
            Michael G. Butts, its attorney

## <u>CERTIFICATE OF SERVICE BY ATTORNEY</u>

In accordance with Fed.R.Civ.P. 5(a) and LR5.3(c) the undersigned attorney certifies that the foregoing **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** was filed with the Clerk of this Court by submission of the same via this Court's Electronic Case File System ("ECF") on March 19, 2024 and that notice of said electronic filing will automatically be transmitted by email to:

Lorna K. Geiler: lgeiler@meyercapel.com

Brian K. Jackson: bjackson@lanermuchin.com

Chard R. DeGroot: cdegroot@lanermuchin.com


                                              Respectfully submitted,
                                              ADVANCE TRADING, INC.,
                                              an Illinois Corporation


                                              /s/ Michael G. Butts
                                              Michael G. Butts, its attorney

Michael G. Butts
ARDC: 6308683
Wood, DeVary, Armstrong & Houska, P.C.
207 W. Jefferson St., Ste. 400
Bloomington, IL 61701
Phone: 309-827-0044
Fax: 309-829-0328
mbutts@wdalawyers.com

# ADVANCE TRADING, INC.

## 401(k) PLAN AND ESOP

**As Amended and Restated Effective January 1, 2017**

Exhibit A

Table of Contents

Page

ARTICLE I        DEFINITIONS ................................................................. 1
ARTICLE II       ELIGIBILITY ................................................................ 13
    2.1    Conditions of Eligibility ......................................................... 13
    2.2    Special Rule for Former Participants ............................................. 13
    2.3    Application/Enrollment for Participation ........................................ 13
    2.4    Determination of Eligibility ..................................................... 13
    2.5    Employee Deferral Agreement ..................................................... 14
    2.6    Modifications of Employee Deferral Agreement .................................... 14
    2.7    Termination of Recognized Employment ............................................ 15
    2.8    Leased Employees ................................................................ 15
ARTICLE III      CONTRIBUTIONS AND ALLOCATIONS ................................... 16
    3.1    Employer Contributions .......................................................... 16
    3.2    Time of Payment of Employer Contributions ...................................... 18
    3.3    Make-Up Contributions for Omitted Participants/Adjustments for
           Inappropriately Included Participants ........................................... 18
    3.4    Allocation of Employer Contributions ............................................ 18
    3.5    Allocation of Forfeitures ....................................................... 19
    3.6    Rollover Contributions .......................................................... 20
    3.7    Voluntary Contributions ......................................................... 20
    3.8    Allocation to ESOP Accounts ..................................................... 21
    3.9    Minimum Allocations Required for Top-Heavy Plan Years ........................... 25
    3.10   Limitation on Allocations ....................................................... 26
    3.11   USERRA/HEART .................................................................... 27
    3.12   Section 1042 Transactions ....................................................... 29
    3.13   Prohibited Allocation of S Corporation Securities ............................... 30
ARTICLE IV       LIMITATIONS WITH RESPECT TO CONTRIBUTIONS ................. 32
    4.1    Special Rules Regarding Salary Reduction Contributions and Employer
           Matching Contributions .......................................................... 32
    4.2    Maximum Annual Additions ........................................................ 54
    4.3    Adjustment for Excessive Contributions .......................................... 60

i

Table of Contents
(continued)

Page

ARTICLE V        INVESTMENT AND ADJUSTMENT OF ACCOUNTS ............................ 61

    5.1    Operation of Subfunds ......................................................................... 61

    5.2    Valuation and Adjustment of Accounts ................................................ 63

ARTICLE VI        DISTRIBUTABLE EVENTS AND FORFEITURES................................. 63

    6.1    Distributable Events............................................................................. 63

    6.2    Determination of Benefits.................................................................... 64

    6.3    Vesting ................................................................................................ 64

    6.4    Cash-Out Distributions to Partially Vested Participants/ Restoration of Forfeited  Accrued Benefit.......................................................................... 65

ARTICLE VII        DISTRIBUTION OF BENEFITS .................................................. 68

    7.1    Application for Distribution.................................................................. 68

    7.2    Time of Distribution ............................................................................ 68

    7.3    Effect of Reemployment ...................................................................... 76

    7.4    Designation of Beneficiaries................................................................ 76

    7.5    Form of Distribution ............................................................................ 78

    7.6    Facility of Payment .............................................................................. 78

    7.7    Elective Withdrawals ........................................................................... 78

    7.8    Hardship Withdrawal ........................................................................... 80

    7.9    Loans................................................................................................... 82

    7.10    Location of Participant or Beneficiary Unknown................................. 84

    7.11    Limitations with Respect to Qualified Domestic Relation Orders ....................... 85

    7.12    Transfer of Interest............................................................................... 85

    7.13    Rights and Options on Distributed Qualifying Employer Securities.................. 87

    7.14    Distributions to Individuals Called to Active Duty ............................... 89

ARTICLE VIII        TOP-HEAVY PROVISIONS ........................................................ 90

    8.1    Top-Heavy Plan Requirements ............................................................. 90

    8.2    Key Employees .................................................................................... 90

    8.3    Determination of Top-Heavy Status ..................................................... 91

Table of Contents
(continued)

Page

ARTICLE IX       AMENDMENT, TERMINATION, AND MERGERS ................................. 95

   9.1       Amendment ......................................................................................... 95

   9.2       Termination ......................................................................................... 95

   9.3       Merger or Consolidation ..................................................................... 96

ARTICLE X       ADOPTION BY AFFILIATES .................................................. 96

   10.1      Adoption by Other Employers ............................................................. 96

   10.2      Requirements of Participating Employers ........................................... 96

   10.3      Designation of Agent .......................................................................... 96

   10.4      Employee Transfers ............................................................................ 97

   10.5      Participating Employers Contribution ................................................. 97

   10.6      Amendment ......................................................................................... 97

   10.7      Discontinuance of Participation .......................................................... 97

ARTICLE XI       PLAN ADMINISTRATOR ......................................................... 97

   11.1      Employer ............................................................................................. 97

   11.2      Plan Administrator/Administrative Committee ................................... 98

   11.3      Records and Reports ........................................................................... 99

   11.4      Appointment of Advisor .................................................................... 100

   11.5      Conflict of Interest ............................................................................ 100

   11.6      Claims Procedure .............................................................................. 100

   11.7      General Claims Review Procedure .................................................... 100

   11.8      Disability Claims Review Procedure ................................................ 101

ARTICLE XII       CONCERNING THE TRUSTEES ........................................... 102

   12.1      Terms and Conditions of the Trustee Obligations ............................ 102

   12.2      Provisions Relating to the ESOP Trustee ......................................... 102

ARTICLE XIII       MISCELLANEOUS ................................................................ 108

   13.1      Participant's Rights ........................................................................... 108

   13.2      Alienation .......................................................................................... 108

   13.3      Gender and Number .......................................................................... 109

   13.4      Legal Action ...................................................................................... 109

Table of Contents
(continued)

Page

13.5     Prohibition Against Diversion of Funds ........................................................... 110

13.6     Bonding ................................................................................................................ 110

13.7     Receipt and Release for Payments ..................................................................... 110

13.8     Named Fiduciaries .............................................................................................. 111

13.9     Service of Process ............................................................................................... 111

13.10   Headings .............................................................................................................. 111

13.11   Return of Contributions ..................................................................................... 111

13.12   Uniformity ........................................................................................................... 111

13.13   Limitation of Liability and Indemnification ................................................... 111

APPENDIX A
       Qualified Domestic Relations Orders

APPENDIX B
       Plan Loan Procedures

## ADVANCE TRADING, INC.
## 401(k) PLAN AND ESOP

### Recitals:

1.  Advance Trading, Inc. (the "Employer"), on January 1, 1984, previously authorized and adopted a profit sharing plan meeting the requirements of Section 401(a) of the Internal Revenue Code, for the benefit of its eligible employees ("Plan"), said Plan being set forth in a Plan and Trust Agreement entered into by and between the Employer and the trustee; and

2.  Said Plan has been amended and restated from time to time; and

3.  The purpose of the Plan is to enable participating Employees of the Employer and of any participating Affiliates to share in the growth and prosperity of the Employer and to provide Participants with an opportunity to accumulate capital for their future economic security. By this amendment and restatement, a primary purpose of the Plan is to continue enabling Participants to acquire a proprietary interest in the Employer. Contributions made to the Employee Stock Ownership portion of the Plan will be invested primarily in Qualifying Employer Securities; and

4.  This Plan is intended to qualify as an employee stock ownership plan, as defined in Section 4975(e)(7) of the Internal Revenue Code as a stock bonus plan under Section 401(a) of the Code, and as a profit sharing plan under Section 401(a) of the Code. All trust assets acquired under this Plan as a result of contributions, income and other additions to the trust will be administered, distributed, forfeited and otherwise governed by the provisions of this Plan which is administered by the Committee for the exclusive benefit of Participants in the Plan and their Beneficiaries; and

5.  The Employer desires to amend and restate the Plan and to make other changes effective January 1, 2017, or as otherwise provided herein.

NOW, THEREFORE, the Plan shall be amended and restated as follows:

### ARTICLE I
### DEFINITIONS

1.1  Act means the Employee Retirement Income Security Act of 1974, as amended from time to time.

1.2  Accounts mean the following Accounts maintained under the Plan for Participants:

    a.  Total Account - A Participant's entire interest in the Trust Fund, including his Employee Deferral Account (Before-Tax), Employee Deferral Account (Roth), Employer Matching Account, Employer Contribution Account, Rollover/Transfer Account and Employee Voluntary Account (After-Tax). A Participant's Total Account shall be divided between the ESOP and non-ESOP portions of the Plan.

1

b.  <u>Employee Deferral Account (Before-Tax)</u> - The account maintained for each Participant to which are credited the Employer contributions made in consideration of such Participant's earnings and deductions pursuant to Section 2.5 hereof, together with any increase or decrease with respect thereto. The Committee shall maintain records of each Participant's investment in the contract with respect to such accounts.

c.  <u>Employee Deferral Account (Roth)</u> – The account maintained for each Participant to which are credited the Employer contributions made in consideration of such Participant's earnings and deductions pursuant to Section 2.5 hereof, together with any increase or decrease with respect thereto. The Committee shall maintain records of each Participant's investment in the contract with respect to such accounts.

d.  <u>Employer Matching Account</u> - the Account maintained for each Participant to which is credited his allocable share of the Employer contributions made pursuant to Article III hereof, together with any increase or decrease thereon.

e.  <u>Employer Contribution Account</u> - the Account maintained for each Participant to which is credited his allocable share of the Employer discretionary contributions made pursuant to Article III hereof, together with any increase or decrease thereon.

f.  <u>Qualified Non-Elective Contributions Account</u> - the Account maintained for a Participant to which is credited Employer Non-Elective Contributions which are 100% nonforfeitable.

g.  <u>Rollover/Transfer Account</u> - the Account maintained for each Participant to which are credited his rollover contributions made pursuant to Section 3.6 hereof, together with any increase or decrease thereon, and the Account maintained for each Participant to which are credited any funds transferred from another qualified plan by the trustee of such other plan and not credited to any other Account, together with any increase or decrease thereon.

h.  <u>Employee Contribution Account (After-Tax)</u> - the Account maintained for each Participant to which are credited his non-deductible voluntary contributions made pursuant to Section 3.7 hereof, together with any increase or decrease thereon.

i.  <u>Company Stock Account</u> - that portion of a Participant's Total Account invested in Qualifying Employer Securities and which is part of the ESOP portion of the Plan.

j.  <u>Other Investments Account</u> - that portion of a Participant's Total Account not invested in Qualifying Employer Securities, which is a part of the ESOP portion of the Plan and which is credited and debited in accordance with Section 3.8.c of the Plan.

2

k.  <u>Unallocated Other Investments Account</u> - that portion of a Participant's Total Account which is a part of the ESOP portion of the Plan and which is credited (or debited) with a dollar value of such Account's allocable share of (i) the net income or loss attributable to such Account, (ii) cash dividends or other rights or warrants received on Company Stock in Qualifying Employer Securities in the Suspense Account, and (iii) amounts attributable to such Account that are used to pay principal or interest on a Securities Acquisition Loan.

1.3  <u>Addition</u> means with respect to each Limitation Year, the total of any contributions (Employer or Employee) and Forfeitures allocated to a Participant's Accounts (exclusive of any Forfeiture amounts reinstated pursuant to this Plan because of reemployment).

1.4  <u>Affiliate</u> means a corporation, partnership, or proprietorship which is a "predecessor" to the Employer or is under "common control" with the employer or which is a member of an "affiliated service group" that includes the Employer, as those terms are defined in Sections 414(b), (c), and (m) of the Code. In addition, the Employer may designate as an Affiliate any corporation, partnership, or proprietorship which is not such a "predecessor," "common control," or "affiliated service group" employer but which is otherwise affiliated with the Employer.

1.5  <u>Anniversary Date</u> or <u>Plan Anniversary</u> means the last day of the Plan Year.

1.6  <u>Beneficiary</u> or <u>Beneficiaries</u> means the person, persons, trust, or other recipient to whom the share of a deceased Participant's Accounts are payable, as provided in the Plan Statement.

1.7  <u>Code</u> means the Internal Revenue Code of 1986, as amended from time to time, together with any regulations issued thereunder.

1.8  <u>Committee</u> or <u>Administrative Committee</u> means the committee established pursuant to Section 11.2 to carry out the administrative functions of the Plan on behalf of the Employer. If the Board of Directors of the Employer does not appoint a Committee, then references in this Plan Statement to "Committee" shall be read to mean "Board of Directors of the Employer."

1.9  <u>Compensation</u> means regular pay, commissions, overtime pay, and incentive bonuses paid by the Employer to the Participant for the applicable Plan Year during which the Participant is actively engaged in Recognized Employment, including all pay subject to federal income tax withholding and pay which the Participant would have received had he not entered into an Employee Deferral Agreement under this Plan, a similar agreement under a plan defined in Section 125, 132(f)(4), 402(e)(3), 402(b)(2), 403(b), 408(p) or 457 of the Code. Compensation excludes the following amounts:

a.  Moving expenses and any other expense reimbursements;

b.  Imputed income from employee loans, long-term disability, life insurance or the use of company automobiles;

3

c.      Foreign service premiums or allowances;

d.      Severance pay;

e.      Any sums allocated or allocable to the Participant under any retirement plan or plan of deferred compensation to which the Employer contributes, except that salary deferrals under this Plan shall not be excluded;

f.      Amounts realized from the exercise of a nonqualified stock option, or when restricted stock (or property) held by the Employee either becomes freely transferable or is no longer subject to a substantial risk of forfeiture; and

g.      Amounts realized for the sale, exchange, other disposition of stock acquired under a qualified stock option.

An Employee compensated solely by commission shall be deemed to have received a salary equal to his draw for the year.

Compensation in excess of $265,000 (or such other amount provided in the Code) shall be disregarded. Such amount shall be adjusted for increases in the cost of living in accordance with Code Section 401(a)(17)(B), except that the dollar increase in effect on January 1 of any calendar year shall be effective for the Plan Year beginning with or within such calendar year. For any "determination period" of less than twelve (12) months, the Compensation limit shall be an amount equal to the Compensation limit for the calendar year in which the "determination period" begins, multiplied by the ratio obtained by dividing the number of full months in the short "determination period" by twelve (12). A "determination period" is not less than twelve (12) months solely because a Participant's Compensation does not include Compensation paid during a determination period while the Participant was not a Participant in the Plan (or a component of the Plan).

If any Employees are excluded from the Plan (or from any component of the Plan), then Compensation for any such Employees who become eligible or cease to be eligible to participate in the Plan (or in the component of the Plan) during a Plan Year shall only include Compensation while such Employees are Eligible Employees of the Plan (or of such component of the Plan).

If, in connection with the adoption of any amendment, the definition of Compensation has been modified, then, except as otherwise provided herein, for Plan Years prior to the Plan Year which includes the adoption date of such amendment, Compensation means compensation determined pursuant to the terms of the Plan then in effect.

For Plan Years beginning on or after July 1, 2007, Compensation for a Plan Year shall also include Compensation paid by the later of 2-1/2 months after an Employee's Severance from Employment with the Employer maintaining the Plan or the end of the Plan Year that includes the date of the Employee's Severance from Employment with the Employer maintaining the Plan, if: (i) the payment is regular Compensation for services during the Employee's regular working hours, or Compensation for services outside the

Employee's regular working hours (such as overtime or shift differential), commissions, bonuses, or other similar payments, and, absent a Severance from Employment, the payments would have been paid to the Employee while the Employee continued in employment with the Employer; (ii) the payment is for unused accrued bona fide sick, vacation, paid time off, or other leave that the Employee would have been able to use if employment had continued; or (iii) the payment is received by the Employee pursuant to a nonqualified unfunded deferred compensation plan and would have been paid at the same time if employment had continued, but only to the extent includible in gross income.

Any payments not described above shall not be considered Compensation if paid after Severance from Employment, even if they are paid by the later of 2-1/2 months after the date of Severance from Employment or the end of the Plan Year that includes the date of Severance from Employment, except payments to an individual who does not currently perform services for the Employer by reason of qualified military service (within the meaning of Code Section 414(u)(1)) to the extent these payments do not exceed the amounts the individual would have received if the individual had continued to perform services for the Employer rather than entering qualified military service.

1.10    Custodian means the entity designated as custodian herein or as appointed by the Employer pursuant to a resolution adopted by the Employer's Board of Directors.

1.11    Disability means a medically determinable physical or mental impairment which is of such a nature that it (i) renders the individual incapable of performing any substantial gainful employment, (ii) can be expected to be of long-continued and indefinite duration or result in death, and (iii) is evidenced by a determination to this effect by a doctor of medicine approved by the Committee. The Committee shall determine the date on which the Disability shall have occurred if such determination is necessary. In lieu of such a determination, the Employer may accept, as proof of Disability, the official written determination that the individual will be eligible for disability benefits under the federal Social Security Act as now enacted or hereinafter amended (when any waiting period expires).

1.12    Effective Date means January 1, 1984. (This Restated Plan, or specific provisions herein that have different effective dates, shall not affect the rights of, or benefits payable to, or with respect to, Participants who died, retired or otherwise terminated employment with the Employer and all Affiliates prior to the applicable effective date except as required by law.)

1.13    Elective Contribution means the contribution made on behalf of a Participant pursuant to an Employee Deferral Agreement described in Section 2.5.

1.14    Eligible Employee means any Employee of the Employer who has attained 21 years of age, who has Recognized Employment, and who meets the eligibility requirements of Section 2.1. An Employee in Recognized Employment who has not attained age 21 and/or who has not met the requirements of Section 2.1 and who is not a Highly Compensated Employee shall nevertheless be an Eligible Employee solely for purposes

of entering into an Employee Deferral Agreement under Section 2.5. Such Eligible Employees are referred to in this Plan where applicable as "NHCE Participants." Notwithstanding the foregoing, NHCE Participants shall not include any person who is considered a part-time, temporary or seasonal employee by the Employer.

1.15    Employee means any person who is employed by the Employer and any individual deemed under Section 414(n) of the Code and Section 2.8 of the Plan Statement to be an employee of the Employer, but excludes any person who is employed as an independent contractor.

1.16    Employee Deferral Agreement is the agreement entered into by a Participant which authorizes the Employer to withhold compensation from such Participant either on a pre-tax basis (Employee Deferrals (Before-Tax)) or an after-tax basis pursuant to the Participant's irrevocable election (Employee Deferrals (Roth)) and contribute such amounts to the Trust Fund.

1.17    Employer means Advance Trading, Inc. and any Affiliate which shall adopt this Plan.

1.18    Enrollment Date means the first day of the month following the date an Eligible Employee satisfies the eligibility requirements of Article II hereof, and has completed a period of at least one Year of Service in Recognized Employment, provided the Eligible Employee is still employed on such date. Enrollment Date for NHCE Participants shall be the date of the Employee's employment in Recognized Employment.

1.19    ESOP Trust means the Plan funding vehicle associated with the ESOP portion of the Plan.

1.20    ESOP Trustee means the person or persons serving as the trustee of the ESOP portion of the Plan, which includes each Participant's or Beneficiary's Company Stock Account and Other Investments Account. The responsibilities of the ESOP Trustee are set forth in Article XII of the Plan.

1.21    Forfeiture means that portion of a Participant's Accounts that is not vested, and occurs on the earlier of:

a.      The distribution of the entire vested portion of a Participant's Accounts; or

b.      The last day of the Plan Year in which the Participant incurs five (5) consecutive One-Year Breaks in Service.

For purposes of this Section, if the value of a Participant's Account balance is zero, the Participant shall be deemed to have received a distribution of such vested Account as of the date of the Participant's termination of employment.

1.22    Highly Compensated Employee means an Employee described in Section 414(q) of the Code and the Regulations thereunder, and generally means an Employee who performed services for the Employer during the calendar year and is in one or more of the following groups:

a.   Employees who at any time during the calendar year or preceding calendar year were "five percent owners."

b.   Employees who received "415 Compensation" (as defined in Section 4.2(j)) during the preceding calendar year from the Employer in excess of $120,000 - as adjusted - and were in the Top Paid Group of Employees for such preceding calendar year.

A "five percent owner" shall mean any person who owns (or is considered as owning within the meaning of Section 318 of the Code) more than five percent (5%) of the outstanding stock of the Employer or stock possessing more than five percent (5%) of the total combined voting power of all stock of the Employer or, in the case of an unincorporated business, any person who owns more than five percent (5%) of the capital or profits interest in the Employer.  In determining percentage ownership hereunder, employers that would otherwise be aggregated under Sections 414(b), (c), (m) and (o) of the Code shall be treated as separate employers.

"Top paid group" means the top twenty percent (20%) of Employees who performed services for the Employer during the applicable year, ranked according to the amount of "415 Compensation" received from the Employer during such year.   All affiliated employers shall be taken into account as a single employer, and leased employees within the meaning of Sections 414(n)(2) and 414(o)(2) of the Code shall be considered Employees unless such leased employees are covered by a plan described in Section 414(n)(5) of the Code and are not covered in any qualified plan maintained by the Employer.  Employees who are non-resident aliens and who received no earned income (within the meaning of Section 911(d)(2) of the Code) from the Employer constituting United States source income within the meaning of Section 861(a)(3) of the Code shall not be treated as Employees.  Additionally, for the purpose of determining the number of active Employees in any year, the following additional Employees shall still be considered for the purpose of identifying the particular Employees in the top paid group:

(i)    Employees with less than six (6) months of service;

(ii)   Employees who normally work less than 17 1/2 hours per week;

(iii)  Employees who normally work less than six (6) months during a year; and

(iv)   Employees who have not yet attained age 21 (age 19 for Plan Years beginning on or after January 1, 1998).

In addition, if ninety percent (90%) or more of the Employees of the Employer are covered under agreements the Secretary of Labor finds to be collective bargaining agreements between an Employee representative and the Employer, and the Plan covers only Employees who are not covered under such agreements, then Employees covered by such agreements shall be excluded from both the total number of active Employees as well as from the identification of particular Employees in the top paid group.

In determining who is a Highly Compensated Employee, Employees who are nonresident aliens and who received no earned income (within the meaning of Section 911(d)(2) of the Code) from the Employer constituting United States source income within the meaning of Section 861(a)(3) of the Code shall not be treated as Employees. Additionally, all affiliated employers shall be taken into account as a single employer and leased employees within the meaning of Sections 414(n)(2) and 414(o)(2) of the Code shall be considered Employees unless such leased employees are covered by a plan described in Section 414(n)(5) of the Code and are not covered in any qualified plan maintained by the Employer. The exclusion of leased employees for this purpose shall be applied on a uniform and consistent basis for all of the Employer's retirement plans.

1.23    Hour of Service means:

    a.    Each hour for which an Employee is directly or indirectly compensated or entitled to compensation by the Employer for the performance of duties during the applicable computation period.

        *Hours of Service*:  For purposes of determining Hours of Service, an Employee compensated on an hourly basis shall be credited for each Hour of Service as described above. Unless the Company maintains records of actual Hours of Service, a salaried Employee shall be credited with Hours of Service for each applicable payroll period in which he is credited with at least one Hour of Service, in accordance with the following schedule:

| Application Payroll Period | Hours of Service |
|---|---|
| Weekly | 45 |
| Bi-Weekly | 90 |
| Semi-monthly | 95 |
| Monthly | 190 |

    b.    Each hour for which an Employee is directly or indirectly compensated or entitled to compensation by the Employer for reasons other than performance of duties (such as vacation, holidays, sickness, disability, layoff, military duty, or leave of absence) during the applicable computation period.

    c.    Each hour for back pay awarded or agreed to by the Employer without regard to mitigation of damages. Notwithstanding (b) above:

        1.    No more than 501 Hours of Service are required to be credited to an Employee on account of any single continuous period during which the Employee performs no duties (whether or not such period occurs in a single computation period);

8

2.    An hour for which an Employee is directly or indirectly paid, or entitled to payment, on account of a period during which no duties are performed is not required to be credited to the Employee if such payment is made or due under a plan maintained solely for the purpose of complying with applicable worker's compensation, or unemployment compensation, or disability insurance laws; and

3.    Hours of Service are not required to be credited for payment which solely reimburses an Employee for medical or medically related expenses incurred by the Employee.

For purposes of this Section, a payment shall be deemed to be made by or due from the Employer regardless of whether such payment is made by or due from the Employer directly, or indirectly through, among others, a trust fund, or insurer, to which the Employer contributes or pays premiums and regardless of whether contributions made or due to the trust fund, insurer, or other entity are for the benefit of particular Employees or are on behalf of a group of Employees in the aggregate.

An Hour of Service must be counted for the purpose of determining the Year of Service, a One-Year Break in Service and the employment commencement date (or reemployment commencement date).

d.    For periods prior to the Effective Date, Hours of Service may be determined using whatever records are reasonably accessible and by making whatever calculations are necessary to determine the approximate number of Hours of Service completed during such prior period. To the extent not inconsistent with other provisions hereof, Department of Labor Regulations 29 C.F.R. Section 2530.200B-2(b) and (c) are hereby incorporated by reference herein. Hours of Service shall be credited for all employment with Affiliates while they were Affiliates and prior to the time that they become Affiliates, but not after they ceased to be Affiliates.

1.24    <u>Investment Manager</u> means any person or person (other than the Trustee or the ESOP Trustee), who is appointed by the Employer to manage all or a portion of the Trust Fund.

1.25    <u>Limitation Year</u> means the Plan Year.

1.26    <u>Non-Elective Contribution</u> means the Employer's contributions to the Plan other than those that are considered to be Elective Contributions pursuant to Section 1.13.

1.27    <u>Normal Retirement Age</u> means the date a Participant attains age sixty-five (65) years.

1.28    <u>One-Year Break in Service</u> means a computation period (as defined in Section 1.41 hereof) during which an Employee is not credited with more than 500 Hours of Service with the Employer, and which shall occur on the last day of such computation period. For the purpose of determining whether a Participant has incurred a One-Year Break in Service, Hours of Service shall be recognized for the following leaves of absence.

a.  <u>Regular Leave of Absence</u>.  If (and to the extent that) the Employer so provides in rules of nondiscriminatory application, an assumed eight (8) hour day and forty (40) hour week shall be credited during each unpaid leave of absence authorized by the Employer or any Affiliates for Plan purposes, but only to the extent that crediting of such hours is necessary to prevent the Employee from incurring a One-Year Break in Service during a computation period described in Section 1.41; provided, however, that if the Employee does not return to employment for any reason other than of death, Disability or attainment of Normal Retirement Age at the expiration of the leave of absence, such Hours of Service shall not be credited.

b.  <u>Military Leaves</u>.  An assumed eight (8) hour day and forty (40) hour week shall be credited during service in the Armed Forces of the United States if the Employee both entered such service and returned to employment with the Employer or any Affiliates from such service under circumstances entitling him to reemployment rights granted veterans under federal law; provided, however, that if the Employee does not return to employment for any reason other than death, Disability or attainment of Normal Retirement Age within the time prescribed by law for the retention of veteran's reemployment rights, such Hours of Service shall not be credited.

c.  <u>Parenting Leave of Absence</u>.  To the extent not otherwise credited, and solely for the purpose of determining whether a One-Year Break in Service has occurred, Hours of Service shall be credited to an Employee for any period of absence from work beginning after December 31, 1984, due to the Employee's pregnancy, birth of the Employee's child, placement of a child with the Employee in connection with the adoption of such child, or for the purpose of caring for such child for a period immediately following such birth or placement.  For this purpose, Hours of Service shall be credited for the computation period in which the absence from work begins, only if credit therefore is necessary to prevent the Employee from incurring a One-Year Break in Service, or, in any other case, eight (8) Hours of Service per day.  The total Hours of Service required to be credited for a "parenting leave of absence" shall not exceed 501.

d.  <u>FMLA Leave</u>.  To the extent not otherwise credited, and solely for the purpose of determining whether a One-Year Break in Service has occurred, Hours of Service shall be credited to an Employee for any period of absence from work due to leave permitted under the Family and Medical Leave Act.  For this purpose, Hours of Service shall be credited for the computation period in which the absence from work begins, only if credit therefor is necessary to prevent the Employee from incurring a One-Year Break in Service, or, in any other case eight (8) Hours of Service per day. The total Hours of Service required to be credited for a FMLA leave of absence shall not exceed 501.

1.29  <u>Participant</u> shall mean any Eligible Employee who elects to participate in the Plan, as provided in Article II, and has not for any reason become ineligible to participate further in the Plan. Participation shall end upon a Participant's death or, if earlier, the date when

he is no longer employed in Recognized Employment, and upon which the Participant no longer has any Account under the Plan (that is, he has received a distribution or deemed distribution of all Accounts).

1.30   Plan means the tax-qualified profit sharing plan of the Employer established for the benefit of Eligible Employees, as first set forth in the original Plan Statement and the tax qualified stock bonus plan adopted as a part of the Plan, effective January 1, 2003. (As used herein, "Plan" refers to the legal entity established by the Employer and not to the document pursuant to which the Plan is maintained. That document is referred to herein as the "Plan Statement" or "Agreement.") The Plan shall be referred to as the "Advance Trading, Inc. 401(k) Plan and ESOP."

1.31   Plan Statement or Agreement means this written instrument entitled "Advance Trading, Inc. 401(k) Plan and ESOP" as originally adopted by the Employer, effective as of January 1, 1984, as the same may be amended from time to time thereafter.

1.32   Plan Year means the Plan's accounting year of twelve (12) months commencing on January 1 of each year and ending the following final day of December.

1.33   Qualifying Employer Securities means the shares of any class of stock, preferred or common, voting or nonvoting, which are issued by the Employer, and are as defined in ERISA Section 407(d).

1.34   Recognized Employment means all employment with the Employer, excluding, however:

a.   Employment in a unit of employees whose terms and conditions of employment are subject to a collective bargaining agreement between the Employer and a union representing that unit of employees, unless such collective bargaining agreement provides for the inclusion of those employees in the Plan;

b.   Employment by a nonresident alien who is not receiving any earned income from the Employer which constitutes income from sources within the United States;

c.   Employment in a division or facility of the Employer which is not in existence on the Effective Date (that is, was, acquired, established, founded or produced by the liquidation or similar discontinuation of a separate subsidiary after the Effective Date) unless and until the Committee shall declare such employment to be Recognized Employment; and

d.   Employment by a United States citizen outside the United States unless such citizen is formally designated by the Committee as eligible for participation in the Plan.

1.35   Securities Acquisition Loan means a loan which is used to purchase Qualifying Employer Securities or to repay a prior Securities Acquisition Loan. A Securities Acquisition Loan shall be for a definite period and bear a reasonable rate of interest. Such loan shall be without recourse against the Plan. The only assets that may be given as collateral for the Securities Acquisition Loan are securities purchased with the proceeds of such loan or

securities purchased with the proceeds of a prior Securities Acquisition Loan. Contributions by the Company to pay the principal and interest on a Securities Acquisition Loan shall be made without regard to deductibility of such contributions.

1.36    Trustee means the person or entity named as Trustee of the Trust in a separate trust agreement. The responsibilities of the Trustee are set forth in Article XII of the Plan Statement.

1.37    Trust means the Plan funding vehicle associated with the non-ESOP portion of the Plan.

1.38    Trust Fund or Fund means the assets of the Trust and the ESOP Trust as the same shall exist from time to-time.

1.39    Valuation Date means the last day of the Plan Year. Valuation date also means such other dates as determined to be necessary or appropriate by the Trustee, ESOP Trustee or Committee from time to time in its sole discretion. The Trustee's, ESOP Trustee's or Committee's determination to make an interim valuation shall be binding and conclusive on all persons interested under the Plan.

1.40    Vested means the portion of a Participant's Accounts that is nonforfeitable.

1.41    Year of Service shall mean a computation period of twelve (12) consecutive months, herein set forth, during which an Employee has at least 1,000 Hours of Service. Completion of a Year of Service shall be determined at the end of the applicable computation period.

Years of Service with any corporation, trade or business which is a member of a controlled group of corporations or under common control as defined by Section 1563(a) and Section 414(c) of the Code, or is a member of an affiliated service group as defined by Section 414(m) of the Code shall be recognized for purposes of eligibility and vesting.

The following rules shall apply to determination of Years of Service:

a.      Computation Periods. The computation periods for determining eligibility, vesting service and One-Year Breaks in Service as applied to vesting service shall be the twelve (12) consecutive month periods beginning with the date the employee first performs an Hour of Service and all annual anniversaries of such date (irrespective of any termination of employment and subsequent reemployment).

b.      Completion. A Year of Service for vesting shall be deemed completed as of the date in the computation period that the Employee completes one thousand (1,000) Hours of Service. (Fractional years of vesting service shall not be credited).

c.      Pre-Effective Date Service. Years of Service for vesting shall be credited for Hours of Service earned and computation periods completed prior to the Effective Date as if this or a prior Plan Statement were then in effect.

d.　<u>Vesting for Pre-Break Service</u>.　For purposes of determining a Participant's vesting percentage in any post-break-in-service Account balance, all Years of Service shall be aggregated.　For purposes of determining a Participant's vested percentage in any pre-break-in-service Account balance, all Years of Service shall be aggregated if the Participant's account is subject to restoration under Section 6.4.　Otherwise Years of Service prior to the breaks in service shall not be counted.

## ARTICLE II
## ELIGIBILITY

2.1　<u>Conditions of Eligibility</u>.　Each Eligible Employee shall become a Participant in the Plan on the Enrollment Date following the completion of one Year of Service in Recognized Employment. NHCE Participants shall become Participants upon the date of the Employee's employment in Recognized Employment solely in order to enter into Employee Deferral Agreements under Section 2.5.

2.2　<u>Special Rule for Former Participants</u>.　A Participant whose employment with the Employer terminates and who subsequently is reemployed by the Employer shall re-enter as a Participant as of the date of his reemployment.

2.3　<u>Application/Enrollment for Participation</u>.　Each Eligible Employee shall complete an Employee Deferral Agreement and such other forms as the Committee may require prior to commencement of Elective Contributions to the Plan. If an Employee does not complete and deliver said forms to the Committee when first eligible to do so, he may complete and deliver said forms in advance of any subsequent Enrollment Date.　The Committee may waive the requirement that an Employee Deferral Agreement be in writing to the extent permitted by law.

Upon satisfying such requirements for participation, the Employee shall automatically be bound by the terms and conditions of this Agreement and all amendments thereto. Such Employee's participation shall automatically continue until his employment by the Employer ceases and his entire vested benefits have been distributed. Participants who are no longer employed by the Employer, but who are still considered Participants because their Accounts have not been distributed, shall not be eligible to make or receive any form of contribution hereunder.

2.4　<u>Determination of Eligibility</u>.　The Committee shall determine the eligibility of each Employee for participation in the Plan based upon information furnished by the Employer. Such determination shall be conclusive and binding upon all persons, as long as the same is made in accordance with this Plan Statement and the Act.　Such determination shall be subject to review per Section 11.7 provided that the provisions thereto shall be uniformly applied to all Employees and Participants in like circumstances, without discrimination.

The Committee shall have the authority to adopt rules that modify and waive the enrollment procedures set forth in this Article II during any period in which it might be

necessary, because of Plan amendments or changes, for the orderly enrollment of Participants. This authority to modify and waive enrollment procedures does not authorize the Committee to modify the job classification requirements for participation in the Plan.

2.5     <u>Employee Deferral Agreement</u>. Subject to the following rules, the Employee Deferral Agreement, which each Participant may execute, shall provide for a reduction equal to a percentage of the amount of Compensation which otherwise would be paid to him by the Employer each pay day. The reduction in earnings agreed to by the Participant, however, shall not exceed the limit under Section 402(g) of the Code for that Participant's taxable year, nor shall the Plan accept Elective Contributions which exceed such limit, except to the extent permitted by this Section 2.5 and Section 414(v) of the Code. From and after January 1, 2010, a Participant may irrevocably designate all or a portion of his Employee Deferrals under his Employee Deferral Agreement as Employee Deferrals (Roth). Effective January 1, 2002, all Eligible Employees who have attained age 50 before the close of the calendar year shall be eligible to make catch-up contributions in accordance with, and subject to the limitations of, Section 414(v) of the Code. Such catch-up contributions shall not be taken into account for purposes of the Plan implementing the required limitations of Sections 402(g) and 415 of the Code. The Plan shall not be treated as failing to satisfy the provisions of the Plan implementing the requirements of Sections 401(k)(3), 401(k)(11), 401(k)(12), 410(b) or 416 of the Code, as applicable, by reason of the making of such catch-up contributions. The limit shall be adjusted for cost of living at the same time and in the same manner as under Section 415(d) of the Code. The reductions in earnings agreed to by the Participant shall be made by the Employer from the Participant's remuneration each pay day for so long as the Employee Deferral Agreement remains in effect. Notwithstanding the foregoing sentence, no reductions in earnings shall be made by the Employer from the Participant's remuneration for the final pay check. The Committee may establish an administrative rule that limits the minimum and maximum Employee Deferrals (Before-Tax), Employee Deferrals (Roth), and Employee Voluntary Contributions (After-Tax) to a specified percentage of a Participant's Compensation.

2.6     <u>Modifications of Employee Deferral Agreement</u>. The Employee Deferral Agreement of a Participant may be modified as follows:

      a.     <u>Increase</u>. A Participant whose Employee Deferral Agreement does not provide for the full, allowable reduction may, upon prior written notice to the Committee, amend his Employee Deferral Agreement to increase the amount of reduction as of the next payroll period, subject to any administrative requirements of the Company.

      b.     <u>Decrease</u>. A Participant whose Employee Deferral Agreement provides for more than the minimum allowable reduction may, at any time, amend his Employee Deferral Agreement to decrease the amount of reduction as of the subsequent payroll period.

c.    <u>Voluntary Termination</u>.  A Participant who has an Employee Deferral Agreement in effect may, upon giving prior written notice to the Committee, completely terminate the Employee Deferral Agreement, which shall take effect as of the next pay period.  Thereafter, such Participant may, upon giving prior written notice to the Committee, enter into a new Employee Deferral Agreement at any time as of the next pay period if he is employed in Recognized Employment.  A Participant may terminate his election to make voluntary (After-Tax) contributions under Section 3.7 without termination of the Employee Deferral Agreement.

2.7    <u>Termination of Recognized Employment</u>.  The Employee Deferral Agreement of a Participant who ceases to be employed in Recognized Employment shall be terminated automatically as of the date he ceased to be employed in Recognized Employment.  If such Participant returns to Recognized Employment, he may enter into a new Employee Deferral Agreement effective as of the date of his reemployment.

2.8    <u>Leased Employees</u>

a.    For purposes of this Section, a "leased employee" shall mean any person (other than an Employee of the Employer) who provides services to the Employer (or for the Employer and related persons determined in accordance with Section 414(n)(6) of the Code) if:

1.    Such services are provided pursuant to an agreement between the Employer and any other person (herein called "leasing organization");

2.    The person has performed such services for the Employer on a substantially full-time basis, for a period of at least one (1) year; and

3.    Such services are performed under primary direction and control of the recipient.

b.    For purposes of participation in this Plan, a "leased employee" shall be considered an Employee of the Employer after he or she has met the requirements of (a)(2) above, except that Years of Service for the Employer shall be determined by taking into account the entire period during which the "leased employee" performed services for the Employer.

Any benefits which are to be provided for a "leased employee" as a Participant under this Plan shall be reduced by the value of any contributions or benefits provided by the "leasing organization" for such "leased employee" and which are attributable to services performed for the Employer.

c.    The rules of this Section shall not apply, and any "leased employee" shall not be considered an Employee of the Employer, if such person is covered under a money purchase plan provided by the "leasing organization" under which a non-integrated employer contributions are made at a rate of at least ten percent (10%) of compensation, as defined in Section 415(c)(3) of the Code, but including amounts contributed by the Employer pursuant to a salary reduction agreement

15

which are excludable from the Employee's gross income under Section 125, Section 402(a)(8), Section 402(h) or Section 403(b) of the Code, and which provides immediate participation and full and immediate vesting for the "leased employee." This paragraph shall not apply, and "leased employees" shall be considered Employees of the Employer, if "leased employees" constitute more than 20% of the Employer's non-highly compensated work force.

## ARTICLE III
## CONTRIBUTIONS AND ALLOCATIONS

3.1     Employer Contributions. For each Plan Year during which the Plan is maintained, the Employer shall contribute to the Plan the following amounts:

a.      The amount of the total salary reductions for that Plan Year, as were collected from each Participant pursuant to Employee Deferral Agreements, which amount shall be deemed the Employer's Elective Contribution.

b.      On behalf of each Participant who is eligible to share in the contribution below, such contribution, which amount shall be deemed an Employer Elective Contribution.

For Plan Years beginning on and after January 1, 2000, a nonelective contribution equal to 3% of the Participant's Compensation for the Plan Year.

Contributions made to the Plan pursuant to this Section 3.1.b are intended to comply with Sections 4.1.d and 4.1.e pursuant to the safe harbor methods permitted by Code Sections 401(k)(12) and 401(m)(11). However, if matching contributions are made to this Plan or any other plan maintained by the Employer, and (i) such matching contributions are made with respect to compensation or after-tax voluntary Employee contributions that in the aggregate exceed 6% of the Employee's Compensation, (ii) the rate of matching contributions increases as the rate of Deferred Compensation or after-tax voluntary Employee contributions increases, (iii) at any rate of Elective Contributions or after-tax voluntary Employee contributions, the rate of matching contributions that would apply with respect to any Highly Compensated Employee is greater than the rate of matching contributions that would apply with respect to a Non-Highly Compensated Participant and who has the same rate of Elective contributions or after-tax voluntary Employee contributions, (iv) any discretionary matching contribution made to this Plan and any other plan maintained by the Employer, in the aggregate, exceed 4% of the Participant's Compensation, then such matching contributions in the aggregate must satisfy the "Actual Contribution Percentage" tests of Section 4.1.e. In this regard, the Employer may elect to disregard, with respect to all Eligible Employees, all matching contributions with respect to a Participant's Elective Contribution up to 6% of each Participant's Compensation, or matching contributions up to 4% of each Participant's Compensation. In applying the "Actual Contribution Percentage" tests, match contributions or nonelective contributions made pursuant to this Section 3.1.b that satisfy the safe

16

harbor methods permitted by Code Section 401(k)(12) may not be treated as matching contributions under Code Section 401(m)(3).

The rules that apply for purposes of aggregating and disaggregating cash or deferred arrangements and plans under Code Sections 401(k) and 401(m) also apply for purposes of Code Sections 401(k)(12) and 401(m)(11).

If, pursuant to Section 410(b)(4)(B), the Employer applies Section 410(b) of the Code separately to the portion of the Plan (within the meaning of Section 414(1) of the Code) that benefits only NHCE Participants, the Plan is treated as two separate plans for purposes of Section 401(k) of the Code. Accordingly, if the Employer elects to make a Matching Contribution, a Nonelective Contribution, an Elective Employer Contribution, or a Qualified Non-Elective Contribution, then such contribution shall not be made on behalf of NHCE Participants.

c.    On behalf of each Participant who is eligible to share in matching contributions for the Plan Year, a discretionary matching contribution equal to a uniform percentage of each such Participant's Deferred Compensation, the exact percentage, if any, to be determined each year by the Employer, which amount, if any, shall be deemed an Employer Elective Contribution.

Notwithstanding the above, if the Employer elects to contribute to the Plan the Employer Elective Contribution pursuant to Section 3.1.b, then the discretionary matching contribution shall not exceed four percent (4%) of Compensation of a Participant who is eligible to share in the discretionary matching contribution for the Plan Year.

d.    A discretionary amount determined each year by the Employer, which amount shall be deemed the Employer's Non-Elective Contribution. The Employer may base the discretionary contribution on any criteria it deems appropriate, and may choose not to make a discretionary contribution for any Plan Year.

e.    Contributions shall be divided between the ESOP portion of the Plan and the profit sharing portion of the Plan as determined by the Employer.

f.    Notwithstanding the above, however, the Employer's total contribution for any fiscal year of the Employer shall not exceed the maximum amount allowable as a deduction to the Employer under the provisions of Code Section 404. All contributions by the Employer shall be made in cash or such property of equal value as is acceptable to the Trustee or ESOP Trustee, including Qualifying Employer Securities. Except, however, to the extent necessary to provide the top-heavy minimum allocations, the Employer shall make a contribution even if it exceeds the amount which is deductible under Code Section 404.

Neither current nor accumulated profits shall be required as a condition for contributions hereunder, although the Employer may use profits as a criteria for making discretionary contributions for any Plan Year. Notwithstanding the preceding sentence, this Plan shall operate in all other regards as a profit sharing

plan and as a stock bonus plan with respect to qualification requirements as imposed by the Code and the Internal Revenue Service.

3.2　Time of Payment of Employer Contributions

    a.    The Employer shall pay to the Plan its Elective Contributions collected for such pay period on the earliest date contributions may reasonably be segregated from the Employer's general assets, but in no event later than fifteen (15) business days following the month which the Elective Contributions were withheld from the Employee's Compensation.

    b.    The Employer shall pay to the Plan its matching and Non-Elective Contributions for a Plan Year at such times as determined by the Employer within the time prescribed by law, including extensions of time, for the filing of the Employer's federal income tax return for the Employer's fiscal year in which the Plan Year ends.

3.3　Make-Up Contributions for Omitted Participants/Adjustments for Inappropriately Included Participants. If, after the Employer's annual contribution for a Plan Year has been made and allocated, it should appear that, through oversight or a mistake of fact or law, a Participant (or an Employee who should have been considered a Participant) who should have been entitled to share in such contribution, received no allocation or received an allocation which was less than he should have received, the Employer may, at its election and in lieu of reallocating such contribution, make a special make-up contribution for the Account of such Participant in an amount adequate to provide for him the same addition to his Account for such Plan Year as he should have received.

3.4　Allocation of Employer Contributions

    a.    Accounts shall be maintained in the name of each Participant to which all amounts contributed hereunder shall be allocated.

    b.    The Employer shall provide the Committee with all the information required to make a proper allocation of contributions made for each Plan Year. Within a reasonable period of time after each Valuation Date, all such contributions made since the previous Valuation Date and for such Plan Year shall be allocated as follows:

        1.    The portion of the Elective Contributions made with respect to each Participant shall be allocated to the Employee Deferral Account (Before-Tax) or Employee Deferral Account (Roth) of such Participant as of the Valuation Date coincident with or immediately following the last day of the pay period for which the contribution is made. Allocations to the employee Deferral Account (Roth) shall be made with respect to Elective Contributions made after October 31, 2010 from Compensation earned after that date.

18

The allocation of Elective Contributions shall be made regardless of the number of Hours of Service credited to a Participant for the Plan Year.

2. Subject to Section 3.1.b, the Employer's matching contributions shall be allocated to the Employer Matching Account of each Participant for whom elective contributions have been made, in an amount equal to the matching percentage declared for the Plan Year as applied to the amount the Participant deferred pursuant to an Employee Deferral Agreement.

The allocation of the Employer's matching contribution shall be made to a Participant regardless of the number of Hours of Service credited to the Participant for the Plan Year.

3. The Employer's discretionary Non-Elective Contributions shall be allocated to those Participants who are credited with 1,000 Hours of Service during the Plan Year and have Recognized Employment on the last day of the Plan Year. The amount to be allocated to each such Participant's Employer Contribution Account is the proportion that each such Participant's Compensation for the Plan Year bears to the aggregate Compensation of all such Participants for such Plan Year.

4. If the Employer, at the time of contribution, designates a contribution to be a Qualified Non-Elective Contribution for the Plan Year, such contribution shall be allocated to the Qualified Non-Elective Contribution Account of each Participant who is not a Highly Compensated Employee and who either has completed 500 Hours of Service during the Plan Year or is in Recognized Employment on the last day of the Plan Year.

3.5 **Allocation of Forfeitures**. As of each Anniversary Date, any amounts which became Forfeitures since the last Anniversary Date, pursuant to Section 6.4 and regardless of the Account(s) from which such forfeitures were derived, shall first be used to reinstate the Account balances of any Participants who have been rehired and who met the requirements for reinstatement of previously forfeited amounts, and, at the election of the employer, to pay Plan expenses. Remaining Forfeitures shall be allocated among the Participant's Accounts as follows:

Amounts forfeited from Employer Contribution Accounts shall be allocated to each Participant's (other than a NHCE Participant) Employer Contribution Account in the proportion that each Participant's Compensation for the Plan Year bears to the aggregate Compensation of all Participants for the Plan Year; provided, however, only Participants (a) who are employed on the Anniversary Date or (b) who are on a Leave of Absence or disabled, shall be entitled to share in such forfeitures and Compensation shall not include bonuses and commissions.

In the event that the allocation of Forfeitures provided in the preceding paragraphs shall cause the "annual addition" (as defined in Section 4.2) to any Participant's Accounts to

exceed the maximum allowable amount, the excess for that Participant shall be reallocated.

No forfeitures shall be allocated to Participants' Employee Deferral (Roth) Accounts.

3.6     Rollover Contributions

    a.     Contingent Provision.  The provisions of this Section 3.6 shall be subject to such conditions and limitations as the Committee may prescribe from time-to-time for administrative convenience and to preserve the tax-qualified status of the Plan.

    b.     Eligible Participant Contributions.   At any time, Participants may contribute rollover amounts to the Plan in accordance with those provisions of federal law relating to rollover contributions, property (or the cash proceeds thereof) received by them in eligible rollover distributions from certain types of qualified plans or trusts, employee annuities, and individual retirement accounts or annuities established as rollover accounts, the assets of which are comprised only of lump-sum distributions received from qualified plans or trusts.   After December 31, 2001, the Plan may accept Participant rollover contributions or direct rollovers from (i) a qualified plan described in Section 401(a) or 403(b) of the Code, excluding after-tax employee contributions, (ii) an annuity contract described in Section 403(b) of the Code, excluding after-tax employee contributions, (iii) an eligible plan under Section 457(b) of the Code which is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or a political subdivision of a state, and (iv) the portion of a distribution from an individual retirement account or annuity described in Section 408(a) or 408(b) of the Code that is eligible to be rolled over and would otherwise be includible in gross income. The Plan may also accept direct transfers from eligible plans in accordance with procedures established by the Committee.

    c.     Specific Review.  The Committee shall have the right to reject or return any such rollover or transfer contribution if, in its opinion, the acceptance thereof might jeopardize the tax-qualified status of the Plan or unduly complicate its administration, but the acceptance of any such rollover contribution shall not be required as an opinion or guarantee on the part of the Employer, the Committee, the Trustee, the ESOP Trustee or the Plan as to the tax consequences which may result to the contributing Participant thereby.

    d.     Allocation.  All rollover and transfer contributions made by a Participant to the Plan shall be allocated to a Rollover/Transfer Account established for such Participant.  The amount so allocated to a Participant shall be credited to that Participant's Rollover/Transfer Account as of the Valuation Date in the Plan Year on the date as of which such contribution is received by the Plan.

3.7     Voluntary Contributions.

    a.     Contingent Provision.  The provisions of this Section 3.7 shall be subject to such conditions and limitations as the Committee may prescribe from time to time for

administrative convenience and to preserve the tax-qualified status of the Plan. The Committee may establish an administrative rule that limits the maximum Employee Deferrals (Before-Tax), Employee Deferrals (Roth), and Employee Voluntary Contributions (After-Tax) to a specified percentage of a Participant's Compensation.

b.  Eligible Contributions.  Each Participant may make a voluntary (After-Tax) contribution to the Plan during any Plan Year. The maximum voluntary contribution made by a Participant for any Plan Year shall be limited to the lesser of:

    1.  The amount to ensure compliance with the overall annual additions limitation of Section 4.2; or

    2.  The amount to ensure compliance with the 401(m) discrimination test of Section 4.1.e.

Voluntary (After-Tax) Contributions are not Employee Deferrals (Roth).

c.  Method of Contribution.  A Participant electing to make contributions may do so by entering into a payroll withholding agreement with the Employer and/or by making a single direct payment during the Plan Year and shall be subject to such limitations as the Committee may prescribe under uniform rules with respect to the time, frequency, amount and manner of making such contributions.

d.  Payment to Trustee. The voluntary contributions of Participants shall be collected by the Employer, in accordance with (c) above. The Employer shall remit such voluntary contributions to the Plan within thirty (30) days of collecting such contributions from Participants.

e.  Allocation.  All voluntary contributions made by a Participant to the Plan shall be allocated to the Voluntary Account (After-Tax) of such Participant.  The amount so allocated to a Participant shall be credited to such Participant's Voluntary Account (After-Tax) as of the Valuation Date in the Plan Year during which such contribution is made or, if earlier, the Valuation Date coincident with or next following the date as of which such contribution is received by the Plan.

f.  Termination of Voluntary Contributions.  A Participant who has elected to make voluntary (After-Tax) contributions may, at any time, completely terminate the voluntary (After-Tax) contributions.  Thereafter, such Participant may, at any time, again elect to make voluntary (After-Tax) contributions effective as of any subsequent pay period if, on that date, he is employed in Recognized Employment.

3.8  Allocation to ESOP Accounts.

a.  Individual Accounts.  The Committee shall establish and maintain individual Accounts for each Participant in the ESOP portion of the Plan.  Individual

Accounts shall also be maintained for all former Participants who still have an interest in the Plan. Except as provided in Section 5.1.d, such individual Accounts shall not require a segregation of the Trust Fund and no Participant, former Participant or Beneficiary shall acquire any right to or interest in any specific asset of the Trust Fund as a result of the allocation provided for in the Plan.

b.     <u>Company Stock Account</u>.

    1.     The Company Stock Account of each Participant will be credited as of each Anniversary Date with the Participant's allocated share of Qualifying Employer Securities (including fractional shares) purchased and paid for by the Plan or contributed in-kind by the Company, with amounts released and allocated from the Suspense Account, with Forfeitures of Qualifying Employer Securities and with stock dividends on Qualifying Employer Securities held in the Participant's Company Stock Account.

         Qualifying Employer Securities acquired by the Plan with the proceeds of a Securities Acquisition Loan shall be credited to a Suspense Account. For each Plan Year during the duration of the Loan, the number of shares of Qualifying Employer Securities to be released from said Suspense Account and allocated to the Company Stock Accounts of Participants shall be determined pursuant to either the "General Rule" or the "Special Rule" described below as selected by the Committee for each Securities Acquisition Loan. Once the Committee has selected either the General Rule or the Special Rule, that Rule shall be used exclusively for the allocation of shares of Employer Securities purchased with the proceeds of a particular Securities Acquisition Loan.

         (i)     General Rule: For each Plan Year during the duration of the loan, the Committee shall withdraw from the Suspense Account a number of shares of Employer Securities equal to the total number of such shares held in the Suspense Account immediately prior to the withdrawal multiplied by a fraction:

            A.     The number of which is the amount of principal and interest paid for the Plan Year; and

            B.     The denominator of which is the sum of the numerator plus the principal and interest to be paid for all future years.

         (ii)     Special Rule:

            A.     For each Plan Year, the Committee shall withdraw from the Suspense Account a number of shares of Employer Securities equal to the total number of such shares held in the Suspense Account immediately prior to the withdrawal multiplied by a fraction:

         i.      The numerator of which is the amount of principal paid for the Plan Year; and

         ii.     The denominator of which is the sum of the numerator plus the principal to be paid for all future Plan Years.

B.     The Committee may select the Special Rule only if:

         i.      The Securities Acquisition Loan provides for annual payments of principal and interest at a cumulative rate which is not less rapid at any time than level annual payments of such amounts for ten (10) years;

         ii.     The interest included in any payment is disregarded only to the extent that it would be determined to be interest under standard loan amortization tables; and

         iii.    By reason of a renewal, extension or refinancing, the sum of the expired duration of the original loan, any renewal period, any extension period and the duration of any new loan does not exceed ten (10) years.

(iii)    In determining the number of shares to be released for any Plan Year under either the General Rule or the Special Rule:

A.     The number of future years under the Loan must be definitely ascertainable and must be determined without taking into account any possible extensions or renewal periods;

B.     If the Loan provides for a variable interest rate, the interest to be paid for all future Plan Years must be computed by using the interest rate applicable as of the end of the Plan Year for which the determination is being made; and

C.     If the Employer Securities allocated to the Suspense Account includes more than one class of shares, the number of shares of each class to be withdrawn for a Plan Year from the Suspense Account must be determined by applying the applicable fraction provided for above to each such class.

2.     Allocations of Qualifying Employer Securities shall be reflected separately for each class of such stock, and the Committee shall maintain adequate records of the aggregate cost basis of Qualifying Employer Securities allocated to each Participant's Company Stock Account.

c.  <u>Other Investments Account</u>.  The Other Investments Account of each Participant will be credited (or debited) as of each Anniversary Date with the Participant's share of the net income (or loss) of the ESOP Trust, with cash dividends or other rights or warrants on Qualifying Employer Securities not distributed to Participants or used to pay a Securities Acquisition Loan, with Contributions and Forfeitures in other than Qualifying Employer Securities, and with the Participant's share of the unrealized appreciation (or depreciation) in the value of ESOP Trust assets other than Company Stock.  It will be debited for any payments for purchases of Qualifying Employer Securities or for repayment of debt (including principal and interest) incurred for the purchase of Qualifying Employer Securities.

d.  <u>Unallocated Other Investments Account</u>.  Amounts held in the Unallocated Other Investments Account shall be used to pay the principal and interest on a Securities Acquisition Loan.

e.  <u>Cash Dividends on Qualifying Employer Securities</u>.  Cash dividends, if any, on shares of Company Stock allocated to Participants' Accounts may be accumulated in the ESOP Trust or may be paid to Participants currently as determined in the sole discretion of the Committee, exercised in a uniform and nondiscriminatory manner.  In the event the Plan is primarily invested in Qualifying Employer Securities and the Company is a C corporation, it is intended that the Employer shall be allowed a deduction with respect to any dividends paid on allocated shares of Company Stock of any class held by the Plan on the record date to the extent such dividends are paid in cash directly to the Participants, or their Beneficiaries, or are paid to the Plan and are distributed from the Plan to the Participants or their Beneficiaries not later than ninety (90) days after the close of the Plan Year in which paid; provided, however, that the Employer shall not be required to pay or distribute any dividends with respect to the non-Vested portion of the Company Stock Account of a Participant who has terminated employment prior to the date such dividends are paid directly to Participants, or are distributed from the Plan to the Participants.  In the event that the Plan is primarily invested in Qualifying Employer Securities and the Company is a C corporation, it is also intended that, to the extent permitted by the Code, the Employer shall be allowed a deduction for any dividends used to make payments on a Securities Acquisition Loan, the proceeds of which were used to acquire the Qualifying Employer Securities (whether or not allocated) with respect to which the dividend is paid, provided that in the case of dividends paid on allocated shares, Employer Securities of a fair market value equal to such dividends are allocated to such Participants for the year in which such dividends would otherwise have been allocated to such Participants.  It is also intended that the Employer shall be allowed a deduction for any dividends reinvested in additional shares of Qualifying Employer Securities as directed by a Participant or Beneficiary.  While the Employer is an S corporation, dividends on allocated shares shall not be used to make payments on a Securities Acquisition Loan.

3.9   <u>Minimum Allocations Required for Top-Heavy Plan Years</u>.   Notwithstanding the foregoing, for any Top-heavy Plan Year, the sum of the Employer's Contributions and Forfeitures allocated to the Participant's Account of each Non-Key Employee shall be equal to at least three percent (3%) of such Non-Key Employee's "compensation." For years beginning after January 1, 2002, Employer Matching Contributions shall be taken into account for purposes of satisfying the minimum contribution requirements. Employer Matching Contributions that are used to satisfy the minimum contribution requirements shall be treated as matching contributions for purposes of the actual contribution percentage test and other requirements of Section 401(m) of the Code. However,

a.   if:

1.   the sum of the Employer's contributions and Forfeitures allocated to the Participant's Account of each Key Employee for such Top-Heavy Plan Year is less than three percent (3%) of each Key Employee's "compensation," and

2.   this Plan is not required to be included in an Aggregation Group to enable a defined benefit plan to meet the requirements of Code Section 401(a)(4) or 410, the sum of the Employer's Contributions and Forfeitures allocated to the Participant's Account of each Non-Key Employee shall be equal to the largest percentage allocated to the Participant's Account of each Key Employee.

Except, however, no such minimum allocation shall be required for any Non-Key Employee who participates in another defined contribution plan subject to Code Section 412 included with this Plan in a Required Aggregation Group.

b.   For purposes of the minimum allocations set forth above, the percentage allocated to the Participant's Account of any Key Employee shall be equal to the ratio of the sum of the Employer's contributions and Forfeitures allocated on behalf of such Key Employee divided by the "compensation" for such Key Employee. In determining the minimum contribution pursuant to (a) above, Elective Contributions for Key Employees shall be considered.

c.   For any Plan Year when:

1.   the Plan is a Top-Heavy Plan but not a Super Top-Heavy Plan, and

2.   the Key Employee is a Participant in both this Plan and a defined benefit plan included in a Required Aggregation Group which is Top-Heavy, the minimum allocations described above shall not be provided under this Plan; instead, minimum benefits, as specified in Section 416 of the Code, shall be provided under the defined benefit plan.

d.   For any Top-Heavy Plan Year, the minimum allocations set forth above shall be allocated to the Participant's Employer Contribution Account of all Non-Key

Employees who are Participants and who have Recognized Employment with the Employer on the last day of the Plan Year, including Non-Key Employees who have failed to complete a Year of Service.

e.  For purposes of this Section, "compensation," with respect to any Participant, means such Participant's wages, salaries, fees for professional services and other amounts received (without regard to whether or not an amount is paid in cash) for personal services actually rendered in the course of employment with the Employer maintaining the Plan to the extent that the amounts are includable in gross income (including, but not limited to, commissions paid salesmen, compensation for services on the basis of a percentage of profits, commissions on insurance premiums, tips, bonuses, fringe benefits, and reimbursements or other expense allowances under a nonaccountable plan (as described in Regulation 1.62-2(c)) for a Plan Year.

"Compensation" shall exclude (a)(1) contributions made by the Employer to a plan of deferred compensation to the extent that, the contributions are not includable in the gross income of the Participant for the taxable year in which contributed, (2) Employer contributions made on behalf of an Employee to a simplified employee pension plan described in Section 408(k) of the Code to the extent such contributions are excludable from the Employee's gross income, (3) any distributions from a plan of deferred compensation; (b) amounts realized from the exercise of a non-qualified stock option, or when restricted stock (or property) held by an Employee either becomes freely transferable or is no longer subject to a substantial risk of forfeiture; (c) amounts realized from the sale, exchange or other disposition of stock acquired under a qualified stock option; and (d) other amounts which receive special tax benefits, or contributions made by the Employer (whether or not under a salary reduction agreement) towards the purchase of any annuity contract described in Section 403(b) of the Code (whether or not the contributions are actually excludable from the gross income of the Employee).

Effective January 1, 1998, "compensation" shall include (i) any elective deferral (as defined in Section 402(g)(3) of the Code, and (ii) any amount which is contributed or deferred by the Employer at the election of a Participant and which is not includable in the gross income of the Participant by reason of Sections 125, 132(f)(4) or 457 of the Code.

If, in connection with the adoption of this amendment and restatement, the definition of "compensation" has been modified, then, for Plan Years prior to the Plan Year which includes the adoption date of this amendment and restatement, "compensation" means compensation determined pursuant to the Plan then in effect.

3.10  Limitation on Allocations.  In no event shall amounts be allocated to the Account of any Participant if, or to the extent, such amounts would exceed the limitations set forth in Section 4.2 of this Plan Statement.

3.11   <u>USERRA/HEART</u>.

a.   From and after December 12, 1994, notwithstanding any provision of the Plan to the contrary, contributions, benefits and service credit with respect to qualified military service shall be provided in accordance with Section 414(u) of the Code.

b.   On and after January 1, 2007, the Plan shall provide that the beneficiary survivors of a Participant who dies while performing Qualified Military Service (as defined in Code Section 414(u)), are entitled to any additional benefits provided under the Plan as if the Participant resumed service with the Employer and then terminated employment on account of death.  The additional benefits shall not include benefit accruals relating to the period of Qualified Military Service.

c.   After December 31, 2008, the Plan will permit Differential Wage Payments paid to an individual in active Qualified Military Service to be treated as wages for retirement plan purposes.

   1.   *Differential Wage Payment.*  For purposes of this subsection, the term "Differential Wage Payment" means any payment which:

      (i)    is made by an Employer to an individual with respect to any period during which the individual is performing service in the uniformed services (as defined in Chapter 43 of Title 38, United States Code) while on active duty for a period of more than 30 days; and

      (ii)   represents all or a portion of the wages the individual would have received from the Employer if the individual were performing services for the Employer.

   2.   *Treatment of Differential Wage Payments.*  For the purpose of the Plan:

      (i)    an individual receiving a Differential Wage Payment shall be treated as an Employee of the Employer making the payment;

      (ii)   the Differential Wage Payment shall be treated as Compensation; and

      (iii)  the Plan shall not be treated as failing to meet the requirements of any plan qualification requirements under Code Section 401(a) where a contribution or benefit is based on the Differential Wage Payment.

d.   Notwithstanding the foregoing:

   1.   *Benefit Accruals.*  Continued benefit accruals pursuant to the Heroes Earnings Assistance and Tax Relief Act of 2008 (HEART Act) are not provided.

27

2.   *Death Benefits.* In the case of a death occurring on or after January 1, 2007, if a Participant dies while performing qualified military service (as defined in Section 414(u) of the Code), the Participant's Beneficiary is entitled to any additional benefits (other than benefit accruals relating to the period of qualified military service) provided under the Plan as if the Participant has resumed employment and then terminated employment on account of death. Moreover, the Plan will credit the Participant's qualified military service as service for vesting purposes, as though the Participant had resumed employment under USERRA immediately prior to the Participant's death.

3.   *Differential Wage Payments.* For years beginning after December 31, 2008:

(i)   an individual receiving a differential wage payment, as defined by Section 3401(h)(2) of the Code, is treated as an employee of the employer making the payment;

(ii)   the differential wage payment is treated as compensation for purposes of Section 415(c)(3) of the Code and Treasury Reg. Section 1.415(c)-2 (e.g., for purposes of Code Section 415, top-heavy provisions of Code Section 416, determination of highly compensated employees under Section 414(g) of the Code, and applying the 5% gateway requirement under the Section 401(a)(4) regulations); and

(iii)   the Plan is not treated as failing to meet the requirements of any provision described in Section 414(u)(1)(C) of the Code (or corresponding plan provisions, including, but not limited to, Plan provisions related to the ADP or ACP test) by reason of any contribution or benefit which is based on the differential wage payment.   The Committee operationally may determine, for purposes of the provisions described in Section 414(u)(1)(C) of the Code, whether to take into account any deferrals, and if applicable, any matching contributions, attributable to differential wages. Differential wage payments (as described herein) will also be considered Compensation for all Plan purposes.

Section 3.11.c applies only if all employees of the Employer performing service in the uniformed services described in Section 3401(h)(2)(A) of the Code are entitled to receive differential wage payments (as defined in Section 3401(h)(2) of the Code) on reasonably equivalent terms and, if eligible to participate in a retirement plan maintained by the Employer, to make contributions based on the payments on reasonably equivalent terms (taking into account Sections 410(b)(3), (4) and (5) of the Code).

4.  *Deemed Severance.* Notwithstanding Section 3.11.a, if a Participant performs service in the uniformed services (as defined in Section 414(u)(12)(B) of the Code) on active duty for a period of more than thirty (30) days, the Participant will be deemed to have a severance from employment solely for purposes of eligibility for distribution of amounts not subject to Section 412 of the Code. However, the Plan will not distribute such a Participant's account on account of this deemed severance unless the Participant specifically elects to receive a benefit distribution hereunder. If a Participant elects to receive a distribution on account of this deemed severance, then the individual may not make an elective deferral or employee contribution during the 6-month period beginning on the date of the distribution. If a Participant would be entitled to a distribution on account of a deemed severance, and a distribution on account of another Plan provision (such as a qualified reservist distribution), then the other Plan provision will control and the 6-month suspension will not apply.

5.  *Qualified Reservist Distributions.* Qualified reservist distributions are not allowed.

3.12  Section 1042 Transactions. In the case of a sale in which a seller elects nonrecognition of gain under Section 1042 of the Code, no portion of the Qualified Employer Securities sold (or allocable in lieu thereof under the Plans) may be allocated during the nonallocation period to the Account of (i) the seller (or the seller's family), or (ii) any other person who owns (after application of the family attribution rules) more than twenty-five percent (25%) of any class of outstanding employer securities, or more than twenty-five percent (25%) of the total value of any class of outstanding employer securities at any time during the one year period preceding the purchase of such Qualified Employer Securities by the Plan, or on any subsequent date when such Qualified Employer Securities are allocated to Participants in the Plan. For purposes of this paragraph, the seller's family shall include the seller's spouse, ancestors, lineal descendants, and brothers and sisters. Lineal descendants of a seller shall be permitted to share in the allocation of Qualified Employer Securities, provided that the aggregate amount of such stock allocated for the benefit of all such lineal descendants does not exceed more than five percent (5%) of such stock purchased from the seller. For purposes of this Section 3.12, a person shall be considered to be a more than twenty-five percent (25%) shareholder if the amount of employer securities which such person owns (whether outright or as a Plan Participant), together with the amount of employer securities owned by such person's spouse, children, grandchildren and parents (whether outright or as Plan Participants), exceeds twenty-five percent (25%) of any class of outstanding employer securities or twenty-five percent (25%) of the total value of any class of outstanding employer securities. For purposes of this Section 3.12, the "nonallocation period" means the period beginning on the date of the sale and ending on the later of (i) the date which is ten (10) years after the date of sale, or (ii) the date of the Plan allocation attributable to the final payment of the Securities Acquisition Loan.

In applying the above rules, the Plan shall comply with the requirements of Section 409(u) of the Code.

3.13   <u>Prohibited Allocation of S Corporation Securities</u>.  No portion of the assets of the Plan attributable to (or allocable in lieu of) employer securities held by the Plan consisting of stock of an S corporation may, during a nonallocation year, accrue (or be allocated directly or indirectly under any plan of the Employer meeting the requirements of Section 401(a)) for the benefit of a disqualified person. The terms "employer securities," "nonallocation year," and "disqualified person" shall have the meanings set forth in Section 409(p) of the Code.

<u>Definitions</u>.

a.   The term "Nonallocation Year" means any Plan Year of the Plan if, at any time during such Plan Year -

   1.   such Plan holds employer securities consisting of stock in an S corporation, and

   2.   Disqualified Persons own at least fifty percent of the number of shares of stock in the S corporation.

For purposes of this Section 3.13, the rules of Section 318(a) of the Code shall apply for purposes of determining ownership, except that -

   1.   in applying paragraph (1) of Section 3.18(a) of the Code, the members of an individual's family shall include members of the family described in Section 3.13.b.4; and

   2.   paragraph (4) of Section 318(a) of the Code shall not apply.

Notwithstanding the employee trust exception in Section 318(a)(2)(B)(i) of the Code, an individual shall be treated as owning deemed-owned shares of the individual.

Solely for purposes of applying this Section, this subsection shall be applied after the attribution rules of this Section have been applied.

b.   "Disqualified Person" - For purposes of this subsection -

   1.   *In general.* The term "Disqualified Person" means any person if –

      (i)   the aggregate number of deemed-owned shares of such person and the members of such person's family is at least twenty percent of the number of deemed-owned shares of stock in the S corporation, or

(ii)    in the case of a person not described in clause (i), the number of deemed-owned shares of such person is at least ten percent of the number of deemed-owned shares of stock in such corporation.

2.    *Treatment of family members* - In the case of a Disqualified Person described in subsection 1(i), any member of such person's family with deemed-owned shares shall be treated as a disqualified person if not otherwise treated as a disqualified person under subparagraph 1.

3.    *Deemed-owned shares* -

(i)    *In general.* The term "deemed-owned shares" means, with respect to any person -

A.    the stock in the S corporation constituting employer securities of an employee stock ownership plan which is allocated to such person under the plan, and

B.    such person's share of the stock in such corporation which is held by such plan but which is not allocated under the plan to Participants.

(ii)    *Person's share of unallocated stock.* For purposes of clause (i).B, a person's share of unallocated S corporation stock held by such plan is the amount of the unallocated stock which would be allocated to such person if the unallocated stock were allocated to all participants in the same proportions as the most recent stock allocation under the Plan.

4.    *Member of family* - For purposes of this paragraph, the term "member of the family" means, with respect to any individual -

(i)    the spouse of the individual;

(ii)    an ancestor or lineal descendant of the individual or the individual's spouse;

(iii)    a brother or sister of the individual or the individual's spouse and any lineal descendant of the brother or sister; and

(iv)    the spouse of any individual described in clause (ii) or (iii).

A spouse of an individual who is legally separated from such individual under a decree of divorce or separate maintenance shall not be treated as such individual's spouse for purposes of this subparagraph.

c.    "Treatment of synthetic equity" - For purposes of Section 3.13a and b, in the case of a person who owns synthetic equity in the S corporation, except to the extent

provided in regulations, the shares of stock in such corporation on which such synthetic equity is based shall be treated as outstanding stock in such corporation and deemed-owned shares of such person if such treatment of synthetic equity of one or more such persons results in -

1.     the treatment of any person as a Disqualified Person; or

2.     the treatment of any year as a Nonallocation Year.

For purposes of this paragraph, synthetic equity shall be treated as owned by a person in the same manner as stock is treated as owned by a person under the rules of paragraphs (2) and (3) of Section 318(a) of the Code. If, without regard to this paragraph, a person is treated as a Disqualified Person or a year is treated as a Nonallocation Year, this paragraph shall not be construed to result in the person or year not being so treated.

The term "synthetic equity" means any stock option, warrant, restricted stock, deferred issuance stock right, or similar interest or right that gives the holder the right to acquire or receive stock of the S corporation in the future. Except to the extent provided in regulations, synthetic equity also includes a stock appreciation right, phantom stock unit, or similar right to a future cash payment based on the value of such stock or appreciation in such value.

## ARTICLE IV
## LIMITATIONS WITH RESPECT TO CONTRIBUTIONS

4.1    Special Rules Regarding Salary Reduction Contributions and Employer Matching Contributions.

a.     Definitions.  For purposes of this Section 4.1:

1.     "Highly Compensated Employee" means an Eligible Employee who satisfies the definition in Section 1.22 of the Plan Statement.

2.     "Non-highly Compensated Employee" means an Eligible Employee who is not a Highly Compensated Employee.

3.     "Eligible Employee" means, for purposes of the Actual Deferral Percentage ("ADP") test described in Section 4.1.d, an Employee who is eligible to enter into a salary reduction agreement for the Plan Year, irrespective of whether he actually enters into such an agreement. For purposes of the Actual Contribution Percentage ("ACP") test described in Section 4.1.e, an "Eligible Employee" means a Participant who is eligible to receive an allocation of Employer matching contributions (or would be eligible if he made the type of contributions necessary to receive an allocation of matching contributions). An Employee continues to be an

32

Eligible Employee during a period the Plan suspends the Employee's right to make elective deferrals following a hardship distribution.

4. "Highly Compensated Group" means the group of Eligible Employees who are Highly Compensated Employees for the Plan Year.

5. "Non-highly Compensated Group" means the group of Eligible Employees who are Non-highly Compensated Employees for the Plan Year.

6. "Compensation" means Compensation as defined in Section 1.9. Compensation must include Compensation for the entire Plan Year, irrespective of whether the Section 401(k) arrangement was in effect for the entire Plan Year or whether the Employee begins, resumes or ceases to be an Eligible Employee during the Plan Year.

7. "Elective Deferrals" are Employer Deferral Contributions. Such contributions will be taken into account under the Plan under the ADP test for a Plan Year only if it is allocated to the Participant as of a date within the Plan Year. For this purpose, such contribution is considered allocated as of a date within a Plan Year if the allocation is not contingent on participation or performance of services after such date and the contribution is actually paid to the Plan no later than 12 months after the Plan Year to which the contribution relates. Moreover, such contribution will be taken into account under the actual deferral percentage test for a Plan Year only if it relates to compensation that either would have been received by the Employee in the Plan Year (but for the deferral election) or is attributable to services performed by the Employee in the Plan Year and would have been received by the Employee within 2-1/2 months after the close of the Plan Year (but for the deferral election).

8. "Matching Contributions" are contributions made by the Employer on account of elective deferrals under a Section 401(k) arrangement.

9. "Non-elective Contributions" are contributions made by the Employer which are not subject to a deferral election by an Employee and which are not matching contributions.

10. "Qualified Matching Contributions" are matching contributions which are 100% non-forfeitable at all times and which are subject to the distribution restrictions described in Section 4.1.a.12. Matching contributions are not 100% non-forfeitable at all times if the Employee has a 100% non-forfeitable interest because of his Years of Service taken into account under a vesting schedule. Any matching contributions allocated to a Participant's Employee Deferral Account under the Plan automatically satisfy the definition of qualified matching contributions.

11.    "Qualified Non-elective Contributions" are non-elective contributions which are 100% non-forfeitable at all times and which are subject to the distribution restrictions described in Section 4.1.a.12.   Non-elective contributions are not 100% non-forfeitable at all times if the Employee has a 100% non-forfeitable interest because of his Years of Service taken into account under a vesting schedule.   Any non-elective contributions allocated to a Participant's Employee Deferral Account under the Plan automatically satisfy the definition of qualified non-elective contributions.

12.    "Distribution Restrictions" means the Participant may not receive a distribution of the specified contributions (nor earnings on those contributions) except in the event of (1) the Participant's death, disability, separation from service, severance of employment or attainment of age 59-1/2, (2) financial hardship satisfying the requirements of Section 401(k) of the Code and the applicable Treasury regulations, (3) a plan termination, without establishment of a successor defined contribution plan (other than an ESOP), (4) a sale of substantially all of the assets (within the meaning of Section 409(d)(2) of the Code) used in a trade or business, but only to an employee who continues employment with the corporation acquiring those assets, or (5) a sale by a corporation of its interest in a subsidiary (within the meaning of Section 409(d)(3) of the Code), but only to an employee who continues employment with the subsidiary. A distribution on account of financial hardship, as described in clause (2), may not include earnings on elective deferrals and may not include qualified matching contributions and qualified non-elective contributions, nor any earnings on such contributions, irrespective of when credited. A distribution described in clauses (3), (4) or (5) must be a lump sum distribution, as required under Section 401(k)(10) of the Code.

b.    <u>Special Allocation Provisions - Qualified Non-elective Contributions ("QNEC")</u>. If the Employer, at the time of contribution, designates a contribution to be a qualified non-elective contribution for the Plan Year, the Committee will allocate that qualified non-elective contribution to the Employee Deferral Account of each Participant eligible for an allocation of that designated contribution, as provided in Section 3.4.b.4.   The Committee will make the allocation to each eligible Participant's Account in the same ratio that the Participant's Compensation for the Plan Year bears to the total Compensation of all eligible Participants for the Plan Year.

1.    <u>Non-elective contributions</u>.   To the extent the Employer makes non-elective contributions for the Plan Year which, at the time of contribution, it does not designate as qualified non-elective contributions, the Committee will allocate those contributions in the same manner as Employer discretionary contributions.   For purposes of the special non-discrimination tests described in Sections 4.1.d and 4.1.e, the Committee may treat non-elective contributions allocated under this paragraph as

34

Qualified Non-elective Contributions, if the contributions otherwise satisfy the definition of QNECs.

2.  <u>Targeted Non-elective Contribution Limit</u>.  Qualified Nonelective Contributions (as defined in Regulation Section 1.401(k)-6) cannot be taken into account in determining the Actual Deferral Ratio (ADR) for a Plan Year for a Non-Highly Compensated Employee to the extent such contributions exceed the product of that Non-Highly Compensated Employee's compensation under Section 414(s) of the Code and the greater of five percent (5%) or two (2) times the Plan's "representative contribution rate." Any Qualified Non-Elective Contribution taken into account under an Actual Contribution Percentage (ACP) test under Regulation Section 1.401(m)-2(a)(6) (including the determination of the representative contribution rate for purposes of Regulation Section 1.401(m)-2(a)(6)(v)(B)), is not permitted to be taken into account for purposes of this Section (including the determination of the "representative contribution rate" under this Section). For purposes of this Section:

(i)  The Plan's "representative contribution rate" is the lowest "applicable contribution rate" of any eligible Non-Highly Compensated Employee among a group of eligible Non-Highly Compensated Employees that consists of half of all eligible Non-Highly Compensated Employees for the Plan Year (or, if greater, the lowest "applicable contribution rate" of any eligible Non-Highly Compensated Employee who is in the group of all eligible Non-Highly Compensated Employees for the Plan Year and who is employed by the Employer on the last day of the Plan Year), and

(ii)  The "applicable contribution rate" for an eligible Non-Highly Compensated Employee is the sum of the Qualified Matching Contributions (as defined in Regulation Section 1.401(k)-6) taken into account in determining the ADR for the eligible Non-Highly Compensated Employee for the Plan Year and the Qualified Non-Elective Contributions made for the eligible Non-Highly Compensated Employee for the Plan Year, divided by the eligible Non-Highly Compensated Employee's compensation under Section 414(s) of the Code for the same period.

Qualified Matching Contributions may only be used to calculate an ADR to the extent that such Qualified Matching Contributions are matching contributions that are not precluded from being taken into account under the ACP test for the Plan Year under the rules of Regulation Section 1.401(m)-2(a)(5)(ii) and as set forth in Section 4.1e.

The ADR of an eligible Employee for a Plan Year or applicable year is the sum of the Employee's Elective Contributions taken into account with

respect to such Employee for the year, and the Qualified Non-Elective Contributions and Qualified Matching Contributions taken into account with respect to such Employee for the year, divided by the Employee's Compensation taken into account for the year. The ADR is calculated to the nearest hundredth of a percentage point. If no Elective Contributions, Qualified Non-Elective Contributions, or Qualified Matching Contributions are taken into account with respect to an eligible Employee for the year, the ADR of the Employee is zero.

3.  <u>Limitation on QNECs and QMACs</u>.  Qualified Non-Elective Contributions and Qualified Matching Contributions cannot be taken into account to determine an ADR to the extent such contributions are taken into account for purposes of satisfying any other ADP test, any ACP test, or the requirements of Regulation Section 1.401(k)-3, 1.401(m)-3, or 1.401(k)-4.  Thus, for example, matching contributions that are made pursuant to Regulation Section 1.401(k)-3(c) cannot be taken into account under the ADP test. Similarly, if a plan switches from the current year testing method to the prior year testing method pursuant to Regulation Section 1.401(k)-2(c), Qualified Non-Elective Contributions that are taken into account under the current year testing method for a year may not be taken into account under the prior year testing method for the next year.

4.  <u>ADR of Highly Compensated Employee if Multiple Plans</u>.  The Actual Deferral Ratio (ADR) of any Participant who is a Highly Compensated Employee for the Plan Year and who is eligible to have Elective Contributions (as defined in Regulation Section 1.401(k)-6) (and Qualified Non-Elective Contributions and/or Qualified Matching Contributions, if treated as Elective Contributions for purposes of the ADP test) allocated to such Participant's accounts under two (2) or more cash or deferred arrangements described in Code Section 401(k), that are maintained by the same Employer, shall be determined as if such Elective Contributions (and, if applicable, such Qualified Non-Elective Contributions and/or Qualified Matching Contributions) were made under a single arrangement. If a Highly Compensated Employee participates in two or more cash or deferred arrangements of the Employer that have different Plan Years, then all Elective Contributions made during the Plan Year being tested under all such cash or deferred arrangements shall be aggregated, without regard to the plan years of the other plans.  However, for Plan Years beginning before the effective date of this Amendment, if the plans have different Plan Years, then all such cash or deferred arrangements ending with or within the same calendar year shall be treated as a single cash or deferred arrangement. Notwithstanding the foregoing, certain plans shall be treated as separate if mandatorily disaggregated under the Regulations of Section 401(k) of the Code.

5.  <u>Plans Using Different Testing Methods for the ADP and ACP Test</u>. Except as otherwise provided in this Section, the Plan may use the current

year testing method or prior year testing method for the ADP test for a Plan Year without regard to whether the current year testing method or prior year testing method is used for the ACP test for that Plan Year. However, if different testing methods are used, then the Plan cannot use:

(i)     The recharacterization method of Regulation Section 1.401(k)-2(b)(3) - to correct excess contributions for a Plan Year;

(ii)    The rules of Regulation Section 1.401(m)-2(a)(6)(ii) to take Elective Contributions into account under the ACP test (rather than the ADP test); or

(iii)   The rules of Regulation Section 1.401(k)-2(a)(6)(v) to take Qualified Matching Contributions into account under the ADP test (rather than the ACP test).

6.      <u>Corrective Contributions</u>.   If a failed ADP test is to be corrected by making an Employer contribution, then the provisions of the Plan for the corrective contributions shall be applied by limiting the contribution made on behalf of any Non-Highly Compensated Employee pursuant to such provisions to an amount that does not exceed the targeted contribution limits of Section 4.1.d, or in the case of a corrective contribution that is a Qualified Matching Contribution, the targeted contribution limit of Section 4.1.e.

c.      <u>Annual Elective Deferral Limitation</u>.   An Employee's elective deferrals for a calendar year may not exceed the 402(g) limitation. The 402(g) limitation is the greater of $18,000 or the adjusted amount determined by the Secretary of the Treasury, plus the catch-up contributions permitted under Section 2.5 of the Plan and Section 414(v) of the Code. If, pursuant to an Employee Deferral Agreement or pursuant to a cash or deferral election, the Employer determines the Employee's elective deferrals to the Plan for a calendar year would exceed the 402(g) limitation, the Employer shall suspend the Employee's salary reduction agreement, if any, until the following January 1 and pay in cash to the Employee the portion of a cash or deferral election which would result in the Employee's elective deferrals for the calendar year exceeding the 402(g) limitation. If the Committee determines an Employee's elective deferrals already contributed for a calendar year exceed the 402(g) limitation, the Committee will distribute the amount in excess of the 402(g) limitation (the "excess deferral"), as adjusted for allocable income, no later than April 15 of the following calendar year. If the Committee distributes the excess deferral by the appropriate April 15, it may make the distribution irrespective of any other provision under this Plan or under the Code. The Committee will reduce the amount of excess deferrals for a calendar year distributable to the Employee by the amount of excess contributions (as defined in Section 4.1.d), if any, previously distributed to the Employee for the Plan Year beginning in that calendar year.

If an Employee--participates in another plan under which he makes elective deferrals pursuant to a Section 401(k) arrangement, elective deferrals under a Simplified Employee Pension, or salary reduction contributions to a tax-sheltered annuity, irrespective of whether the Employer maintains the other plan, he may provide the Committee a written claim for excess deferrals made for a calendar year. The Employee must submit the claim no later than the March 1 following the close of the particular calendar year and the claim must specify the amount of the Employee's elective deferrals under this Plan which are excess deferrals. If the Committee receives a timely claim, it will distribute the excess deferral, as adjusted for allocable income, the Employee has assigned to this Plan in accordance with the distribution procedure described in the immediately preceding paragraph.

1.  <u>Allocable income</u>. For purposes of making a distribution of excess deferrals pursuant to this Section 4.1.c, allocable income means net income or net loss allocable to the excess deferrals for the calendar year in which the Employee made the excess deferral but not for the "gap period" measured from the beginning of the next calendar year to the date of the distribution. The Committee will determine allocable income in the same manner as described in Section 4.1.d for excess contributions, except the numerator of the allocation fraction will be the amount of the Employee's excess deferrals and the denominator of the allocation fraction will be the Employee's accrued benefit attributable to his elective deferrals.

d.  <u>ADP Test</u>. For each Plan Year, the Committee must determine whether the Plan's Section 401(k) arrangement satisfies one of the following ADP tests:

1.  The average ADP for the Highly Compensated Group does not exceed 1.25 times the average ADP of the Non-highly Compensated Group (for the preceding Plan Year if the prior year testing method is used to calculate the ADP for the Non-highly Compensated Group); or

2.  The average ADP for the Highly Compensated Group does not exceed the average ADP for the Non-highly Compensated Group by more than two percentage points (for the preceding Plan Year if the prior year testing method is used to calculate the ADP for the Non-highly Compensated Group) and the average ADP for the Highly Compensated Group is not more than twice the average ADP for the Non-highly Compensated Group (for the preceding Plan Year if the prior year testing method is used to calculate the ADP for the Non-highly Compensated Group). The provisions of Section 401(k)(3)(A)(ii) of the Code and Regulation §1.401(k)-1(b) are incorporated herein by reference.

However, in order to prevent the multiple use of the alternative method described in 2 above and in Code Section 401(m) of the Code, any Highly Compensated Employee eligible to make elective deferrals pursuant to Section 2.1 and to make Employee contributions or to receive matching contributions under this Plan or

under any other plan maintained by the Employer or an Affiliate shall have a combination of his elective contributions and Employer matching contributions reduced pursuant to this Section and Regulation 1.401(m)-2, the provisions of which are incorporated herein by reference.

Calculation of ADP. The average ADP for a group is the average of the separate ADPs calculated for each Eligible Employee who is a member of that group. An Eligible Employee's ADP for a Plan Year is the ratio of the Eligible Employee's Salary Reduction Contributions for the Plan Year to the Employee's Compensation for the Plan Year. A Non-Highly Compensated Employee's ADP does not include elective deferrals made to this Plan or to any other Plan maintained by the Employer, to the extent such elective deferrals exceed the 402(g) limitation described above.

Notwithstanding the above, if the prior year test method is used to calculate the ADP for the Non-highly Compensated Group for the first Plan Year of this amendment and restatement, the ADP for the Non-highly Compensated Group for the preceding Plan Year shall be calculated pursuant to the provisions of the Plan then in effect.

For the purposes of this Section, a Highly Compensated Employee and a Non-highly Compensated Employee shall include any Employee eligible to make a deferral election, whether or not such deferral election was made or suspended.

Notwithstanding the above, if the prior year testing method is used to calculate the ADP for the Non-highly Compensated Group for the first Plan Year of this amendment and restatement, for purposes of Section 4.1.d, a Non-highly Compensated Employee shall include any such Employee eligible to make a deferral election, whether or not such deferral election was made or suspended, pursuant to the provisions of the Plan in effect for the preceding Plan Year.

If the Plan uses the prior year testing method, the ADP for the Non-highly Compensated Group is determined without regard to changes in the group of Non-highly Compensated Employees who are eligible under the Plan in the testing year. However, if the Plan is affected by a "Plan Coverage Change" that becomes effective during the testing year, then the ADP for the Non-highly Compensated Group for the prior year is the "Weighted Average of the Actual Deferral Percentages for the Prior Year Subgroups." Notwithstanding the above, if ninety percent (90%) or more of the total number of Non-highly Compensated Employees from all "Prior Year Subgroups" are from a single "Prior Year Subgroup," then in determining the ADP for the Non-highly Compensated Employees for the prior year, the Employer may elect to use the ADP for Non-highly Compensated Employees for the prior year under which that single "Prior Year Subgroup" was eligible, in lieu of using the weighted averages. For purposes of this Section, the following definitions shall apply:

1.   "Plan Coverage Change" means a change in the group or groups of eligible Participants on account of (i) the establishment or amendment of a plan, (ii) a plan merger, consolidation, or spinoff under Code Section 414(1), (iii) a change in the way plans within the meaning of Code Section 414(1) are combined or separated for purposes of Regulation 1.401(k)-1(g)(11), or (iv) a combination of any of the foregoing.

2.   "Prior Year Subgroup" means all Non-highly Compensated Employees for the prior year who, in the prior year, were eligible Participants under a specific Code Section 401(k) plan maintained by the Employer and who would have been eligible Participants in the prior year under the plan tested if the plan coverage change had first been effective as of the first day of the prior year instead of first being effective during the testing year.

3.   "Weighted Average of the Actual Deferral Percentages for the Prior Year Subgroups" means the sum, for all prior year subgroups, of the "Adjusted Actual Deferral Percentages."

4.   "Adjusted Actual Deferral Percentage" with respect to a prior year subgroup means the ADP for Non-highly Compensated Employees for the prior year of the specific plan under which the members of the prior year subgroup were eligible Participants, multiplied by a fraction, the numerator of which is the number of Non-highly Compensated Employees in the prior year subgroup and the denominator of which is the total number of Non-highly Compensated Employees in all prior year subgroups.

Special Aggregation Rules for Highly Compensated Employees. For the purposes of this Section and Code Sections 401(a)(4), 410(b) and 401(k), if two or more plans which include cash or deferred arrangements are considered one plan for the purposes of Code Section 401(a)(4) or 410(b) (other than Code Section 410(b)(2)(A)(ii)), the cash or deferred arrangements included in such plans shall be treated as one arrangement. In addition, two or more cash or deferred arrangements may be considered as a single arrangement for purposes of determining whether or not such arrangements satisfy Code Sections 401(a)(4), 410(b) and 401(k). In such a case, the cash or deferred arrangements included in such plans and the plans including such arrangements shall be treated as one arrangement and as one plan for purposes of this Section and Code Sections 401(a)(4), 410(b) and 401(k). Any adjustment to the Non-highly Compensated actual deferral ratio for the prior year shall be made in accordance with Internal Revenue Service Notice 98-1 and any superseding guidance. Plans may be aggregated under this paragraph only if they have the same plan year. Notwithstanding the above, if two or more plans which include cash or deferred arrangements are permissively aggregated under Regulation 1.410(b)-7(d), all plans permissively aggregated must use either the current year testing method or the prior year testing method for the testing year.

Notwithstanding the above, an employee stock ownership plan described in Code Section 4975(e)(7) or 409 may not be combined with this Plan for purposes of determining whether the employee stock ownership plan or this Plan satisfies this Section and Code Sections 401(a)(4), 410(b) and 401(k).

For the purposes of this Section, if a Highly Compensated Participant is a Participant under two or more cash or deferred arrangements (other than a cash or deferred arrangement which is part of an employee stock ownership plan as defined in Code Section 4975(e)(7) or 409) of the Employer or an Affiliated Employer, all such cash or deferred arrangements shall be treated as one cash or deferred arrangement for the purpose of determining the actual deferral ratio with respect to such Highly Compensated Employee. However, if the cash or deferred arrangements have different plan years, this paragraph shall be applied by treating all cash or deferred arrangements ending with or within the same calendar year as a single arrangement.

For the purpose of this Section, when calculating the ADP for the Non-highly Compensated Group, the current year testing method shall be used for all years. Any change from the current year testing method to the prior year testing method shall be made pursuant to Internal Revenue Service Notice 98-1, Section VII (or superseding guidance), the provisions of which are incorporated herein by reference.

The Committee may determine (in a manner consistent with Treasury regulations) the ADPs of the Eligible Employees by taking into account qualified non-elective contributions or qualified matching contributions, or both, made to this Plan or to any other qualified Plan maintained by the Employer. The Committee may not include qualified non-elective contributions in the ADP test unless the allocation of non-elective contributions is non-discriminatory when the Committee takes into account all non-elective contributions (including the qualified non-elective contributions) and also when the Committee takes into account only the non-elective contributions not used in either the ADP test described in this Section 4.1.d or the ACP test described in Section 4.1.e. The Committee may not include in the ADP test any qualified non-elective contributions or qualified matching contributions under another qualified plan unless that plan has the same plan year as this Plan. The Committee must maintain records to demonstrate compliance with the ADP test, including the extent to which the Plan used qualified non-elective contributions or qualified matching contributions to satisfy the test.

Characterization of Excess Contributions. If, pursuant to this Section 4.1.d, the Committee has elected to include qualified matching contributions in the average ADP, the Committee will treat excess contributions as attributable proportionately to Employee Deferral Contributions and to qualified matching contributions allocated on the basis of those Employee Deferral Contributions. If the total amount of a Highly Compensated Employee's excess contributions for the Plan Year exceeds his Employee Deferrals or qualified matching contributions for the Plan Year, the Committee will treat the remaining portion of his excess

contributions as attributable to qualified non-elective contributions. The Committee will reduce the amount of excess contributions for a Plan Year distributable to a Highly Compensated Employee by the amount of excess deferrals (as defined in Section 4.1.c), if any, previously distributed to that Employee for the Employee's taxable year ending in that Plan Year.

Distribution of Excess Contributions. If the Committee determines the Plan fails to satisfy the ADP test for a Plan Year, it must distribute the excess contributions, as adjusted for allocable income, during the next Plan Year. The excess contributions are the amount of deferral contributions made by the Highly Compensated Employees which causes the Plan to fail to satisfy the ADP test in accordance with Section 401(k)(8)(B) of the Code. The Committee will distribute to each Highly Compensated Employee his respective share of the excess contributions. Excess contributions shall first be distributed from such Participant's Employee Deferral (Roth) account.

The Committee will determine the respective shares of excess aggregate contributions in the following manner: If the total amount of Employee Deferrals under the Plan exceeds the ADP test for the Plan Year, the actual deferral ratio (ADR) of the Highly Compensated Participant with the highest ADR is reduced to the extent necessary to pass the ADP test or to cause such ratio to equal the ADR of the Highly Compensated Participant with the next highest ADR, whichever occurs first. This process must be repeated (taking into consideration the previous reductions under this method) until the ADP test is met. The dollar value of the reductions in the ADR for each Highly Compensated Participant (rounded to the nearest one cent) are then calculated and added together to arrive at Excess Contributions.

The total amount of Excess Contributions shall be distributed to the Highly Compensated Participants with the greatest dollar amount of such contributions in the following manner: the amount shall be the lesser of (a) the total excess contributions or (b) the amount that will cause the dollar value of such Highly Compensated Participants' Employee Deferrals to equal the dollar value of the Highly Compensated Participant with the next highest dollar value of Highly Compensated Participants. The process described in the previous sentence shall be repeated (taking into consideration previous reductions under this method) until the total of all reductions equals the Excess Contributions.

Excess contributions shall be reduced by any excess deferrals previously distributed to the Employee for the Employee's taxable year ending with or within the Plan Year in accordance with Section 402(g)(2) of the Code.

The amount of excess deferrals that may be distributed with respect to an Employee for a taxable year is reduced by excess contributions previously distributed or recharacterized with respect to an Employee for the Plan Year beginning with or within the taxable year.

Allocable Income. Distribution of Excess Contributions must be adjusted for income (gain or loss), including for Plan Years before January 1, 2008, an adjustment for income for the period between the end of the Plan Year and the date of the distribution (the "gap period").

1. Plan Year Income. The Committee shall allocate income to Excess Contributions for the Plan Year by multiplying the income for the Plan Year allocable to the Elective Contributions and other amounts taken into account under the ADP test (including contributions made for the Plan Year), by a fraction, the numerator of which is the Excess Contributions for the Employee for the Plan Year, and the denominator of which is the sum of the:

   (i) Account balance attributable to Elective Contributions and other amounts taken into account under the ADP test as of the beginning of the Plan Year, and

   (ii) Any additional amount of such contributions made for the Plan Year.

2. Gap Period Income. The Committee shall use the safe harbor method to determine income on Excess Contributions for the gap period. Under this safe harbor method, income on Excess Contributions for the gap period is equal to ten percent (10%) of the income allocable to Excess Contributions for the Plan Year that would be determined as provided above, multiplied by the number of calendar months that have elapsed since the end of the Plan Year. For purposes of calculating the number of calendar months that have elapsed under the safe harbor method, a corrective distribution that is made on or before the fifteenth (15th) day of a month is treated as made on the last day of the preceding month and a distribution made after the fifteenth (15th) day of a month is treated as made on the last day of the month.

e. Non-discrimination Rules for Employer Matching Contributions. The Committee must determine whether the annual Employer matching contributions (other than qualified matching contributions used in the ADP under Section 4.1.d and Employee voluntary contributions (After-Tax), if any, satisfy one of the following average contribution percentage ("ACP") tests:

1. The ACP for the Highly Compensated Group does not exceed 1.25 times the ACP of the Non-highly Compensated Group (for the preceding Plan Year if the prior year testing method is used to calculate the ACP for the Non-highly Compensated Group); or

2. The ACP for the Highly Compensated Group does not exceed the ACP for the Non-highly Compensated Group by more than two percentage points (for the preceding Plan Year if the prior year testing method is used to

calculate the ACP for the Non-highly Compensated Group) and the ACP for the Highly Compensated Group is not more than twice the ACP for the Non-highly Compensated Group (for the preceding Plan Year if the prior year testing method is used to calculate the ACP for the Non-highly Compensated Group). The provisions of Section 401(m) of the Code and Regulation §§1.401(m)-1(b) and 1.401(m)-2 are incorporated herein by reference.

However, to prevent the multiple use of the alternative method described in this paragraph and Section 401(m) of the Code, any Highly Compensated Employee eligible to make elective deferrals under this Plan or any other cash or deferred arrangement maintained by the Employer or an Affiliate and to make Employee contributions or to receive matching contributions under this Plan or under any plan maintained by the Employer or an Affiliate shall have a combination of his Elective Contributions and Employer matching contributions reduced pursuant to Regulation 1.401(m)-2 and the Plan. The provisions of Code Section 401(m) and Regulations 1.401(m)-1(b) and 1.401(m)-2 are incorporated herein by reference.

Calculation of ACP. The average contribution percentage for a group is the average of the separate contribution percentages calculated for each Eligible Employee who is a member of that group. An Eligible Employee's contribution percentage for a Plan Year is the ratio of the Eligible Employee's aggregate contributions for the Plan Year to the Employee's Compensation for the Plan Year. "Aggregate contributions" are Employer matching contributions (other than qualified matching contributions used in the ADP test under Section 4.1.d), and voluntary contributions paid under the Plan on behalf of the Participant for such Plan Year.

Notwithstanding the above, if the prior year testing method is used to calculate the ACP for the Non-highly Compensated Group for the first Plan Year of this amendment and restatement, for purposes of Section 4.1.e, the ACP for the Non-highly Compensated Group for the preceding Plan Year shall be determined pursuant to the provisions of the Plan then in effect.

For purposes of determining the ACP, only Employer matching contributions contributed to the Plan prior to the end of the succeeding Plan Year shall be considered. In addition, the Committee may elect to take into account, with respect to Employees eligible to have Employer matching contributions pursuant to Section 3.1.b allocated to their accounts, elective deferrals (as defined in Regulation 1.402(g)-1(b)) and qualified non-elective contributions (as defined in Code Section 401(m)(4)(C)) contributed to any plan maintained by the Employer. Such elective deferrals and qualified non-elective contributions shall be treated as Employer matching contributions subject to Regulation 1.401(m)-1(b)(5), which is incorporated herein by reference. However, the Plan Year must be the same as the plan year of the plan to which the elective deferrals and the qualified non-elective contributions are made.

For Plan Years on and after October 1, 1997, the Plan uses the current year testing method.

<u>Special Aggregation Rules for Highly Compensated Employees</u>. For purposes of this Section and Code Sections 401(a)(4), 410(b) and 401(m), if two or more plans of the Employer to which matching contributions, Employee contributions, or both, are made are treated as one plan for purposes of Sections 401(a)(4) or 410(b) of the Code (other than the average benefits test under Section 410(b)(2)(A)(ii) of the Code), such plans shall be treated as one plan. In addition, two or more plans of the Employer to which matching contributions, Employee contributions, or both, are made may be considered as a single plan for purposes of determining whether or not such plans satisfy Sections 401(a)(4), 410(b) and 401(m) of the Code. In such a case, the aggregated plans must satisfy this Section and Sections 401(a)(4), 410(b) and 401(m) of the Code as though such aggregated plans were a single plan. Any adjustment to the Non-highly Compensated Employee actual contribution ratio for the prior year shall be made in accordance with Internal Revenue Service Notice 98-1 and any superseding guidance. Plans may be aggregated under this paragraph only if they have the same plan year. Notwithstanding the above, if two or more plans which include cash or deferred arrangements are permissibly aggregated under Regulation 1.410(b)-7(d), all plans permissively aggregated must use either the current year testing method or the prior year testing method for the testing year.

Notwithstanding the above, an employee stock ownership plan described in Section 4975(e)(7) or 409 of the Code may not be aggregated with this Plan for purposes of determining whether the employee stock ownership plan or this Plan satisfies this Section and Sections 401(a)(4), 410(b) and 401(m) of the Code.

If a Highly Compensated Employee is a Participant under two or more plans (other than an employee stock ownership plan as defined in Section 4975(e)(7) or 409 of the Code) which are maintained by the Employer or an Affiliate to which matching contributions, Employee contributions, or both, are made, all such contributions on behalf of such Highly Compensated Employee shall be aggregated for purposes of determining such Highly Compensated Employee's actual contribution ratio. However, if the plans have different plan years, this paragraph shall be applied by treating all plans ending with or within the same calendar year as a single plan.

For purposes of this Section, a Highly Compensated Employee and Non-highly Compensated Employee shall include any Employee eligible to have Employer matching contributions (whether or not a deferral election was made or suspended) or voluntary employee contributions (whether or not voluntary employee contributions are made) allocated to his account for the Plan Year.

Notwithstanding the above, if the prior year testing method is used to calculate the ACP for the Non-highly Compensated Group for the first Plan Year of this amendment and restatement, for the purposes of Section 4.1.e, a Non-highly

Compensated Employee shall include any such Employee eligible to have Employer matching contributions (whether or not a deferral election was made or suspended) or voluntary employee contributions (whether or not voluntary employee contributions are made) allocated to his account for the preceding Plan Year pursuant to the provisions of the Plan then in effect.

If the Plan uses the prior year testing method, the ACP for the Non-highly Compensated Group is determined without regard to changes in the group of Non-highly Compensated Employees who are eligible under the Plan in the testing year. However, if the Plan is affected by a "Plan Coverage Change" that becomes effective during the testing year, then the ACP for the Non-highly Compensated Group for the prior year is the "Weighted Average of the Actual Contribution Percentages for the Prior Year Subgroups." Notwithstanding the above, if ninety percent (90%) or more of the total number of Non-highly Compensated Employees from all "Prior Year Subgroups" are from a single "Prior Year Subgroup," then in determining the ACP for the Non-highly Compensated Employees for the prior year, the Employer may elect to use the ACP for Non-highly Compensated Employees for the prior year under which that single "Prior Year Subgroup" was eligible, in lieu of using the weighted averages. For purposes of this Section, the following definitions shall apply:

1.  "Plan Coverage Change" means a change in the group or groups of eligible Participants on account of (i) the establishment or amendment of a plan; (ii) a plan merger, consolidation, or spinoff under Section 414(1) of the Code; (iii) a change in the way plans within the meaning of Section 414(1) of the Code are combined or separated for purposes of Regulation 1.401(k)-1(g)(11); or (iv) a combination of any of the foregoing.

2.  "Prior Year Subgroup" means all Non-highly Compensated Employees for the prior year who, in the prior year, were eligible Participants under a specific Code Section 401(m) plan maintained by the Employer and who would have been eligible Participants in the prior year under the plan tested if the plan coverage change had first been effective as of the first day of the prior year instead of first being effective during the testing year.

3.  "Weighted Average of the Actual Contribution Percentages for the Prior Year Subgroups" means the sum, for all prior year subgroups, of the "Adjusted Actual Contribution Percentages."

4.  "Adjusted Actual Contribution Percentage" with respect to a prior year subgroup means the ACP for Non-highly Compensated Employees for the prior year of the specific plan under which the members of the prior year subgroup were eligible Participants, multiplied by a fraction, the numerator of which is the number of Non-highly Compensated Employees in the prior year subgroup and the denominator of which is the total number of Non-highly Compensated Employees in all prior year subgroups.

For all years the current year testing method shall be used. Any change from the current year testing method to the prior year testing method shall be made pursuant to Internal Revenue Service Notice 98-1, Section VII (or superseding guidance), the provisions of which are incorporated herein by reference.

The Committee, in a manner consistent with Treasury regulations, may determine the contribution percentages of the Eligible Employees by taking into account qualified non-elective contributions (other than qualified non-elective contributions used in the ADP test or elective deferrals, or both, made to this Plan or to any other qualified plan maintained by the Employer. The Committee may not include qualified non-elective contributions in the ACP test unless the allocation of non-elective contributions is non-discriminatory when the Committee takes into account all non-elective contributions (including the qualified non-elective contributions) and also when the Committee takes into account only the non-elective contributions not used in the ADP test described in Section 4.1.d or the ACP test described in this Section 4.1.e. The Committee may not include elective deferrals in the ACP test, unless the Plan which includes the elective deferrals satisfies the ADP test both with and without the elective deferrals included in this ACP test. The Committee may not include in the ACP test any qualified non-elective contributions or elective deferrals under another qualified plan unless that plan has the same plan year as this Plan. The Committee must maintain records to demonstrate compliance with the ACP test, including the extent to which the Plan used qualified non-elective contributions or elective deferrals to satisfy the test.

Distribution of Excess Aggregate Contributions. The Committee will determine excess aggregate contributions in accordance with Section 401(m)(6)(B) of the Code after determining excess deferrals under Section 4.1.c and excess contributions under Section 4.1.d. If the Committee determines the Plan fails to satisfy the ACP test for a Plan Year, it must distribute the excess aggregate contributions as determined under Section 401(m)(6)(B) of the Code, as adjusted for allocable income, during the next Plan Year. However, the Employer will incur an excise tax equal to 10% of the amount of excess aggregate contributions for a Plan Year not distributed to the appropriate Highly Compensated Employees during the first 2-1/2 months of that next Plan Year. The excess aggregate contributions are the amount of aggregate contributions made by the Highly Compensated Employees which causes the Plan to fail to satisfy the ACP test. The Committee will distribute to each Highly Compensated Employee his respective share of the excess aggregate contributions.

The Committee will determine the respective shares of excess aggregate contributions as follows: For any Plan Year the aggregate amount of Matching Contributions and Employee voluntary contributions under the Plan exceeds the ACP test for such Plan Year, the actual contribution ratio (ACR) of the Highly Compensated Participant with the highest ACR is reduced to the extent necessary to pass the ACP test or to cause such ratio to equal the ACR of the Highly Compensated Participant with the next highest ACR, whichever occurs first. This

process must be repeated (taking into consideration previous reductions under this method) until the ACP test is met. The dollar value of the reductions in the ACR for each Highly Compensated Participant (rounded to the nearest one cent) are then calculated and added together to arrive at the Excess Aggregate Contributions.

The total amount of Excess Aggregate Contributions shall be distributed to the Highly Compensated Participants with the greatest dollar amount of such contributions in the following manner: the amount shall be the lesser of (a) the total excess contributions or (b) the amount that will cause the dollar value of such Highly Compensated Participant's employee voluntary and Matching Contributions to equal the dollar value of the Highly Compensated Participant with the next highest dollar value of such contributions. The process described in the previous sentence shall be repeated (taking into consideration previous reductions under this method) until the total of all reductions equals the Excess Aggregate Contributions.

Allocable Income. Distributions of Excess Aggregate Contributions must be adjusted for income (gain or loss), including for Plan Years before January 1, 2008 an adjustment for income for the period between the end of the Plan Year and the date of the distribution (the "gap period"). For the purpose of this Section, "income" shall be determined and allocated in accordance with the provisions of the Allocable Income paragraph of Section 4.1.d of the Plan, except that such Section shall be applied by substituting "Excess Contributions" with "Excess Aggregate Contributions" and by substituting amounts taken into account under the ACP test for amounts taken into account under the ADP test.

Characterization of Excess Aggregate Contributions. The Committee will treat a Highly Compensated Employee's allocable share of excess aggregate contributions in the following priority: (1) first as attributable to his Employee contributions which are voluntary contributions, if any; (2) then as matching contributions allocable with respect to excess contributions determined under the ADP test described in Section 4.1.d; (3) then on a pro rata basis to matching contributions and to the deferral contributions relating to those matching contributions which the Committee has included in the ACP test; (4) then on a pro rata basis to Employee contributions which are mandatory contributions, if any, and to the matching contributions allocated on the basis of those mandatory contributions; and (5) last to Qualified Non-Elective Contributions used in the ACP test. To the extent the Highly Compensated Employee's excess aggregate contributions are attributable to matching contributions, and he is not 100% vested in his Account attributable to matching contributions, the Committee will cause such Employee to forfeit, without distribution, such non-vested excess aggregate contributions attributable to Employer matching contributions, as well as the income allocable to such forfeiture.

Targeted Matching Contributions.

1.  Targeted Matching Contribution Limit. A matching contribution with respect to an Elective Contribution for a Plan Year is not taken into account under the Actual Contribution Percentage (ACP) test for a Non-Highly Compensated Employee to the extent it exceeds the greatest of:

    (i)   five percent (5%) of the Non-Highly Compensated Employee's compensation under Section 414(s) of the Code for the Plan Year;

    (ii)  the Non-Highly Compensated Employee's Elective Contributions for the Plan Year; and

    (iii) the product of two (2) times the Plan's "representative matching rate" and the Non-Highly Compensated Employee's Elective Contributions for the Plan Year.

For purposes of this Section, the Plan's "representative matching rate" is the lowest "matching rate" for any eligible Non-Highly Compensated Employee among a group of Non-Highly Compensated Employees that consists of half of all eligible Non-Highly Compensated Employees in the Plan for the Plan Year who make Elective Contributions for the Plan Year (or, if greater, the lowest "matching rate" for all eligible Non-Highly Compensated Employees in the Plan who are employed by the Employer on the last day of the Plan Year and who make Elective Contributions for the Plan Year).

For purposes of this Section, the "matching rate" for an Employee generally is the matching contributions made for such Employee divided by the Employee's Elective Contributions for the Plan Year. If the matching rate is not the same for all levels of Elective Contributions for an Employee, then the Employee's "matching rate" is determined assuming that an Employee's Elective Contributions are equal to six percent (6%) of compensation under Section 414(s) of the Code.

If the Plan provides a match with respect to the sum of the Employee's after-tax Employee contributions and Elective Contributions, then for purposes of this Section, that sum is substituted for the amount of the Employee's Elective Contributions in subsections (b) and (c) above and in determining the "matching rate," and Employees who make either after-tax Employee contributions or Elective Contributions are taken into account in determining the Plan's "representative matching rate." Similarly, if the Plan provides a match with respect to the Employee's after-tax Employee contributions, but not Elective Contributions, then for purposes of this subsection, the Employee's after-tax Employee contributions are substituted for the amount of the Employee's Elective Contributions in subsections (b) and (c) above and in determining the "matching rate," and Employees who make after-tax Employee contributions are taken into account in determining the Plan's "representative matching rate"

2.   <u>Targeted QNEC Limit</u>. Qualified Non-Elective Contributions (as defined in Regulation Section 1.401(k)-6) cannot be taken into account under the Actual Contribution Percentage (ACP) test for a Plan Year for a Non-Highly Compensated Employee to the extent such contributions exceed the product of that Non-Highly Compensated Employee's compensation under Section 414(s) of the Code and the greater of five percent (5%) or two (2) times the Plan's "representative contribution rate." Any Qualified Non-Elective Contribution taken into account under an Actual Deferral Percentage (ADP) test under Regulation Section 1.401(k)-2(a)(6) (including the determination of the "representative contribution rate" for purposes of Regulation Section 1.401(k)-2(a)(6)(iv)(B)) is not permitted to be taken into account for purposes of this Section (including the determination of the "representative contribution rate" for purposes of subsection (a) below). For purposes of this Section:

(i)    The Plan's "representative contribution rate" is the lowest "applicable contribution rate" of any eligible Non-Highly Compensated Employee among a group of eligible Non-Highly Compensated Employees that consists of half of all eligible Non-Highly Compensated Employees for the Plan Year (or, if greater, the lowest "applicable contribution rate" of any eligible Non-Highly Compensated Employee who is in the group of all eligible Non-Highly Compensated Employees for the Plan Year and who is employed by the Employer on the last day of the Plan Year); and

(ii)   The "applicable contribution rate" for an eligible Non-Highly Compensated Employee is the sum of the matching contributions (as defined in Regulation Section 1.401(m)-1(a)(2)) taken into account in determining the ACR for the eligible Non-Highly Compensated Employee for the Plan Year and the Qualified Non-Elective Contributions made for that Non-Highly Compensated Employee for the Plan Year, divided by that Non-Highly Compensated Employee's compensation under Section 414(s) of the Code for the Plan Year.

(iii)  <u>ACR of Highly Compensated Employee if Multiple Plans</u>. The Actual Contribution Ratio (ACR) for any Participant who is a Highly Compensated Employee and who is eligible to have matching contributions or after-tax Employee contributions allocated to his or her account under two (2) or more plans described in Code Section 401(a), or arrangements described in Code Section 401(k) that are maintained by the same Employer, shall be determined as if the total of such contributions was made under each plan and arrangement. If a Highly Compensated Employee participates in two (2) or more such plans or arrangements that have different plan years, then all matching contributions and after-tax Employee contributions made during the Plan Year being tested under all such plans and arrangements shall be aggregated, without regard to the plan years of the other plans. For plan years beginning before the effective date of this Amendment, all such plans and arrangements ending with or within the same calendar year shall be treated as a single plan or

arrangement. Notwithstanding the foregoing, certain plans shall be treated as separate if mandatorily disaggregated under the Regulations of Code Section 401(m).

(iv)    Plans Using Different Testing Methods for the ACP and ADP Test. Except as otherwise provided in this Section, the Plan may use the current year testing method or prior test testing method for the ACP test for a Plan Year without regard to whether the current year testing method or prior year testing method is used for the ADP test for that Plan Year. However, if different testing methods are used, then the Plan cannot use:

    A.    The recharacterization method of Regulation Section 1.401(k)-2(b)(3) to correct excess contributions for a Plan Year;

    B.    The rules of Regulation Section 1.401(m)-2(a)(6)(ii) to take Elective Contributions into account under the ACP test (rather than the ADP test); or

    C.    The rules of Regulation Section 1.401(k)-2(a)(6) to take Qualified Matching Contributions into account under the ADP test (rather than the ACP test).

(v)    Corrective Contributions. If a failed ACP test is to be corrected by making an Employer contribution, then the provisions of the Plan for the corrective contributions shall be applied by limiting the contribution made on behalf of any Non-Highly Compensated Employee pursuant to such provisions to an amount that does not exceed the targeted contribution limits of Section 4.1.e.

f.    Multiple Use Limitation. For Plan Years beginning prior to January 1, 2002, if at least one Highly Compensated Employee is includable in the ADP test under Section 4.1.d and in the ACP test under Section 4.1.e, the sum of the Highly Compensated Group's ADP and ACP may not exceed the multiple use limitation.

The multiple use limitation is the sum of 1 and 2:

1.    25% of the greater of: (A) the ADP of the Non-highly Compensated Group under the Section 401(k) arrangement; or (B) the ACP of the Non-highly Compensated Group for the Plan Year beginning with or within the Plan Year of the Section 401(k) arrangement.

2.    2% plus the lesser of (1)(A) or (1)(B), but no more than twice the lesser of (1)(A) or (1)(B).

The Committee will determine whether the Plan satisfies the multiple use limitation after applying the ADP test under Section 4.1.d and the ACP test under Section 4.1.e and after making any corrective distributions required by those Sections. If, after applying this Section 4.1.f, the Committee determines the Plan

has failed to satisfy the multiple use limitation, the Committee will correct the failure by treating the excess amount as excess aggregate contributions under Section 4.1.d. This Section 4.1.f does not apply unless, prior to application of the multiple use limitation, the ADP and the ACP of the Highly Compensated Group each exceeds 125% of the respective percentages for the Non-highly Compensated Group.

g.    Distribution Restrictions.  The distribution events applicable to the Participant's Employee Deferral Account must satisfy the distribution restrictions described in paragraph (12) of Section 4.1.a.

h.    Safe Harbor Provisions.  The Plan adopts the safe harbor alternative methods under Section 401(k)(12) and Section 401(m)(11) of the Code, effective October 1, 2006.

1.    Allocation Conditions. With respect to any Plan Year, if the Plan uses the ADP Test Safe Harbor and provides for matching contributions, then (1) the Plan will be an ACP Test Safe Harbor plan, provided the ACP Test Safe Harbor requirements are met, and (2) the Plan will not impose any allocation conditions on employer matching contributions.

2.    Matching Catch-up Contributions. If the Plan provides for ADP Test Safe Harbor matching contributions or ACP Test Safe Harbor matching contributions, catch-up contributions (as defined in Code Section 414(v)) will not be taken into account in applying such matching contributions under the Plan.

3.    Plan Year Requirement. Except as provided in Regulation Sections 1.401(k)-3(e) and 1.401(k)-3(f), and below, the Plan will fail to satisfy the requirements of Code Section 401(k)(12) and this Section for a Plan Year unless such provisions remain in effect for an entire twelve (12) month Plan Year.

4.    Change of Plan Year. If a Plan has a short Plan Year as a result of changing its Plan Year, then the Plan will not fail to satisfy the requirements of Section 4.1.h.3 merely because the Plan Year has less than twelve (12) months, provided that:

(i)    The Plan satisfied the ADP Test Safe Harbor and/or ACP Test Safe Harbor requirements for the immediately preceding Plan Year; and

(ii)    The Plan satisfies the ADP Test Safe Harbor and/or ACP Test Safe Harbor requirements (determined without regard to Regulation Section 1.401(k)-3(g)) for the immediately following Plan Year (or for the immediately following twelve (12) months if the immediately following Plan Year is less than twelve (12) months).

5.    <u>Timing of Matching Contributions</u>. If the ADP Test Safe Harbor contribution being made to the Plan is a matching contribution (or any ACP Test Safe Harbor matching contribution) that is made separately with respect to each payroll period (or with respect to all payroll periods ending with or within each month or quarter of a Plan Year) taken into account under the Plan for the Plan Year, then safe harbor matching contributions with respect to any elective deferrals and/or after-tax employee contributions made during a Plan Year quarter must be contributed to the Plan by the last day of the immediately following Plan Year quarter.

6.    <u>Exiting Safe Harbor Matching</u>. The Employer may amend the Plan during a Plan Year to reduce or eliminate prospectively any or all matching contributions under the Plan (including any ADP Test Safe Harbor matching contributions) provided: (A) the Committee provides a supplemental notice to the Participants which explains the consequences of the amendment, specifies the amendment's effective date, and informs Participants that they will have a reasonable opportunity to modify their cash or deferred elections and, if applicable, after-tax Employee contribution elections; (B) Participants have a reasonable opportunity (including a reasonable period after receipt of the supplemental notice) prior to the effective date of the amendment to modify their cash or deferred elections, and, if applicable, after-tax Employee contribution elections; and (C) the amendment is not effective earlier than the later of: (i) thirty (30) days after the Committee gives supplemental notice; or (ii) the date the Employer adopts the amendment. An Employer which amends its Plan to eliminate or reduce any matching contribution under this Section, effective during the Plan Year, must continue to apply all of the ADP Test Safe Harbor and/or ACP Test Safe Harbor requirements of the Plan until the amendment becomes effective and also must apply for the entire Plan Year, using current year testing, the ADP test and the ACP test.

7.    <u>Plan Termination</u>. An Employer may terminate the Plan during a Plan Year in accordance with Plan termination provisions of the Plan and this Section.

   (i)    <u>Acquisition/Disposition or Substantial Business Hardship</u>. If the Employer terminates the Plan resulting in a short Plan Year, and the termination is on account of an acquisition or disposition transaction described in Code Section 410(b)(6)(C), or if the termination is on account of the Employer's substantial business hardship within the meaning of Code Section 412(d), then the Plan remains an ADP Test Safe Harbor and/or ACP Test Safe Harbor Plan provided that the Employer satisfies the ADP Test Safe Harbor and/or ACP Test Safe Harbor provisions through the effective date of the Plan termination.

53

(ii)   <u>Other Termination</u>. If the Employer terminates the Plan for any reason other than as described in Section 4.1.6.A above, and the termination results in a short Plan Year, the Employer must conduct the termination under the provisions of Section 4.1.h.6 above, except that the Employer need not provide Participants with the right to change their cash or deferred elections.

4.2   <u>Maximum Annual Additions</u>.

a.   Notwithstanding the foregoing, the maximum "annual additions" credited to a Participant's Accounts for any "limitation year" shall equal the lesser of: (1) $53,000 adjusted annually as provided in Section 415(d) of the Code, pursuant to the Regulations, or (2) one hundred percent (100%) of the Participant's "415 Compensation" for such "limitation year." For any short "limitation year," the dollar limitation in (1) above shall be reduced by a fraction, the numerator of which is the number of full months in the short "limitation year" and the denominator of which is twelve (12).

b.   For purposes of applying the limitations of Section 415 of the Code, "annual additions" means the sum credited to a Participant's accounts for any "limitation year" of (1) Employer contributions, (2) Employee contributions, (3) forfeitures, (4) amounts allocated, after March 31, 1984, to an individual medical account, as defined in Section 415(1)(2) of the Code which is part of a pension or annuity plan maintained by the Employer and (5) amounts derived from contributions paid or accrued after December 31, 1985, in taxable years ending after such date, which are attributable to post-retirement medical benefits allocated to the separate account of a key employee (as defined in Section 419A(d)(3) of the Code) under a welfare benefit plan (as defined in Section 419(e) of the Code) maintained by the Employer. Except, however, the "415 Compensation" percentage limitation referred to in paragraph (a)(2) above shall not apply to: (1) any contribution for medical benefits (within the meaning of Section 419A(f)(2) of the Code) after separation from service which is otherwise treated as an "annual addition," or (2) any amount otherwise treated as an "annual addition" under Section 415(1)(1) of the Code.

In any Plan Year in which there is a Securities Acquisition Loan in effect and the Employer makes contributions to the Plan for the purposes of making payments of principal and interest on the Loan which are due that year, the amount of annual additions of each Participant who is entitled to receive an allocation of annual additions will be calculated on the basis of whichever of the following methods results in a lesser annual addition to the Participant: (i) on the actual amount of contributions credited to the Participant's Account for the year; or (ii) on the amount of contributions credited to the Participant's Other Investments Account with respect to amounts invested in assets other than Company Stock and on the basis of the fair market value of Company Stock released from the suspense account and credited to the Participant's Company Stock Account for the Plan Year, valued as of the date which coincides with the date as of which the annual

addition is allocated. Provided, however, shares of Company Stock which are not acquired by the Plan with the proceeds of a Securities Acquisition Loan will be calculated solely on the basis of the fair market value of such shares.

If the Employer is not an "S" corporation as described in Section 1361(b) of the Code, then, notwithstanding the other provisions of this Section, if no more than one-third of the Employer contributions for a Plan Year which are deductible as principal or interest payments on a Securities Acquisition Loan pursuant to the provisions of Section 404(a)(9) of the Code, are allocated to Highly Compensated Employees (within the meaning of Section 414(q) of the Code), then the limitations imposed by this Section will not apply to:

1.     Company Stock forfeited and allocated under the Plan if the Company Stock was acquired with the proceeds of a Securities Acquisition Loan; or

2.     Employer Contributions which are deductible as interest payments on a loan under Section 404(a)(9)(B) of the Code and charged against a Participant's account.

Annual additions for purposes of Section 415 of the Code shall not include restorative payments. A restorative payment is a payment made to restore losses to a plan resulting from actions by a fiduciary for which there is reasonable risk of liability for breach of a fiduciary duty under ERISA or under other applicable federal or state law, where participants who are similarly situated are treated similarly with respect to the payments. Generally, payments are restorative payments only if the payments are made in order to restore some or all of the Plan's losses due to an action (or a failure to act) that creates a reasonable risk of liability for such a breach of fiduciary duty (other than a breach of fiduciary duty arising from failure to remit contributions to the plan). This includes payments to a Plan made pursuant to a Department of Labor order, the Department of Labor's Voluntary Fiduciary Correction Program, or a court-approved settlement, to restore losses to a qualified defined contribution plan on account of the breach of fiduciary duty (other than a breach of fiduciary duty arising from failure to remit contributions to the plan). Payments made to the Plan to make up for losses due merely to market fluctuations and other payments that are not made on account of a reasonable risk of liability for breach of a fiduciary duty under ERISA are not restorative payments and generally constitute contributions that are considered annual additions.

Annual additions for purposes of Section 415 of the Code shall not include: (1) The direct transfer of a benefit or employee contributions from a qualified plan to this Plan; (2) rollover contributions (as described in Sections 401(a)(31), 402(c)(1), 403(a)(4), 403(b)(8), 408(d)(3), and 457(e)(16) of the Code); (3) repayments of loans made to a participant from the Plan; and (4) repayments of amounts described in Section 411(a)(7)(B) of the Code (in accordance with Section 411(a)(7)(C) and Section 411(a)(3)(D) of the Code or repayment of contributions to a governmental plan (as described in Section 414(d) of the Code)

as described in Section 415(k)(3) of the Code, as well as Employer restorations of benefits that are required to such repayments.

c.     For purposes of applying the limitations of Section 415 of the Code, the transfer of funds from one qualified plan to another is not an "annual addition." In addition, the following are not Employee contributions for annual addition purposes: (1) rollover contributions (as defined in Sections 402(e)(6), 403(a)(4), 403(b)(8) and 408(d)(3) of the Code); (2) repayments of loans made to a Participant from the Plan; (3) repayments of distributions received by an Employee pursuant to Section 411(a)(7)(B) of the Code (cash-outs); (4) repayments of distributions received by an Employee pursuant to Section 411(a)(3)(D) of the Code (mandatory contributions); and (5) Employee contributions to a simplified employee pension excludable from gross income under Section 408(k)(6) of the Code.

d.     For purposes of applying the limitations of Section 415 of the Code, the "limitation year" shall be the Plan Year. The limitation year may only be changed by a Plan amendment. Furthermore, if the Plan is terminated, effective as of a date other than the last day of the Plan's limitation year, then the Plan is treated as if the Plan had been amended to change its limitation year.

e.

1.     For purposes of applying the limitations of Section 415 of the Code, all defined contribution plans (without regard to whether a plan has been terminated) ever maintained by the Employer (or a "predecessor employer") under which the participant receives annual additions are treated as one defined contribution plan. The "Employer" means the Employer that adopts this Plan and all members of a controlled group or an affiliated service group that includes the Employer (within the meaning of Sections 414(b), (c), (m) or (o) of the Code), except that for purposes of this Section, the determination shall be made by applying Section 415(h) of the Code, and shall take into account tax-exempt organizations under Regulation Section 1.414(c)-5, as modified by Regulation Section 1.415(a)-1(f)(1). For purposes of this Section:

(i)     A former Employer is a "predecessor employer" with respect to a participant in a plan maintained by an Employer if the Employer maintains a plan under which the participant had accrued a benefit while performing services for the former Employer, but only if that benefit is provided under the plan maintained by the Employer. For this purpose, the formerly affiliated plan rules in Regulation Section 1.415(f)-1(b)(2) apply as if the Employer and predecessor Employer constituted a single employer under the rules described in Regulation Section 1.415(a)-1(f)(1) and (2) immediately prior to the cessation of affiliation (and as if they constituted two, unrelated employers under the rules described in Regulation Section 1.415(a)-1(f)(1) and (2) immediately after the cessation of

56

affiliation) and cessation of affiliation was the event that gives rise to the predecessor employer relationship, such as a transfer of benefits or plan sponsorship.

(ii)    With respect to an Employer of a Participant, a former entity that antedates the Employer is a "predecessor employer" with respect to the participant if, under the facts and circumstances, the employer constitutes a continuation of all or a portion of the trade or business of the former entity.

2.    For purposes of aggregating plans for Section 415, a "formerly affiliated plan" of an employer is taken into account for purposes of applying the Section 415 limitations to the employer, but the formerly affiliated plan is treated as if it had terminated immediately prior to the "cessation of affiliation." For purposes of this paragraph, a "formerly affiliated plan" of an employer is a plan that, immediately prior to the cessation of affiliation, was actually maintained by one or more of the entities that constitute the employer (as determined under the employer affiliation rules described in Regulation Section 1.415(a)-1(f)(1) and (2)), and immediately after the cessation of affiliation, is not actually maintained by any of the entities that constitute the employer (as determined under the employer affiliation rules described in Regulation Section 1.415(a)-1(f)(1) and (2)). For purposes of this paragraph, a "cessation of affiliation" means the event that causes an entity to no longer be aggregated with one or more other entities as a single employer under the employer affiliation rules described in Regulation Section 1.415(a)-1(f)(1) and (2) (such as the sale of a subsidiary outside a controlled group), or that causes a plan to not actually be maintained by any of the entities that constitute the employer under the employer affiliation rules of Regulation Section 1.415(a)-1(f)(1) and (2) (such as a transfer of plan sponsorship outside of a controlled group).

3.    Two or more defined contribution plans that are not required to be aggregated pursuant to Code Section 415(f) and the Regulations thereunder as of the first day of a limitation year do not fail to satisfy the requirements of Code Section 415 with respect to a participant for the limitation year merely because they are aggregated later in that limitation year, provided that no annual additions are credited to the participant's account after the date on which the plans are required to be aggregated.

f.    Participants may not make elective deferrals with respect to amounts that are not 415 Compensation. However, for this purpose, 415 Compensation is not limited to the annual compensation limit of Section 401(a)(17) of the Code.

g.    If this is a plan described in Section 413(c) of the Code (other than a plan described in Section 413(f) of the Code), then all of the benefits or contributions attributable to a Participant from all of the Employers maintaining this Plan shall be taken into account in applying the limits of this Section with respect to such

Participant. Furthermore, in applying the limitations of this Section with respect to such a Participant, the total "415 Compensation" received by the Participant from all of the Employers maintaining the Plan shall be taken into account.

h.

1. If a Participant participates in more than one defined contribution plan maintained by the Employer which have different anniversary dates, the maximum "annual additions" under this Plan shall equal the maximum "annual additions" for the "limitation year" minus any "annual additions" previously credited to such Participant's accounts during the "limitation year."

2. If a Participant participates in both a defined contribution plan subject to Section 412 of the Code and a defined contribution plan not subject to Section 412 of the Code maintained by the Employer which have the same anniversary date, "annual additions" will be credited to the Participant's accounts under the defined contribution plan subject to Section 412 of the Code prior to crediting "annual additions" to the Participant's accounts under the defined contribution plan not subject to Section 412 of the Code.

3. If a Participant participates in more than one defined contribution plan not subject to Section 412 of the Code maintained by the Employer which have the same anniversary date, the maximum "annual additions" under this Plan shall equal the product of (A) the maximum "annual additions" for the "limitation year" minus any "annual additions" previously credited under subparagraphs (1) or (2) above, multiplied by (B) a fraction (i) the numerator of which is the "annual additions" which would be credited to such Participant's accounts under this Plan without regard to the limitations of Section 415 of the Code and (ii) the denominator of which is such "annual additions" for all plans described in this subparagraph.

i. Notwithstanding anything contained in this Section to the contrary, the limitations, adjustments and other requirements prescribed in this Section shall at all times comply with the provisions of Section 415 of the Code and the Regulations thereunder.

j. "415 Compensation" with respect to any Participant means such Participant's wages, salaries, fees for professional services and other amounts received (without regard to whether or not an amount is paid in cash) for personal services actually rendered in the course of employment with the Employer maintaining the Plan to the extent that the amounts are includible in gross income (including, but not limited to, commissions paid salesmen, compensation for services on the basis of a percentage of profits, commissions on insurance premiums, tips, bonuses, fringe benefits, and reimbursements or other expense allowances under a non-accountable plan as described in Regulation 1.62-2(c)) for a Plan Year.

"415 Compensation" shall exclude (a)(1) contributions made by the Employer to a plan of deferred compensation to the extent that the contributions are not includible in the gross income of the Participant for the taxable year in which contributed, (2) Employer contributions made on behalf of an Employee to a simplified employee pension plan described in Code Section 408(k) to the extent such contributions are excludable from the Employee's gross income, (3) any distributions from a plan of deferred compensation; (b) amounts realized from the exercise of a non-qualified stock option, or when restricted stock (or property) held by an Employee either becomes freely transferable or is no longer subject to a substantial risk of forfeiture; (c) amounts realized from the sale, exchange or other disposition of stock acquired under a qualified stock option; and (d) other amounts which receive special tax benefits, or contributions made by the Employer (whether or not under a salary reduction agreement) towards the purchase of any annuity contract described in Code Section 403(b) (whether or not the contributions are actually excludable from the gross income of the Employee).

For purposes of this Section, the determination of "415 Compensation" shall include any "elective deferral" (as defined in Code Section 402(g)(3)), and any amount which is contributed or deferred by the Employer at the election of the Participant and which is not includible in the gross income of the Participant by reason of Sections 125, 132(f)(4) or 457 of the Code.

For Plan Years beginning on or after July 1, 2007, 415 Compensation for a Plan Year (as well as Compensation for purposes of determining highly compensated employees and for top-heavy purposes) shall also include Compensation paid by the later of 2-1/2 months after an Employee's Severance from Employment with the Employer maintaining the Plan or the end of the Plan Year that includes the date of the Employee's Severance from Employment with the Employer maintaining the Plan, if: (i) the payment is regular Compensation for services during the Employee's regular working hours, or Compensation for services outside the Employee's regular working hours (such as overtime or shift differential), commissions, bonuses, or other similar payments, and, absent a Severance from Employment, the payments would have been paid to the Employee while the Employee continued in employment with the Employer; (ii) the payment is for unused accrued bona fide sick, vacation, or other leave that the Employee would have been able to use if employment had continued; or (iii) the payment is received by the Employee pursuant to a nonqualified unfunded deferred compensation plan and would have been paid at the same time if employment had continued, but only to the extent includible in gross income.

Any payments not described above shall not be considered Compensation if paid after Severance from Employment, even if they are paid by the later of 2-1/2 months after the date of Severance from Employment or the end of the Plan Year that includes the date of Severance from Employment, except payments to an individual who does not currently perform services for the Employer by reason of qualified military service (within the meaning of Section 414(u)(1) of the Code)

to the extent these payments do not exceed the amounts the individual would have received if the individual had continued to perform services for the Employer rather than entering qualified military service.

From and after January 1, 2009: (i) an individual receiving a differential wage payment, as defined by Section 3401(h)(2) of the Code is treated as an employee of the employer making the payment; (ii) the differential wage payment is treated as compensation for purposes of Section 415(c)(3) of the Code and Treasury Reg. § 1.415(c)-2 (e.g., for purposes of Section 415 of the Code, top-heavy provisions of Code Section 416, determination of highly compensated employees under Section 414(q) of the Code, and applying the 5% gateway requirement under Section 401(a)(4) of the Code (regulations)); and (iii) the Plan is not treated as failing to meet the requirements of any provision described in Section 414(u)(1)(C) of the Code (or corresponding plan provisions, including, but not limited to, Plan provisions related to the ADP or ACP test) by reason of any contribution or benefit which is based on the differential wage payment. The Employer operationally may determine, for purposes of the provisions described in Section 414(u)(1)(C) of the Code, whether to take into account any deferrals, and if applicable, any matching contributions, attributable to differential wages. Differential wage payments (as described herein) will also be considered compensation for all Plan purposes.

Item (iii) above applies only if all employees of the Employer performing service in the uniformed services described in Section 401(h)(2)(A) of the Code are entitled to receive differential wage payments (as defined in Section 3401(h)(2) of the Code) on reasonably equivalent terms and, if eligible to participate in a retirement plan maintained by the Employer, to make contributions based on the payments on reasonably equivalent terms (taking into account Section 410(b)(3), (4) and (5) of the Code).

4.3    Adjustment for Excessive Contributions

a.    If, as a result of the allocation of Forfeitures, a reasonable error in estimating a Participant's Compensation, a reasonable error in determining the amount of elective deferrals (within the meaning of Section 402(g)(3) of the Code) that may be made with respect to any Participant or other facts and circumstances to which Regulation 1.415-6(b)(6) shall be applicable, the "annual additions" under this Plan would cause the maximum "annual additions" to be exceeded for any Participant, the "excess amount" will be disposed of in accordance with the Employee Plans Compliance Resolution System (EPCRS) as set forth in Revenue Procedure 2006-27, or any superseding guidance, including, but not limited to, the preamble of the final Section 415 Regulations.

Subject to the EPCRS rules, the Committee may provide for the distribution of Elective Deferrals (within the meaning of Code Section 402(g)(3)) or the return of employee contributions (whether voluntary or mandatory), to the extent that the

distribution or return would reduce the excess amounts in a Participant's account. This provision shall be effective on and after October 1, 2007.

b.  For purposes of this Article, "excess amount" for any Participant for a "limitation year" shall mean the excess, if any, of (1) the "annual additions" which would be credited to the Participant's account under the terms of the Plan without regard to the limitations of Code Section 415 over (2) the maximum "annual additions" determined pursuant to Code Section 415 and the Plan.

## ARTICLE V
## INVESTMENT AND ADJUSTMENT OF ACCOUNTS

5.1  Operation of Subfunds

a.  Establishing Commingled Subfunds. At the direction of the Committee, the Trustee or ESOP Trustee shall divide the Trust Fund into two or more subfunds, which shall serve as vehicles for the investment of Participants' Accounts. Such subfunds may include segregated common trust funds, guaranteed investment contracts, investments in investment companies (mutual funds, including any mutual fund for which the Trustee or any affiliate of the Trustee serves as investment advisor, custodian, administrator, distributor or other service provider, as disclosed in the current prospectus for such mutual fund), traded securities, and investments in Qualifying Employer Securities. The Committee shall determine, with such independent advice as it deems necessary or appropriate, the general investment characteristics and objectives of each subfund.

b.  Operational Rules. Each Participant shall designate the subfund(s) in which the assets in his Account(s) shall be invested. If a Participant wishes to utilize more than one subfund, he shall notify the Trustee of the whole percentage of his Account(s) to be invested in each fund. In the event a Participant does not elect a subfund for investment of his Account(s), the Committee shall direct that such Participant's Accounts(s) be invested in the subfund with the lowest risk, as determined by the Committee.

All participants shall have the right to invest up to 100% of their Account in any one subfund, including investments in Qualifying Employer Securities; provided, however, unless Qualifying Employer Securities have been registered under the Securities Act of 1933, or an exemption from registration applies, no investments of Account balances that would be considered not attributable to employer contributions under Section 3(a)(2) of the Securities Act of 1933 shall be invested in Qualifying Employer Securities.

At any time, a Participant may change his election of subfunds, or direct that a transfer be made from one subfund to another, pursuant to rules adopted by the Committee and the rules of the investment company, Trustee or ESOP Trustee on transfers. Requested changes shall be effective in accordance with the timing

requirements of these rules. Changes may be made via electronic, telephonic or other means as authorized under the above-referenced rules.

Notwithstanding the foregoing, while employed by the Employer, a Participant may invest his Account in Qualifying Employer Securities only through a purchase of Qualifying Employer Securities from the Employer or the Plan. While employed by the Employer, a Participant may move Qualifying Employer Securities out of his Account only as a result of a purchase of Qualifying Employer Securities by the Employer or the Plan. Except as provided under Section 5.1.d, while a Participant is employed by the Employer, neither the Employer nor the Plan shall be obligated to sell to or purchase from such Participant's Account any Qualifying Employer Securities. Transfers of Qualifying Employer Securities may be made from a Suspense Account to a Participant's Company Stock Account upon payment from a Participant's Other Investments Account to the Suspense Account of fair market value of the shares on the date of transfer. All of said transfers shall be made pursuant to procedures which shall be adopted by the Committee and applied uniformly to similarly situated Participants.

The Committee shall adopt such rules and procedures as it deems advisable with respect to all matters relating to the selection and use of the subfunds, provided that all Participants are treated uniformly.

c.   <u>Revising Subfunds</u>. The Committee shall have the power, from time-to-time, to dissolve subfunds, to direct that additional subfunds be established and, under uniform rules, to withdraw or limit participation in a particular subfund, including, without limitation, the limitation of former Employees to continue to participate in investments in Qualifying Employer Securities. The Committee shall also have the power to direct the Trustee to consolidate any separate subfunds hereunder with any other separate subfunds having the same investment objectives which are established under any other retirement plan trust fund of the Employer or any corporation affiliated in ownership or management with the Employer of which the Trustee is trustee and which are managed by the Trustee or the same Investment Manager.

d.   <u>Diversification of Investments in Qualifying Employer Securities</u>. Within ninety (90) days after the close of each Plan Year in the Qualified Election Period, each Qualified Participant shall be permitted to direct the Plan as to the investment of not more than twenty-five percent (25%) of the value of the Participant's Company Stock Account which is attributable to Qualifying Employer Securities to the extent such value exceeds the amount to which a prior election, if any, applies. In the case of the sixth (6th) year of the Qualified Election Period, the preceding sentence shall be applied by substituting "fifty percent (50%)" for "twenty-five percent (25%)." The Participant's direction shall be completed no later than ninety (90) days after the close of the ninety (90) day election period.

The investment options shall be those options otherwise available under the non-ESOP portion of the Plan.

"Qualified Election Period" shall mean the six (6) Plan Year period beginning with the first Plan Year in which the Participant first became a Qualified Participant.

"Qualified Participant" shall mean any Participant who has attained age fifty-five (55) and has completed ten (10) years of participation under the Employee Stock Ownership Plan or the Plan from and after the effective date of the Employee Stock Ownership Plan portion of the Plan.

e.  Transfer from Company Stock Account for Terminated Participant.  The Committee may direct that any part of a Participant's Company Stock Account invested in Qualifying Employer Securities which is retained in the ESOP Trust following the date on which the Participant has terminated employment, shall be converted to cash and transferred to the Participant's Other Investments Account and shall no longer participate in Qualifying Employer Securities. The Participant shall have the option to direct the investments in investment options, selected by the Committee, which shall be the same options provided under Section 5.1.d. Transfers directed from the Company Stock Account to the Other Investments Account shall be made as soon as administratively practical after any appropriate valuation has been completed.

5.2  Valuation and Adjustment of Accounts.  The Trustee and ESOP Trustee shall value each subfund as of each Valuation Date, which valuation date shall reflect, as nearly as possible, the then fair market value of the assets comprising such subfund. All subfunds shall be valued as of the annual Valuation Date. Specific subfunds may be valued on separate Valuation Dates. Valuation of Qualifying Employer Securities shall be based on the report of an Independent Appraiser appointed by the Committee. "Independent Appraiser" shall have the same meaning as in Section 7.13.a.

## ARTICLE VI
## DISTRIBUTABLE EVENTS AND FORFEITURES

6.1  Distributable Events.  Subject to special rules regarding distributions of Qualifying Employer Securities in Section 7.2 and hardship withdrawals in Section 7.8, a Participant's Total Account shall become distributable in accordance with Article VII upon the earliest occurrence of any of the following events while in the employment of the Employer or an Affiliate:

a.  His death.  The Plan will credit the Participant's qualified military service as service for vesting purposes as though the Participant had resumed employment under USERRA immediately prior to the Participant's death;

b.  His retirement at or after attaining his normal Retirement Age or on account of separation from service or severance, whether voluntary or involuntary;

c.    The attainment of age seventy and one-half (70-1/2) years by a Participant who is a Five Percent Owner (as defined in Section 8.2.c);

d.    A complete termination of the Plan or a partial termination of the Plan which is effective as to him;

e.    The attainment of age 59-1/2 and the election of the Participant to withdraw his Accounts other than his Company Stock Accounts;

f.    The election of the Participant to withdraw his Employee Contribution Account (After-Tax) other than his Company Stock Account under Section 7.7;

g.    Upon hardship of the Participant, to the extent provided in Section 7.8; or

h.    Subject to subsection 7.7.c, prior to age 59½ and the election of the Participant to withdraw his Accounts other than his Company Stock Account;

provided, however, that a transfer from Recognized Employment to employment with the Employer that is other than Recognized Employment or a transfer from the employment of one Employer participating in the Plan to another such Employer or to any Affiliate shall not constitute a distributable event.

Notwithstanding the foregoing, and except as provided in Section 7.1.b., or as required by the Code or ERISA, in the event of any distributable event, withdrawal election or qualified domestic relations order before a Participant's Normal Retirement Age, for reasons other than death or disability, no portion of a Participant's Company Stock Account invested in Qualifying Employer Securities acquired with the proceeds of a Securities Acquisition Loan shall be distributable except as provided in Section 7.2.f.2; or

6.2    Determination of Benefits.  Upon the occurrence of an event entitling a Participant to a distribution hereunder, the value of his Total Account shall be determined in accordance with Article V hereof, and the Vested portion shall be determined by applying the vesting schedule contained in Section 6.3 to the Participant's Years of Service as of the date the Participant has a distributable event.

6.3    Vesting.

a.    A Participant's Total Account shall be fully Vested in him at all times.

b.    In any Plan Year in which this Plan is Top-Heavy, a Participant's Total Account shall be Vested in him at all times.

The Plan shall apply the Top-Heavy schedule to Participants who earn at least one (1) Hour of Service after the Top-Heavy schedule becomes effective. A shift to a new vesting schedule under this subparagraph is effective on the first day of the Plan Year for which the Top-Heavy status of the Plan changes.

Although the Employer reserves the right to amend the vesting schedule at any time, the Plan will not apply the amended vesting schedule to reduce the nonforfeitable percentage of any Participant's Account (determined as of the later of the date the Employer adopts the amendment, or the date the amendment becomes effective) to a percentage less than the nonforfeitable percentage computed under the Plan without regard to the amendment.

If the Employer makes a permissible amendment to the vesting schedule, each Participant having at least three (3) Years of Service with the Employer may elect to have the percentage of his nonforfeitable Employer Contribution Account computed under the Plan without regard to the amendment. The Participant must file his election with the Committee within 60 days of the latest of (a) the Employer's adoption of the amendment; (b) the effective date of the amendment; or (c) his receipt of a copy of the amendment. The Committee, as soon as practicable, must forward a true copy of any amendment to the vesting schedule to each affected Participant, together with an explanation of the effect of the amendment, the appropriate form upon which the Participant may make an election to remain under the vesting schedule provided under the Plan prior to the amendment and notice of the time within which the Participant must make an election to remain under the prior vesting schedule. For purposes of this subparagraph, an amendment to the vesting schedule includes any Plan amendment which directly or indirectly affects the computation of the non-forfeitable percentage of an Employee's right to his Employer Contribution Account. Furthermore, any shift in the vesting schedule, due to a change in the Plan's Top-Heavy status, is an amendment to the vesting schedule for purposes of this subparagraph.

c.     All Forfeitures shall be charged first against the Participant's subfunds invested in investments other than Qualifying Employer Securities, with any balance charged next against Qualifying Employer Securities which were not acquired with the proceeds of a Securities Acquisition Loan.

6.4     Cash-Out Distributions to Partially Vested Participants/ Restoration of Forfeited Accrued Benefit.  If a partially-vested Participant receives a cash-out distribution before he incurs a Forfeiture Break in Service, the cash-out distribution will result in an immediate forfeiture of the non-vested portion of the Participant's Account derived from Employer contributions. A partially-vested Participant is a Participant whose non-forfeitable percentage is less than 100%. A cash-out distribution is a distribution of the entire present value of the Participant's Nonforfeitable Account.

a.     Restoration and conditions upon restoration. A partially-vested Participant who is re-employed by the Employer after receiving a cash-out distribution of the non-forfeitable percentage of his Accrued Benefit may repay the Plan the amount of the cash-out distribution attributable to Employer contributions, unless the Participant no longer has a right to restoration under the requirements of this subparagraph. If a partially-vested Participant makes the cash-out distribution repayment, the Plan, subject to the conditions of this paragraph a, must restore his

Account attributable to Employer contributions to the same dollar amount as the dollar amount of his Account on the valuation date, immediately preceding the date of the cash-out distribution, unadjusted for any gains or losses occurring subsequent to that valuation date. Restoration of the Participant's Account includes restoration of all Code Section 411(d)(6) protected benefits with respect to that restored Account, in accordance with applicable Treasury regulations. The Plan will not restore a reemployed Participant's Account under this paragraph if:

1.  five (5) years have elapsed since the Participant's first re-employment date with the Employer following the cash-out distribution; or

2.  the Participant incurred a Forfeiture Break in Service. This condition also applies if the Participant makes repayment within the Plan Year in which he incurs the Forfeiture Break in Service and that Forfeiture Break in Service would result in a complete forfeiture of the amount the Plan otherwise would restore.

b.  <u>Time and method of restoration</u>. If neither of the two conditions preventing restoration of the Participant's Account applies, the Plan will restore the Participant's Account as of the end of the Plan Year coincident with or immediately following the repayment. To restore the Participant's Account, the Plan, to the extent necessary, will allocate to the Participant's Account:

1.  First, the amount, if any, of Participant forfeitures the Plan would otherwise use under the Plan;

2.  Second, the amount, if any, of the Trust Fund net income or gain for the Plan Year; and

3.  Third, the Employer contribution for the Plan Year to the extent made under a discretionary formula.

To the extent the amounts described in clauses 1, 2 and 3 are insufficient to enable the Plan to make the required restoration, the Employer must contribute the additional amount necessary to enable the Plan to make the required restoration. If, for a particular Plan Year, the Plan must restore the Accrued Benefit of more than one re-employed Participant, then the Plan will make the restoration allocations to each such Participant's Account in the same proportion that a Participant's restored amount for the Plan Year bears to the restored amount for the Plan Year of all reemployed Participants. The Plan will not take into account any allocation under this subsection in applying the limitation on allocations under Section 3.9.

c.  <u>0% Vested Participant</u>. The deemed cash-out rule shall apply to a 0% vested Participant. A "0% vested Participant" is a Participant whose Account derived from Employer contributions is entirely forfeitable at the time of his separation from service. Under this deemed cash-out rule, the Plan will treat the 0% vested Participant as having received a cash-out distribution on the date of the

66

Participant's separation from service or, if the Participant's Account is entitled to an allocation of Employer contributions for the Plan Year in which he separates from service, on the last day of that Plan Year. For purposes of applying the restoration provisions of this subsection, the Plan will treat the 0% vested Participant as repaying his cash-out "distribution" on the first date of his re-employment with the Employer.

d.   Segregated Account for Repaid Amount. Until the Plan restores the Participant's Account, as described above, the Plan will invest the cash-out amount the Participant has repaid in a segregated Account maintained solely for that Participant. Such Participant's vested and nonforfeitable percentage in such separate Accounts upon any subsequent termination of service shall be equal to:

$$\frac{X - Y}{100\% - Y}$$

For the purposes of applying this formula, X is the vested percentage at the time of the subsequent termination, and Y is the vested percentage at the time of the prior termination. Until commingled with the balance of the Trust Fund on the date the Plan restores the Participant's Account, the Participant's segregated Account remains a part of the Trust, but it alone shares in any income it earns and it alone bears any expense or loss it incurs. Unless the repayment qualifies as a rollover contribution, the Plan will repay to the Participant as soon as is administratively practicable, the full amount of the Participant's segregated Account if the Committee determines either of the conditions of Section 6.4.a prevents restoration as of the applicable valuation, notwithstanding the Participant's repayment.

e.   Included Years of Service - Vesting. For the sole purpose of determining a Participant's non-forfeitable percentage of his Account derived from Employer contributions which accrued for his benefit prior to a Forfeiture Break in Service, the Plan disregards any Year of Service after the Participant first incurs a Forfeiture Break in Service. The Participant incurs a "Forfeiture Break in Service" when he incurs five (5) consecutive Breaks in Service.

In addition, if a Participant is 0% vested in his Account derived from Employer contributions at the time he has a Break in Service, any Year of Service before a Break in Service is disregarded if the number of consecutive Breaks in Service equals or exceeds the greater of five (5) or the aggregate number of Years of Service prior to the Break.

Furthermore, the aggregate number of Years of Service before a Break in Service do not include any Years of Service not required to be taken into account under this subparagraph by reason of any prior Break in Service.

f.   When Forfeiture Occurs. A Participant's forfeiture, if any, of his Account derived from Employer contributions occurs under the Plan on the earlier of:

1.      the last day of the Plan Year in which the Participant first incurs a Forfeiture Break in Service; or

2.      the date the Participant receives a cash-out distribution.

Forfeitures of shares of Qualifying Employer Securities purchased with the proceeds of a Securities Acquisition Loan shall be forfeited only after the forfeiture of other Qualifying Employer Securities.

## ARTICLE VII
## DISTRIBUTION OF BENEFITS

7.1   Application for Distribution.

   a.   Application Required. With the exceptions noted below, no distribution shall be made from the Plan until the Committee has received a written application for distribution from the Participant or the Beneficiary entitled to receive a distribution (the "Distributee"). The Committee may prescribe rules regarding the form of such application, the manner of filing such application and the information required to be furnished in connection with such application.

   b.   Exception for Small Amounts. On and after March 25, 2005, in the event a Participant's Total Account balance does not exceed One Thousand Dollars ($1,000) on the date of the first distribution, the Total Account may be distributed upon the direction of the Committee after the occurrence of a distributable event effective as to the Participant, without a written application for distribution. A Participant's written application for distribution is required if his Total Account balance exceeds One Thousand Dollars ($1,000). Effective January 1, 2002, the value of a Participant's Total Account shall be determined without regard to that portion of the Account balances that is attributable to rollover contributions (and earnings allocable thereto) within the meaning of Section 402(c), 403(a)(4), 403(b)(8), 408(d)(3)(A)(ii), and 457(e)(16) of the Code.

   c.   Exception for Age 70-1/2. Once a Participant attains the age of 70-1/2 years, if no application has been received by the required beginning date under Section 7.2.b, a Participant's Total Account shall commence automatically without a written application for distribution, provided the Participant has terminated service or is a five percent (5%) owner, as defined in Code Section 416(b)(1)(B) of the Code.

7.2   Time of Distribution.  Upon the receipt of a valid application for distribution from the "Distributee," after the occurrence of a distributable event effective as to a Participant, and after the Participant's Account has been determined, and the right of the "Distributee" to receive a distribution has been established, the Committee shall cause the Plan to commence distribution of such Participant's Total Account in accordance with the dates specified below:

   a.   Normal Beginning Date. Subject to the provisions of Section 7.2.f regarding distributions of Qualifying Employer Securities, distribution shall commence as

68

soon as practical following the distributable event and request for payment. The distribution amount shall be based on the value of Accounts as of the Valuation Date immediately preceding actual distribution.

b.    <u>Required Beginning Date</u>. Subject to Section 7.2.c:

1.    The Total Vested Account of a Participant who is a five percent (5%) owner shall be distributed or must begin to be distributed no later than April 1 of the calendar year following the calendar year in which the Participant attains age 70-1/2. Such distribution shall be equal to or greater than any required distribution. Any Participant who is not a five percent (5%) owner shall have his Total Vested Account distributed, or begin to be distributed, not later than the April 1 of the calendar year following the later of (i) the calendar year in which the Participant attains age 70-1/2, or (ii) the calendar year in which the Participant retires.

2.    If the "Distributee" is a Beneficiary of a deceased Participant, the distribution must commence and be completed as provided in Section 7.2.e.

c.    <u>Election to Defer</u>. Unless a Participant elects in writing to defer the distribution to a later date, distribution to a Participant must commence not later than the sixtieth (60th) day after the close of the Plan Year in which:

1.    the Participant attains his Normal Retirement Age or, if later,

2.    the Participant terminates his employment with the employer or, if later,

3.    occurs the tenth (10th) anniversary of the year in which the Participant first commenced participation in the Plan.

After such election shall be made by the Participant by submitting to the Committee a signed, written request describing the date upon which the payment of the benefit shall be made. In no event, however, shall a Participant be permitted to defer distribution under this Section to a date later than that prescribed in Section 7.2.b.

d.    <u>Lifetime Benefits</u>.

1.    Benefits shall be paid as the Participant elects in one of the following forms:

    A.    One lump sum payment in cash;

    B.    Payments over a period certain in monthly, quarterly, semiannual, or annual cash installments. The period over which such payment is to be made shall not extend beyond the Participant's life expectancy (or the life expectancy of

the Participant and his designated beneficiary). Life expectancy shall be recalculated no more frequently than annually. A Participant may elect that the life expectancy of the Participant and/or his spouse not be recalculated;

    C.    A combination of A and B.

2.    Payments shall be suspended if a Participant is reemployed by the Employer.

3.    With respect to distributions under the Plan made for calendar years beginning on or after January 1, 2003, the Plan will apply the minimum distribution requirements of Section 401(a)(9) of the Code in accordance with the final regulations under Section 401(a)(9), which are incorporated herein by reference. During the Participant's lifetime, the minimum amount that will be distributed for each distribution calendar year is the lesser of:

    A.    the quotient obtained by dividing the Participant's account balance by the distribution period in the Uniform Lifetime Table set forth in Section 1.401(a)(9)-9 of the Treasury regulations, using the Participant's age as of the Participant's birthday in the distribution calendar year; or

    B.    if the Participant's sole designated beneficiary for the distribution calendar year is the Participant's spouse, the quotient obtained by dividing the Participant's account balance by the number in the Joint and Last Survivor Table set forth in Section 1.401(a)(9)-9 of the Treasury regulations, using the Participant's and spouse's attained ages as of the Participant's and spouse's birthdays in the distribution calendar year.

Required minimum distributions will be determined under this subsection beginning with the first distribution calendar year and up to and including the distribution calendar year that includes the Participant's date of death.

e.    <u>Death Benefits</u>.

1.    <u>Time and Manner of Distribution</u>.

    (i)    Death of Participant Before Distributions Begin. If the Participant dies before distributions begin, the Participant's entire interest will be distributed, or begin to be distributed, no later than as follows:

    A.    If the Participant's surviving spouse is the Participant's sole designated beneficiary, then distributions to the surviving spouse will begin by December 31 of the calendar year

immediately following the calendar year in which the Participant died, or by December 31 of the calendar year in which the Participant would have attained age 701/2, if later.

B.  If the Participant's surviving spouse is not the Participant's sole designated beneficiary, then distributions to the designated beneficiary will begin by December 31 of the calendar year immediately following the calendar year in which the Participant died.

C.  If there is no designated beneficiary as of September 30 of the year following the year of the Participant's death, the Participant's entire interest will be distributed by December 31 of the calendar year containing the fifth anniversary of the Participant's death.

D.  If the Participant's surviving spouse is the Participant's sole designated beneficiary and the surviving spouse dies after the Participant but before distributions to the surviving spouse begin, this Section 7.2, other than Section 7.2.e.1.(i).A, will apply as if the surviving spouse were the Participant.

For purposes of this Section 7.2.e, unless Section 7.2.e.1.(i).D applies, distributions are considered to begin on the Participant's Required Beginning Date. If Section 7.2.e.1.D applies, distributions are considered to begin on the date distributions are required to begin to the surviving spouse under Section 7.2.e.1.(i).A. If distributions under an annuity purchased from an insurance company irrevocably commence to the Participant before the Participant's Required Beginning Date (or to the Participant's surviving spouse before the date distributions are required to begin to the surviving spouse under Section 7.2e.1.(i).A), the date distributions are considered to begin is the date distributions actually commence.

(ii)  *Forms of Distribution.* Unless the Participant's interest is distributed in a single sum on or before the required beginning date, as of the first distribution calendar year, distributions will be made in accordance with this subsection.

(iii)  Subject to the provisions of this subsection with respect to a Participant who died before his annuity starting date, his or her benefit shall be paid to the Participant's beneficiary by either of the following methods, as elected by the Participant (or if no election is made prior to the Participant's death, by his beneficiary):

71

A.    One lump-sum payment in cash;

B.    Payment in monthly, quarterly, semi-annual, or annual cash installments over a period to be determined by the Participant or his beneficiary. After periodic installments commence, the beneficiary shall have the right to direct the Plan to reduce the period over which such periodic installments shall be made, and the Plan shall adjust the cash amount of such periodic installments accordingly.

Payments to non-spouse beneficiaries shall be made in one lump sum payment in cash.

With respect to a Participant who dies prior to April 1, 2001, such Participant's spouse shall be entitled to receive benefits in the form of a pre-retirement survivor annuity to the extent provided by the terms of the Plan in effect prior to December 31, 2000.

2.    <u>Required Minimum Distribution After Participant's Death</u>.

(i)    *Death On or After Date Distributions Begin.* If the Participant dies on or after the date distributions begin and there is a designated beneficiary, the minimum amount that will be distributed for each distribution calendar year after the year of the Participant's death is the quotient obtained by dividing the Participant's account balance by the longer of the remaining life expectancy of the Participant or the remaining life expectancy of the Participant's designated beneficiary, determined as follows:

A.    The Participant's remaining life expectancy is calculated using the age of the Participant in the year of death, reduced by one for each subsequent year.

B.    If the Participant's surviving spouse is the Participant's sole designated beneficiary, the remaining life expectancy of the surviving spouse is calculated for each distribution calendar year after the year of the Participant's death using the surviving spouse's age as of the spouse's birthday in that year. For distribution calendar years after the year of the surviving spouse's death, the remaining life expectancy of the surviving spouse is calculated using the age of the surviving spouse as of the spouse's birthday in the calendar year of the spouse's death, reduced by one for each subsequent calendar year.

C.    If the Participant's surviving spouse is not the Participant's sole designated beneficiary, the benefits payable to any non-spouse beneficiary shall be in a lump sum.

If the Participant dies on or after the date distributions begin and there is no designated beneficiary as of September 30 of the year after the year of the Participant's death, the minimum amount that will be distributed for each distribution calendar year after the year of the Participant's death is the quotient obtained by dividing the Participant's account balance by the Participant's remaining life expectancy calculated using the age of the Participant in the year of death, reduced by one for each subsequent year.

(ii) *Death Before Date Distributions Begin.*

A. If the Participant dies before the date distributions begin and there is a designated beneficiary, the minimum amount that will be distributed for each distribution calendar year after the year of the Participant's death is the quotient obtained by dividing the Participant's account balance by the remaining life expectancy of the Participant's designated beneficiary, determined as provided in Section 7.2.e.1.

B. If the Participant dies before the date distributions begin and there is no designated beneficiary as of September 30 of the year following the year of the Participant's death, distribution of the Participant's entire interest will be completed by December 31 of the calendar year containing the fifth anniversary of the Participant's death.

C. If the Participant dies before the date distributions begin, the Participant's surviving spouse is the Participant's sole designated beneficiary, and the surviving spouse dies before distributions are required to begin to the surviving spouse under Section 7.2.e.1.(i).A, this Section 7.2.e.2 will apply as if the surviving spouse were the Participant.

f. Distribution of Company Stock Account.

1. Death, Disability or Retirement. In the event of death, Disability or Retirement (i.e., termination of employment with the Employer after attaining Normal Retirement Age), distributions from a Participant's Company Stock Account shall commence under nondiscriminatory procedures adopted by the Committee but not later than one (1) year after the close of the Plan Year in which such event occurs.

2. Other Termination of Participation. With respect to distribution of amounts allocated to a Participant's Company Stock Account, in the event the Participant's employment is terminated for reasons other than death, Disability or Retirement, distribution of the Participant's Plan Benefit

shall commence no later than one (1) year after the close of the Plan Year in which the earliest of the following events occurs:

(i)     the Participant attains Normal Retirement Age; or

(ii)    the Participant's death; or

(iii)   the Participant's Disability.

Notwithstanding the foregoing, with proper Participant consent, distribution of a Participant's Plan Benefit attributable to Qualifying Employer Securities will commence not later than one year after the close of the Plan Year following the Plan Year in which the Participant separated from Service.

3.    <u>Timing of Distribution</u>.   Unless the Participant elects a longer period, distribution of the value of Employer Securities will be made in substantially equal annual installments over a period of no more than five (5) years.  Notwithstanding the foregoing, the Employer may elect, in its sole discretion, to accelerate such distribution, provided that the Employer exercises such discretion in a uniform and nondiscriminatory manner.

Notwithstanding the foregoing provisions of this Section 7.2.f, the Plan shall not be required to distribute any Employer Securities acquired with the proceeds of a Securities Acquisition Loan until the close of the Plan Year in which such Securities Acquisition Loan has been "repaid in full."

4.    <u>Form of Distribution</u>. Distribution of a Participant's Company Stock Account invested in Qualifying Employer Securities shall be made as directed by the Committee in cash or in Employer Securities unless a Participant elects to receive the distribution in the form of Qualifying Employer Securities, in which case the Participant's Plan Benefit will be distributed in the form of whole shares of Employer Securities with the value of any fractional shares paid in cash.

Notwithstanding the foregoing, if the Employer is an S corporation or the charter or bylaws of the Employer restrict the ownership of substantially all outstanding shares of the Company Stock to current Employees and the Plan, the distribution of a Participant's Company Stock Account may be made entirely in cash without granting him the right to demand distribution in Company Stock. Alternatively, in such circumstances, Company Stock may be distributed subject to the requirement that it be immediately resold to the Company under payment terms that comply with Section 7.13.b. The Committee may take such steps as are necessary to facilitate payments in cash by the ESOP Trustee.

Notwithstanding the foregoing provisions of this Section 7.2.f, the Plan shall not be required to distribute any Qualifying Employer Securities to

the extent that the Participants or Beneficiaries have elected to have their Company Stock Account diversified under the provisions of Section 5.1.d hereof.

The ESOP Trustee will make distributions from the ESOP Trust only on instructions from the Committee.

g.    <u>Lien on Distribution</u>. Notwithstanding anything to the contrary herein, if at the time of distribution a Participant is indebted to the Plan, or has retained in his or her possession money or property which properly belongs to the Plan, the Plan shall have a lien on such distribution pending the resolution of such ownership rights. The Plan may exercise such lien by withholding distribution of any assets, pending resolution of such ownership rights.

h.    <u>Definitions</u>.

1.    *Designated Beneficiary*. The individual who is designated as the beneficiary under Section 7.4 of the Plan Statement and is the designated beneficiary under Section 401(a)(9) of the Internal Revenue Code and Section 1.401(a)(9)-1, Q&A-4, of the Treasury regulations.

2.    *Distribution Calendar Year*. A calendar year for which a minimum distribution is required. For distributions beginning before the Participant's death, the first distribution calendar year is the calendar year immediately preceding the calendar year which contains the Participant's Required Beginning Date. For distributions beginning after the Participant's death, the first distribution calendar year is the calendar year in which distributions are required to begin under Section 7.2.e.1. The required minimum distribution for the Participant's first distribution calendar year will be made on or before the Participant's Required Beginning Date. The required minimum distribution for other distribution calendar years, including the required minimum distribution for the distribution calendar year in which the Participant's Required Beginning Date occurs, will be made on or before December 31 of that distribution calendar year.

3.    *Life Expectancy*. Life expectancy as computed by use of the Single Life Table in Section 1.401(a)(9)-9 of the Treasury regulations.

4.    *Participant's Account Balance*. The account balance as of the last valuation date in the calendar year immediately preceding the distribution calendar year (valuation calendar year) increased by the amount of any contributions made and allocated or forfeitures allocated to the account balance as of dates in the valuation calendar year after the valuation date and decreased by distributions made in the valuation calendar year after the valuation date. The account balance for the valuation calendar year includes any amounts rolled over or transferred to the Plan either in the

valuation calendar year or in the distribution calendar year if distributed or transferred in the valuation calendar year.

5. *Required Beginning Date.* The date specified in Section 7.2.b of the Plan Statement.

7.3 <u>Effect of Reemployment</u>. If a Participant is reemployed by the Employer or an Affiliate after distribution has been scheduled to be made to him but before his Normal Retirement Age, distribution of his Accounts shall be suspended and shall continue to be held in the Fund until such later date that the Participant shall be entitled to a distribution after his reemployment; it being the intent hereof that no distribution shall be made while a Participant is maintaining an employment relationship with the Employer or an Affiliate, except as provided for in Sections 7.7 and 7.8.

7.4 <u>Designation of Beneficiaries</u>

a. <u>Right to Designate</u>. Each Participant may designate upon forms to be furnished by and filed with the Committee, one or more primary Beneficiaries or alternative Beneficiaries to receive all or a specified part of his Accounts in the event of his death. No such designation, change or revocation shall be effective unless executed by the participant and received by the Committee during the Participant's lifetime.

A designation will not be valid for the purpose of paying benefits from the Plan to anyone other than a surviving spouse of the Participant (if there is a surviving spouse) unless that surviving spouse consents in writing to the designation of another person as Beneficiary. To be valid, the consent of such spouse must be in writing, must acknowledge the effect of the designation of the Beneficiary and must be witnessed by a notary public. The consent of the spouse must be to the designation of a specific named Beneficiary which may not be changed without further spousal consent or, alternatively, the consent of the spouse must expressly permit the Participant to make and to change the designation of Beneficiaries without any requirement of further spousal consent. The consent of the surviving spouse need not be given at the time the designation is made. The consent of the surviving spouse need not be given before the death of the Participant.

The consent of the surviving spouse will be required, however, before benefits can be paid to any person other than the surviving spouse. The consent of the spouse shall be effective only with respect to that spouse.

Notwithstanding the foregoing, spousal consent to a Participant's Beneficiary designation shall not be required if:

1. the spouse is designated as the sole primary Beneficiary by the Participant, or

2. it is established to the satisfaction of the Committee that spousal consent cannot be obtained because there is no spouse, because the spouse cannot

76

be located or because of such other circumstances as may be prescribed in regulations issued by the Secretary of the Treasury.

Any consent by a spouse or any determination that the consent is not required pursuant to paragraphs 1 or 2 above, shall be effective, only with respect to such spouse.

b.  <u>Failure of Designation</u>. If a Participant:

1.  fails to designate a Beneficiary,

2.  designates a Beneficiary and thereafter revokes such designation without naming another Beneficiary, or

3.  designates one or more Beneficiaries and all such Beneficiaries so designated fail to survive the Participant,

such Participant's Total Account, or the part thereof as to which such Participant's designation fails, as the case may be, shall be payable to the first class of the following classes of automatic Beneficiaries with a member surviving the Participant:

1.  Participant's surviving spouse.

2.  Representative of Participant's estate.

c.  <u>Special Rules and Definitions</u>. When used herein and, unless the Participant has otherwise specified in his Beneficiary designation, when used in a Beneficiary designation, "issue" means all persons who are lineal descendants of the person whose issue are referred to, including legally adopted descendants and their descendants, but not including illegitimate descendants and their descendants; "child" means an issue of the first generation; "per stirpes" means in equal shares among living children of the person whose issue are referred to and the issue (taken collectively) of each deceased child of such person, with such issue taking by right of representation of such deceased child; and "survive" and "surviving" mean living after the death of the Participant; provided, however, that if there is not sufficient evidence that a Beneficiary was living after the death of the Participant, it shall be deemed that the Beneficiary was not living after the death of the Participant. The automatic Beneficiaries specified above and, unless the Participant has otherwise specified in his Beneficiary designation, the Beneficiaries designated by him shall become fixed as of such date so that, if a Beneficiary so survives the Participant but dies before the receipt of all payments due such Beneficiary hereunder, such remaining payments shall be payable to the representative of such Beneficiary's estate. Any designation of a Beneficiary by name that is accompanied by a description of relationship to the Participant shall be given effect without regard to whether the relationship to the Participant exists either then or the Participant's death. Any designation of a Beneficiary only by statement of relationship to the Participant shall be effective only to designate the

77

person or persons standing in such relationship to the Participant at the Participant's death. A Beneficiary designation is permanently void if it either is executed or is filed by a Participant who, at the time of such execution or filing, is then a minor under the law of the state of his legal residence. The Committee shall be the sole judge of the content, interpretation, and the validity of a purported Beneficiary designation.

7.5   Form of Distribution.   Except as otherwise provided in this Section, all  distributions hereunder shall be made in cash by converting non-cash assets to cash, if necessary. Subject to the rules of the Trustee or the ESOP Trustee and the Investment Manager, and the rules of any investment company in which assets of the Plan are invested, a Participant or Beneficiary shall have the right to elect that portion of his accounts invested in a Subfund under Section 5.1 shall be distributable in kind from said Subfund. Any shares of Qualifying Employer Securities allocated to a Participant's Company Stock Account shall be distributed as provided in Section 7.2.f. Additionally, any unpaid loan pursuant to Section 7.9 at the time it shall be deemed distributed shall be distributed by returning the promissory note to the Participant, which note shall be canceled as a result of the Plan retaining the security interest in the Participant's Accounts.

7.6   Facility of Payment.   In case of the legal disability, including minority, of a  Participant or Beneficiary entitled to receive any distribution under the Plan, payment shall be made, if the Committee shall be advised of the existence of such condition:

a.      to the duly appointed guardian, conservator or other legal representative of such Participant or Beneficiary, or

b.      to a person or institution entrusted with the care or maintenance of the incompetent or disabled Participant or Beneficiary, provided such person or institution has satisfied the Committee that the payment will be used for the best interest and assist in the care of such Participant or Beneficiary, and provided further, that no prior claim for said payment has been made by a duly appointed guardian, conservator, or other legal representative of such Participant or Beneficiary.

Any payment made in accordance with the foregoing provisions of this Section shall constitute a complete discharge of any liability or obligation of the Employer, the Committee, the Trustee, the ESOP Trustee and the Plan therefor.

7.7   Elective Withdrawals.   A Participant shall be entitled to file an application with the Committee to receive non-hardship pre-retirement withdrawals under the following circumstances. Any distribution made pursuant to this Section shall be made in a manner consistent with Article VII, including but not limited to, all notice and consent requirements of Code Section 411(a)(11) and the Regulations thereunder:

a.      Employee Contribution Account (After-Tax).  A Participant may, at any time, request to withdraw all or any part of his Employee Contribution Account (After-Tax) other than his Company Stock Account.  In his application, the Participant

78

shall specify the amount to be withdrawn from his Employee Contribution Account (After-Tax). Such withdrawal shall be approved by the Committee to be made as of the Valuation Date coincident with or next following the filing of a completed application with the Committee and shall be made in a single lump-sum payment as soon as practicable after such Valuation Date.

b.     Age 59 1/2 Distributions. Effective January 1, 2008, upon or after attaining age 59½ years of age, a Participant may elect to withdraw the value of all of his Accounts other than his Company Stock Account under the Plan while still employed by the Company (in-service withdrawal). The election shall be for the entire value of all of his Accounts other than his Company Stock Account, and no partial withdrawals shall be permitted. Effective January 1, 2011, the Participant may elect to withdraw the value of all or any portion of his Accounts other than his Company Stock Account. Additionally, effective October 21, 2010, such Participant may direct that any such amounts be allocated to his Employee Deferral Account (Roth), to the extent permitted under subsection 7.12.c.

In his application, the Participant shall specify the amount to be withdrawn or reallocated from his Accounts. The transaction shall be processed as of the Valuation Date coincident with or immediately succeeding the filing of a completed application with the Committee, and shall be made in a single payment as soon as practicable after such Valuation Date.

The receipt of an in-service withdrawal shall not preclude the Participant from continuing participation in the Plan, including the right to make Elective Contributions.

c.     Pre-Age 59½ Distributions. Prior to attaining 59½ years of age, a Participant may elect to withdraw the value of all or any portion of his Accounts other than his Company Stock Account under the Plan while still employed by the Company if (1) said amounts have been allocated to said accounts for a period of at least two (2) Plan Years, or (2) the individual has been a Participant for at least five (5) years. Additionally, effective October 21, 2010, such Participant may direct that any such amounts be allocated to his Employee Deferral Account (Roth), to the extent permitted under subsection 7.12.c. Notwithstanding the foregoing, amounts in the Participant's Employee Deferral Account and amounts described in Section 401(k)(12)(E) of the Code (regarding safe-harbor contributions) shall not be permitted to be withdrawn or allocated to his Employer Deferral Account (Roth) prior to the Participant attaining age 59½ unless otherwise permitted under the Plan and the Code without regard to this subsection.

In his application, the Participant shall specify the amount to be withdrawn or reallocated from his Accounts. The distribution shall be processed as of the Valuation Date coincident with or immediately succeeding the filing of a completed application with the Committee, and shall be made in a single payment as soon as practicable after such Valuation Date.

The receipt of an in-service withdrawal shall not preclude the Participant from continuing participation in the Plan, including the right to make Elective Contributions.

d.  HEART Act Withdrawals. If a Participant performs service in the uniformed services (as defined in Section 414(u)(12)(B) of the Code) on active duty for a period of more than thirty (30) days, the Participant will be deemed to have a severance from employment solely for purposes of eligibility for distribution of amounts not subject to Section 412 of the Code.  However, the Plan will not distribute such a Participant's account on account of this deemed severance unless the Participant specifically elects to receive a distribution hereunder.  If a Participant elects to receive a distribution on account of this deemed severance, then the individual may not make an elective deferral or employee contribution during the six (6) month period beginning on the date of the distribution.  If a Participant would be entitled to a distribution on account of a deemed severance, and a distribution on account of another Plan provision, then the other Plan provision will control and the six (6) month suspension will not apply.

7.8  Hardship Withdrawal.  In the event a Participant has an immediate and heavy financial need, upon application to the Committee, a distribution may be made to the Participant from the Vested portion of his Accounts (excluding Qualifying Employer Securities in a Company Stock Account). In his application, the Participant shall specify the dollar amount to be withdrawn from his Accounts. The amount distributed to the Participant shall not exceed an amount necessary to satisfy the financial need. For purposes of this paragraph, the Committee shall follow the rules contained in the Code and Regulations under Section 401(k), as updated or modified from time-to-time through the publication of revenue rulings, notices, and other documents of general applicability, to determine if a Participant has an immediate and heavy financial need and to determine if the amount is necessary to satisfy such immediate and heavy financial need.

a.  The following expenses shall be deemed to qualify as immediate and heavy financial needs:

1.  Medical expenses described in Code Section 213(d) incurred by the Employee or his spouse and dependents as defined in Code Section 152, or his designated beneficiary;

2.  Down payment and other non-mortgage payments associated with the purchase of a principal residence for the Employee;

3.  Payment of tuition for the next semester or quarter of post-secondary education for the Employee, his spouse, children, or dependents as defined in Code Section 152, or his designated beneficiary;

4.  Expenditures to stave off eviction from the Employee's principal residence, or foreclosure of a mortgage or such residence;

5.    Funeral expenses of the Employee's spouse, children, or dependents as defined in Code Section 152, or his designated beneficiary; and

6.    Expenditures for the repair of damage to an Employee's personal residence that would qualify for the casualty loss under Section 165 of the Code.

b.    With regard to any hardship distribution request for one of the purposes listed in a. above, the Committee shall ensure that the amount distributed is necessary to satisfy the immediate and heavy financial need. This requirement will be deemed satisfied if the Committee reasonably relies upon the Participant's written representation that the immediate and heavy financial need cannot be relieved through the following sources:

1.    Through reimbursement or compensation by insurance or otherwise;

2.    By reasonable liquidation of the Employee's assets, to the extent such liquidation would not itself cause an immediate and heavy financial need; and

3.    By other distributions or nontaxable (at the time of the loan) loans from plans maintained by the Employer or by any other employer, or by borrowing from commercial sources on reasonable commercial terms.

Such hardship withdrawal distribution shall be made as soon as administratively feasible following the approval of the withdrawal application by the Committee. Such withdrawal distribution shall be made in a single, lump-sum cash payment and shall be based on the Account values as of the immediately prior Valuation Date

All hardship withdrawal distributions made pursuant to this Section shall be charged against the Participant's Accounts in the following sequence:

> Voluntary Account (After-Tax)
> Rollover/Transfer Account
> Employer Contribution Account
> Employer Matching Account
> Employee Deferral Account (Roth)
> Employee Deferral Account (Before-Tax)

The following restrictions apply to a Participant who receives a hardship distribution from his Employee Deferral Account: (a) the Participant may not make Elective Contributions or Employee Contributions to the Plan for the 6-month period following the date of his hardship distribution; (b) the distribution is not in excess of the amount of the immediate and heavy financial need; and (c) the Participant must have obtained all distributions, other than hardship distributions, and all non-taxable loans currently available under this Plan and all other qualified plans maintained by the Employer. The suspension of Elective

Deferrals and Employee Contributions described in clause (a) also must apply to all other qualified plans and to all non-qualified plans of deferred compensation maintained by the Employer, other than any mandatory employee contribution portion of a defined benefit plan, including stock option, stock purchase and other similar plans, but not including health or welfare benefit plans (other than the cash or deferred arrangement portion of a cafeteria plan).

A hardship distribution under this Section may not include earnings on an Employee's Elective Deferrals credited after December 31, 1988, and may not include qualified non-elective contributions, nor any earnings on such contributions, irrespective of when credited.

c.   Coordination with Section 5.1(a). If a withdrawal is made from an Account which is invested in more than one (1) subfund authorized and established under Section 5.1(a) hereof, the amount withdrawn shall be charged to each such subfund pro rata; provided, however, a hardship distribution shall not be made from or charged to a Participant's Company Stock Account.

7.9   Loans. The provisions of this Section shall be subject to such conditions and limitations as the Committee may prescribe from time-to-time for administrative convenience and to preserve the tax-qualified status of the Plan. The Committee shall have total authority to administer the Participant loan program.

a.   General Rules. A Participant may apply to the Committee at any time during the Plan Year, on a form(s) specifically provided for such purpose, for a loan from the Plan to be secured by the Participant's vested Accounts.

Upon approval of the loan by the Committee, the Plan shall make a loan to the Participant. No loans shall be permitted for an amount less than $1,000, and only two (2) loans shall be outstanding at any one time with respect to a Participant. Loans shall be permitted for any reason.

The amount of such loans to any Participant shall not exceed, in total amount, fifty percent (50%) of the Vested amount of that Participant's Total Account (at the time the loan is taken, based on the immediately prior Valuation Date), not to exceed Fifty Thousand Dollars ($50,000). The Fifty Thousand Dollar ($50,000) limit shall be reduced, however, by the excess (if any) of (i) the highest outstanding balance of loans from the Plan for such Participant during the one-year period ending on the day before the new loan is made, over (ii) the outstanding balance of all loans from the Plan on the day the new loan is made. For purposes of this determination, a Participant's Total Account shall include the value of any Qualifying Employer Securities, but such securities may not be borrowed.

By acceptance of such loan, the Participant automatically (by operation of the rules of the Plan) grants a lien upon such of his Accounts from which monies are withdrawn to make the loan in an amount not less than the amount of such loans

82

(including unpaid interest); provided that, no such lien shall exceed 50% of the vested amount of the Participant's Total Account. No additional security shall be required as a condition of granting any such loans. Any such loan shall provide that it shall be repaid within a definite period of time to be specified in the loan agreement, which period shall not exceed five (5) years except that, such loan repayment period shall be 10 years if such loan is used to acquire any dwelling unit which within a reasonable time (determined at the time the loan is made) is to be used as a principal residence of the Participant.

Loans shall be available to all Participants on a reasonably equivalent basis; shall not be made available to Highly Compensated Employees, officers or shareholders in an amount (expressed as a percentage of the Vested Total Account) greater than is made available to other Employees; and shall bear a reasonable rate of interest (determined as hereinafter provided). Any such loan must be repaid in substantially level amounts including principal and interest, over the term of the loan; provided, however, that a loan may be prepaid prior to the end of the term of the loan, as provided under Section 7.9.e. Loans to Participants who are eligible employees must be repaid through payroll deduction. Loans to terminated Participants must be repaid by check on the 25th of each month.

b.   <u>Interest Rate</u>. The interest rate on any loan shall be equal to a rate established from time to time by the Committee.

c.   <u>Separate Accounting for Loan</u>. For the purpose of determining the extent to which a Participant's Total Account is entitled to share in income, gains or losses of the Fund under Section 5.2 hereof, the same shall be deemed to be reduced by the unpaid balance of any outstanding loans to the Participant, and the interest payments on such loans shall be credited to his Total Account. If a loan is made to a Participant who has assets in more than one Account, such loan shall be deemed to have been made from the Participant's Accounts in the following sequence:

> Employee Contribution Account (After-Tax)
> Rollover Account/ Transfer Account
> Employer Contribution Account
> Employer Qualified Non-Elective Contribution Account
> Employer Matching Account
> Employee Deferral Account (Before-Tax)
> Employee Deferral Account (Roth)

Repayment of principal and interest on loans shall be apportioned among the above Accounts from which the loan was made in accordance with current investment elections.

d.   <u>Coordination of Section 5.1</u>.  If a loan is made from an Account which is invested in more than one subfund authorized and established under Section 5.1 hereof, the amount withdrawn in order to make the loan shall be charged to each subfund pro

rata, provided, however, a loan may not be made from or charged to a Company Stock Account.

e.    Cancellation of Loan.  At the time that benefits become payable to any Participant as the result of retirement, death, disability, or termination of employment, the Participant or his beneficiary or the personal representative of his estate shall be given the opportunity to repay the loan within sixty (60) days of said retirement, death, disability, or termination. If the loan is not repaid by the expiration of the sixty (60) day period, the Participant's Accounts shall be reduced by an amount not exceeding the unpaid principal and interest at the time distribution is made; and the loan shall be considered paid and canceled.

A Participant shall have the right at any time to prepay a loan in its entirety. Once a loan has been fully paid under the terms of the loan agreement, it shall be canceled; and the lien placed against the Participant's Accounts shall be removed.

A terminated Participant's loan shall be deemed distributed at the end of the loan cure period.

f.    Default on a Loan.  In the event that any payment of principal and interest is not received within fifteen (15) days of the date it is due in accordance with the loan agreement, the Committee shall take appropriate steps to notify the Participant of the past-due amount. If the payment is still not received by the thirtieth (30th) day after the due date, the Plan shall foreclose on the note by attachment of the Participant's Accounts for an amount equal to the unpaid principal and interest. Notwithstanding the preceding sentence, no attachment of the Participant's Employee Deferral Account shall be made until a distributable event shall occur with respect to such Participant.

g.    Loan Fees. Loan processing fees may be applicable to loans and, if so, will be disclosed to Participants on loan documents.

7.10    Location of Participant or Beneficiary Unknown.  In the event that all, or any portion of the distribution payable to a Participant or his beneficiary hereunder shall remain unpaid solely by reason of the inability of the Committee after diligent effort to ascertain the whereabouts of such Participant or his Beneficiary, the amount so distributable shall be forfeited and shall be used to reduce the cost of the Plan. The Committee shall decide the time as to when such forfeiture shall occur, but in no event shall it occur prior to the later of the date the Committee has determined that it is very unlikely that the Participant will be located.

If a Participant or beneficiary who has incurred a forfeiture of his benefit makes a claim, at any time, for his forfeited benefit, the Committee must restore the Participant's or beneficiary's forfeited benefit to the same dollar amount as the dollar amount of the benefit forfeited, unadjusted for any gains or losses occurring subsequent to the date of the forfeiture. The Committee will make the restoration during the Plan Year in which the Participant or beneficiary makes the claim, first from the amount, if any, of Participant

forfeiture the Committee otherwise would allocate for the Plan Year, then from the amount, if any, of the Plan net income or gain for the Plan Year, and then from the amount, or additional amount, the Employer contributes to enable the Committee to make the required restoration. The Plan will distribute the Participant's or beneficiary's restored benefit to him not later than sixty (60) days after the close of the Plan Year in which the Committee restores the forfeited benefit.

7.11    <u>Limitations with Respect to Qualified Domestic Relation Orders</u>.  All rights and benefits, including elections, provided to a Participant in this Plan shall be subject to the rights afforded to any "alternate payee" under a "qualified domestic relations order" (QDRO), as those terms are defined in Section 414(p) of the Code. Appendix A to this Plan Statement shall apply with respect to the QDRO.

7.12    <u>Transfer of Interest</u>.

a.    Notwithstanding any other provision of the Plan to the contrary that would otherwise limit a distributee's election under this Section, a distributee may elect at the time and in the manner prescribed by the Committee, to have any portion of an eligible rollover distribution paid directly to an eligible retirement plan specified by the distributee in a direct rollover. At the direction of the Committee, the Plan shall effect transfers elected by distributees hereunder.

In the event of a mandatory distribution greater than $1,000 in accordance with the provisions of Section 7.1.b, if the Participant does not elect to have such distribution paid directly to an eligible retirement plan specified by the Participant in a direct rollover or to receive the distribution directly, then the Committee will pay the distribution in a direct rollover to an individual retirement plan designated by the Committee.

b.    <u>Definitions</u>.

1.    Eligible rollover distribution shall mean any distribution of all or any portion of the balance to the credit of the distributee, except an eligible rollover distribution does not include the following

A.    Any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the distributee or the joint lives (or joint life expectancies) of the distributee and the distributee's designated beneficiary, or for a specified period of ten years or more;

B.    Any distribution to the extent such distribution is required under §401(a)(9) of the Code; and

C.    The portion of any distribution that is not includible in gross income (determined without regard to the exclusion of net unrealized depreciation with respect to employer

securities); provided, however, effective January 1, 2002, a portion of a distribution shall not fail to be an eligible rollover distribution merely because the portion consists of after-tax employee contributions which are not includible in gross income. However, such portion may be transferred only to an individual retirement account or annuity described in Section 408(a) or (b) of the Code or to a qualified defined contribution plan described in Section 401(a) or 403(a) of the Code that agrees to separately account for amounts so transferred, including separately accounting for the portion of such distribution which is includible in gross income and the portion of such distributions which is not so includible.

D.     Any amount that is distributed on account of hardship under Section 401(k)(2)(B)(i)(v) of the Code.

2.     Eligible retirement plan shall mean an individual retirement account described in §408(a) of the Code, an individual retirement annuity described in §408(b) of the Code, an annuity plan described in §403(a) of the Code, or a qualified trust described in §401(a) of the Code, that accepts the distributee's eligible rollover distribution. Effective January 1, 2002, an eligible retirement plan shall also mean an annuity contract described in Section 403(b) of the Code and an eligible plan under Section 457(b) of the Code which is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or political subdivision of a state and which agrees to separately account for amounts transferred into such plan from this Plan. In the case of an eligible rollover distribution to a surviving spouse, to a spouse or a former spouse who is an alternate payee under a qualified domestic relations order defined in Section 414(p) of the Code, an eligible retirement plan is an individual retirement account and an individual retirement annuity for periods prior to January 1, 2002, and as defined above thereafter.

3.     Distributee.  The distributee shall mean an employee or former employee. In addition, the employee's or former employee's surviving spouse and the employee's or former employee's spouse or former spouse who is the alternative payee under a qualified domestic relations order, as defined in §414(p) of the Code, are distributees with regard to the interest of the spouse or former spouse.

A distributee shall also include any individual who is a Designated Beneficiary under Section 401(a)(9)(E) of the Code and who is not the surviving spouse of the Participant and who causes a direct trustee-to-trustee transfer to an individual retirement account or individual retirement annuity established for the purpose of receiving the distribution on behalf of such individual.

    4.    <u>Direct Rollover</u>.  A direct rollover shall be a payment by the Plan to the eligible retirement plan specified by the distributee.

c.    From and after October 21, 2010, all Participants in the Plan who have not separated from employment with the Employer shall have the right to elect an in plan Roth rollover (IPRR) of any portion of his Accounts distributable under Section 7.7.b and 7.7.c of the Plan; provided, however, no IPRR shall be permitted with respect to shares of common stock of the Employer or with respect to amounts loaned to the Participant from his Accounts under the Plan. All IPRRs shall be in compliance with Section 402A(c)(4)(B) of the Code.

7.13    <u>Rights and Options on Distributed Qualifying Employer Securities</u>.  This Section shall apply only if Qualifying Employer Securities are distributed to a Participant.

a.    <u>Right of First Refusal</u>.

If the distribution of all or a part of a Participant's Account(s) is made in the form of shares of Qualifying Employer Securities, such shares distributed by the ESOP Trustee shall be subject to a "right of first refusal," until such time as such shares are publicly traded (as defined in Treas. Reg. 54.4975-7(b)(iv)).

Such a "right" shall provide that prior to any subsequent transfer, the shares must first be offered by written offer, to the ESOP Trustee, and then, if refused by the ESOP Trustee, to the Employer.

In the event of a proposed purchase by a prospective bona fide purchaser, the offer to the ESOP Trustee and the Employer shall be at the greater of fair market value, as determined by the Committee based on the report of an Independent Appraiser as of the Valuation Date coinciding with or immediately preceding the date of exercise or at the price offered by the prospective bona fide purchaser. "Independent Appraiser" shall mean an appraiser who meets the requirements of regulations prescribed under Section 170(a)(1) of the Code. Disqualified Person shall mean a person defined in Section 4975 (e)(2) of the Code. Valuations must be made in good faith and based on all relevant factors for determining the fair market value of securities. Until such time as the shares of Qualifying Employer Securities are publicly traded, subject to the requirements of ERISA, valuations shall be made on the same basis as the original valuation of shares at the time the ESOP Trustee first purchased Qualifying Employer Securities, i.e., on an enterprise basis without certain discounts. The ESOP Trustee may accept the offer at any time during a period not exceeding eighty (80) days after receipt of such offer. In the event the ESOP Trustee does not accept such offer, the Employer may accept such offer at any time during the ninety (90) day period after receipt of the offer.

In the case of a purchase by the ESOP Trustee from a Disqualified Person, all purchases of shares of Qualifying Employer Securities shall be made at prices which, in the judgment of the Committee based on the report of an Independent

Appraiser, do not exceed the fair market value of such shares as of the date of the transaction.

b.   "Put" Option.

All shares of Company Stock acquired by the Plan will be subject to a "put" option at the time of distribution, provided that at such time the shares are not publicly traded within the meaning of Treasury Regulation Section 54.4975-7(b)(1)(iv) or subject to a trading restriction within the meaning of Treasury Regulation Section 54.4975-7(b)(10); or provided that the Employer's charter or by-laws do not restrict the ownership of employer securities to employees or a Section 401(c) of the Code trust as provided under Section 409(h)(2) of the Code.

The "put" option will be exercisable by the Participant or his Beneficiary, by the donees of either, or by a person (including an estate or its distributee) to whom the Company Stock passes by reason of the Participant's or Beneficiary's death. The "put" option will provide that, for a period of sixty (60) days after such shares are distributed, the holder of the option has the right to cause the Employer, by notifying it in writing, to purchase such shares at their fair market value, in accordance with Treasury Regulation Section 54.4975-11(d)(5). Provided, however, that if the holder of such "put" option does not exercise such option within such sixty (60) day period, an additional exercise period of sixty (60) days will be available during the Plan Year following the Plan Year in which the distribution was made after the new valuation of Company Stock has been determined and communicated to the holder of the option.

The Committee may give the ESOP Trustee the option to assume the rights and obligations of the Company at the time the "put" option is exercised, insofar as the repurchase of Company Stock is concerned. The period during which the "put" option is exercisable will not include any period during which the holder is unable to exercise such "put" option because the Company is prohibited from honoring it by federal or state law. The terms of payment for the purchase of such shares of Company Stock will be as set forth in the "put" option and may be either in a single sum or in installments, as determined by the Committee and uniformly applied.  An installment payment in connection with such "put" option will:

1.   Be adequately secured, as determined by the Committee;

2.   Bear a reasonable rate of interest, as determined by the Committee;

3.   Require equal annual payments;

4.   If the distribution constitutes a distribution to a Participant or Beneficiary, within one taxable year of the recipient, of the entire balance to the credit of the Participant's Account, payment of the fair market value of a Participant's Company Stock Account balance will be made in no more than five substantially equal annual payments.  The first installment will

not be paid later than 30 days after the Participant exercises the "put" option; and

5.      In all respects satisfy the requirements of Section 409(h) of the Code and Treasury Regulation Section 54.4975-7(b)(12).

If the distribution does not constitute a distribution to a Participant or Beneficiary, within one taxable year of the recipient, of the entire balance to the credit of the Participant's Account, the Plan will pay the Participant an amount equal to the fair market value of the Company Stock repurchased no later than 30 days after the Participant exercises the "put" option. The provisions of this Section will apply to all shares of Company Stock acquired by the Plan.

Notwithstanding any of the foregoing provisions of this Section, if the Company is a subchapter "S" corporation, as described in Section 1361(b) of the Code, and if a distributee elects to receive benefits in the form of Company Stock, the Committee, in its sole discretion, shall determine whether the shares will either be (i) immediately repurchased by the Plan or (ii) immediately transferred to and repurchased by the Employer on the date of distribution. Prior to the distribution of any shares of Company Stock, the distributee (i.e., the Participant, Beneficiary, or custodian of the IRA or the trustee of the eligible retirement plan to which the distribution will be transferred or rolled over), will immediately execute a put option as set forth above and the Plan or Company shall pay for the shares in a lump sum or in installments as set forth above. The put option will provide for and authorize the transfer of the shares to the Plan or the Company, as the case may be, and will identify the number of shares and dollar value to be transferred.

c.      <u>Other Options</u>. Except as otherwise provided in this Section 7.13, no security acquired with the proceeds of a Securities Acquisition Loan may be subject to a put, call, buy-sell or similar arrangement while held by or when distributed from the Plan, whether or not the Plan is then an ESOP, to the extent required by regulations Section 54.4975-7(b)(4).

The Plan and ESOP Trustee may not create any obligation to acquire securities from a particular securities holder at an indefinite time determined upon the happening of an event such as the death of the holder.

7.14      <u>Distributions to Individuals Called to Active Duty</u>. A Plan covered under Code Section 401(k) will permit an individual called to active duty after September 11, 2001 to treat his distribution as a Qualified Reservist Distribution.

a.      Any individual who receives a Qualified Reservist Distribution any time during the 2-year period beginning on the day after the end of the active duty period may repay the amount received. The Participant may make one or more payments as a contribution to an Individual Retirement Plan so long as the aggregate amount does not exceed the amount of the distribution. The dollar limitations otherwise applicable to contributions to Individual Retirement Plans shall not apply to any

contribution made pursuant to the preceding sentence. No Employee or Employee deductions are allowed for any contributions made pursuant to this Section.

b.    For purposes of this subparagraph, the term "Qualified Reservist Distribution" means any distribution to an individual if:

1.    the distribution is from an Individual Retirement Plan or from amounts attributable to elective deferrals under a 401(k), 403(b) annuity, or certain similar arrangements;

2.    the individual was (by reason of being a member of a reserve component as defined in Section 101 of Title 37 of the United States Code) ordered or called to active duty for a period in excess of 179 days or for an indefinite period; and

3.    the distribution is made during the period beginning on the date of such order or call and ending at the close of the active duty period.

## ARTICLE VIII
## TOP-HEAVY PROVISIONS

8.1    <u>Top-Heavy Plan Requirements</u>.  For any Top-Heavy Plan Year, the Plan shall meet the special minimum contribution and allocation requirements of Code Section 416(c) as outlined in Section 3.9.

8.2    <u>Key Employees</u>.  Prior to January 1, 2002, a Key Employee means generally any Employee or former Employee (and his Beneficiary) who, at any time during the Plan Year or any of the four preceding Plan Years, is:

a.    An officer of the Employer (as that term is defined within the meaning of the Regulations under Code Section 416) having annual compensation greater than fifty percent (50%) of the amount in effect under Code Section 415(b)(1)(A) for any such Plan Year, provided that if no officer has compensation in excess of such amount, the highest paid officer will be considered an officer notwithstanding his annual compensation.  The total number of officers shall be limited in accordance with Section 416(i) of the Code.

b.    One of the ten Employees owning (or considered as owning within the meaning of the Code Section 318) the largest interests in all employers required to be aggregated under Code Sections 414(b), (c), and (m); provided that such Employee has annual compensation from the Employer of more than $30,000 or such other amount adjusted in accordance with Code Section 415(c)(1)(A) as in effect for the calendar year in which the Determination Date falls.

c.    A "<u>five percent owner</u>" of the Employer.  "Five percent owner" means any person who owns (or is considered as owning within the meaning of Code Section 318) more than five percent (5%) of the outstanding stock of the Employer or stock

possessing more than five percent (5%) of the total combined voting power of all stock of the Employer or, in the case of an unincorporated business or of an incorporated business, any person who owns more than five percent (5%) of the capital or profits interest in the Employer.

In determining percentage ownership hereunder, employers that would otherwise be aggregated under Code Sections 414(b), (c), and (m), shall be treated as separate employers.

d.     A "one percent owner" of the Employer having an annual compensation from the Employer of more than $150,000. "One percent owner" means any person who owns (or is considered as owning within the meaning of Code Section 318) more than one percent (1%) of the outstanding stock of the Employer or stock possessing more than one percent (1%) of the total combined voting power of all stock of the Employer or, in the case of an unincorporated business, any person who owns more than one percent (1%) of the capital or profits interest in the Employer.    In determining percentage ownership hereunder, employers that would otherwise be aggregated under Code Sections 414(b), (c), and (m) shall be treated as separate employers.   However, in determining whether an individual has "415 compensation" of more than $150,000, "415 compensation" from each employer required to be aggregated under Code Sections 414(b), (c), and (m) shall be taken into account.

After December 31, 2001, Key Employee means any Employee or Former Employee (including any deceased employee) who at any time during the Plan Year that includes the Determination Date was an officer of the Employer having annual compensation greater than $130,000 (as adjusted under Section 416(i)(1) of the Code, a five percent (5%) owner of the Employer, or a one percent (1%) owner of the Employer having annual compensation of more than $170,000. For this purpose, annual compensation means compensation within the meaning of Section 415(c)(3) of the Code.   The determination of who is a Key Employee will be made in accordance with Section 416(i)(1) of the Code and the applicable regulations and other guidance of general applicability issued thereunder.

Determination of Key Employees is to be made pursuant to Section 416(i) of the Code. Annual compensation for purposes of this Section shall be as defined in Section 414(q)(7) of the Code.

8.3     Determination of Top-Heavy Status.

a.     This Plan shall be a Top-Heavy Plan for any Plan Year in which, as of the Determination Date,

1.     The Present Value of Accrued Benefits of Key Employees, and

2.     The sum of the Aggregate Accounts of Key Employees under this Plan and all plans of an Aggregation Group exceeds sixty percent (60%) of the

Present Value of Accrued Benefits and the Aggregate Accounts of all Participants under this Plan and all plans of an Aggregation Group.

If any Participant is a Non-Key Employee for any Plan Year, but such Participant was a Key Employee for any prior Plan Year, such Participant's Present Value of Accrued Benefit and/or Aggregate Accounts shall not be taken into account for purposes of determining whether this Plan is a Top-Heavy Plan (or whether any Aggregation Group which includes this Plan is a Top-Heavy Group). In addition, if a Participant or former Participant has not performed services for any Employer maintaining the Plan at any time during the five-year period ending on the Determination Date, the Aggregate Account and/or Present Value of Accrued Benefit for such Participant or Former Participant shall not be taken into account for the purposes of determining whether this Plan is a Top Heavy Plan.

b.      This Plan shall be a Super Top-Heavy Plan for any Plan Year in which, as of the Determination Date:

1.      The Present Value of Accrued Benefits of Key Employees, and

2.      The sum of the Aggregate Accounts of Key Employees under this Plan and all plans of an Aggregation Group exceeds ninety percent (90%) of the Present Value of Accrued Benefits or the Aggregate Accounts of all Participants under this Plan and all plans of an Aggregation Group.

c.      A Participant's Aggregate Account as of the Determination Date is the sum of:

1.      His Total Account balance as of the most recent valuation occurring within a twelve (12) month period ending on the Determination Date;

2.      Contributions that would be allocated as of a date not later than the Determination Date, even though those amounts are not yet made or required to be made;

3.      Any Plan distributions made within the Plan Year that includes the Determination Date or within the four (4) preceding Plan Years. However, in the case of distributions made after the Valuation Date and prior to the Determination Date, such distributions are not included as distributions for Top-Heavy purposes to the extent that such distributions are already included in the Participant's Aggregate Account balance as of the Valuation Date.

Notwithstanding anything herein to the contrary, all distributions, including distributions made prior to January 1, 1984, will be counted;

4.      Any Employee contributions, whether voluntary or mandatory. However, amounts attributable to tax deductible qualified deductible employee

92

contributions shall not be considered to be a part of the Participant's Total Account balance;

5.     With respect to unrelated rollover and plan-to-plan transfers (ones which are both initiated by the Employee and made from a plan maintained by one employer to a plan maintained by another employer), if this Plan provides for rollovers or plan-to-plan transfer, it shall consider such rollover or plan-to-plan transfer as a distribution for the purposes of this Section.

    If this Plan is the plan accepting such rollovers or plan-to-plan transfers, it shall not consider such rollovers or plan-to-plan transfers as part of the Participant's Aggregate Account balance; and

6.     With respect to related rollovers and plan-to-plan transfers (ones either not initiated by the Employee or made to a plan maintained by the same employer), if this Plan provides the rollover or plan-to-plan transfer, it shall not be counted as a distribution for purposes of this Section.  If this Plan is the plan accepting such rollover or plan-to-plan transfer, it shall consider such rollover or plan-to-plan transfer as part of the Participant's Aggregate Account balance, irrespective of the date on which such rollover or plan-to-plan transfer is accepted.

d.     "Aggregation Group" means either a Required Aggregation Group or a Permissive Aggregation Group as hereinafter determined.

1.     <u>Required Aggregation Group</u>.  In determining a Required Aggregation Group hereunder, each plan of the Employer in which a Key Employee is a Participant, and each qualified retirement plan sponsored by an Employer which has been terminated within the 5 year period ending on the determination date, and each other plan of the Employer which enables any plan in which a Key Employee participates to meet the requirements of Code Section 401(a)(4) or 410 will be required to be aggregation Group.

    In the case of the Required Aggregation Group, each plan in the group will be considered a Top-Heavy Plan if the Required Aggregation Group is a Top-Heavy Group.  No plan in the Required Aggregation Group will be considered a Top-Heavy Plan if the Required Aggregation Group is not a Top-Heavy Group.

2.     <u>Permissive Aggregation Group</u>.  The Employer may also include any other plan not required to be included in the Required Aggregation Group, provided the resulting group, taken as a whole, would continue to satisfy the provisions of Code Sections 401(a)(4) and 410. Such group shall be known as a Permissive Aggregation Group.

In the case of a Permissive Aggregation Group, only the plan that is part of the Required Aggregation Group will be considered a Top-Heavy Plan if the Permissive Aggregation Group is a Top-Heavy Group. No plan in the Permissive Aggregation Group will be considered a Top-Heavy Plan if the Permissive Aggregation Group is not a Top-Heavy Group.

3. Only those plans of the Employer in which the Determination Dates fall within the same calendar year shall be aggregated in order to determine whether such plans are Top-Heavy Plans.

e. "Determination Date" means:

1. The last day of the preceding Plan Year, or

2. In the case of the first Plan Year, the last day of such Plan Year.

f. In the case of a defined benefit plan, a Participant's Present Value of Accrued Benefit shall be as determined under the provisions of the applicable defined benefit plan.

g. "Top-Heavy Group" means any Aggregation Group in which, as of the Determination Date, the sum of:

1. the Present Value of Accrued Benefits of Key Employees under all defined benefit plans included in the Group, and

2. the Aggregate Accounts of Key Employees under all defined contribution plans included in the Group exceeds sixty percent (60%) of a similar sum determined for all Participants.

h. "Top-Heavy Plan Year" means that, for a particular Plan Year commencing after December 31, 1983, the Plan is a Top-Heavy Plan.

i. In determining a Participant's accrued Benefit and Aggregate Account balance if a Participant:

1. Is not a Key Employee but who was a Key Employee in a prior year, or

2. Has not performed any services for an Employer at any time during the 5 year period ending on the Determination Day, such Accrued Benefit and Aggregate Account balance for such Participant shall not be taken into account.

j. After December 31, 2001, notwithstanding the foregoing provision, this Section 8.3 shall apply for purposes of determining the present values of accrued benefits and the amounts of Account balances of Employees as of the Determination Date.

The present values of accrued benefits and the amounts of Account balances of an Employee as of the Determination Date shall be increased by the distributions made with respect to the Employee under the Plan and any plan aggregated with the Plan under Section 416(g)(2) of the Code during the one (1) year period ending on the Determination Date. The preceding sentence shall also apply to distributions under a terminated plan which, had it not been terminated, would have been aggregated with the Plan under Section 416(g)(2)(A)(i) of the Code. In the case of a distribution made for a reason other than severance from employment, death, or disability, this provision shall be applied by substituting "five (5) year period" for "one (1) year period."

The accrued benefits and Accounts of any individual who has not performed services for the Employer during the one (1) year period ending on the Determination Date shall not be taken into account.

## ARTICLE IX
## AMENDMENT, TERMINATION, AND MERGERS

9.1   <u>Amendment</u>. The Employer shall have the right at any time and from time-to-time to amend, in whole or in part, any or all of the provisions of this Plan Statement. However, no such amendment shall authorize or permit any part of the Trust Fund (other than such part as is required to pay taxes and administration expenses) to be used for or diverted to purposes other than for the exclusive benefit of the Participants or their Beneficiaries or estates; no such amendment shall, directly or indirectly, cause any reduction in the amount credited to the Account of any Participant, or cause or permit any portion of the Trust Fund to revert to or become the property of the Employer; no such amendment shall eliminate or reduce a benefit which is protected under Section 411(d)(6) of the Code with respect to the Participant's Account prior to the effective date of such amendment (except as provided under Treasury Regulation Section 1.411(d)-4, or as otherwise permitted under law; and no such amendment which affects the rights, duties or responsibilities of the ESOP Trustee may be made without the ESOP Trustee's written consent.

Any such amendment shall become effective upon delivery of a duly executed instrument to the ESOP Trustee, provided that the ESOP Trustee shall in writing consent to the terms of such amendment.

9.2   <u>Termination</u>. The Employer shall have the right at any time to terminate the Plan by delivering to the Trustee and the ESOP Trustee written notice of such termination. A complete discontinuance of the Employer's contributions to the Plan shall be deemed to constitute a termination. Upon any termination (full or partial), or complete discontinuance of contributions, all amounts credited to the affected Participants' Accounts shall become 100% Vested and shall not thereafter be subject to Forfeiture; and all unallocated amounts shall be allocated to the Accounts of all Participants in accordance with the provisions hereof. Upon complete termination of the Plan, or upon receipt of a favorable determination letter from the Internal Revenue Service, if one is applied for, that the Plan remains tax qualified upon its termination, the Employer, by

written notice to the Trustee and the ESOP Trustee, shall direct that the assets in the Trust Fund be disposed of in one of the following ways as determined by the Company in its discretion.

a.   Complete distribution of the assets in the Trust Fund to the Participants, in cash, as soon as administratively feasible; or

b.   Continuation of the Trust Fund created by this Plan Statement and the distribution of benefits at such time and in such manner as though the Plan had not been terminated.

c.   Distribution of the assets in the Trust Fund as determined by the Plan as amended pre-or post termination and applicable law.

9.3   Merger or Consolidation.   This Plan may be merged or consolidated with, or its assets may be transferred to any other Plan only if the benefits which would be received by a Participant of this Plan, in the event of a termination of the Plan immediately after such transfer, merger or consolidation, are at least equal to the benefits the Participant would have received if the Plan had terminated immediately before the transfer, merger or consolidation.   Notwithstanding the foregoing, no transfer shall be made to this Plan consisting of assets that are subject to the joint and survivor annuity and preretirement survivor annuity requirements of Section 401(a)(11) of the Code.

## ARTICLE X
## ADOPTION BY AFFILIATES

10.1   Adoption by Other Employers.   Notwithstanding anything contained herein to the contrary, with the consent of the Employer, any other corporation or entity which is an Affiliate of the Employer may adopt this Plan and all of the provisions hereof, and participate herein and be known as a Participating Employer, by a properly executed document evidencing said intent and will of such Participating Employer.

10.2   Requirements of Participating Employers.

a.   Each Participating Employer shall be required to use the same Trustee and ESOP Trustee as provided in this Plan.

b.   The Plan may, but shall not be required to, commingle, hold and invest as one Trust Fund all contributions made by Participating Employers, as well as all increments thereof.

c.   The transfer of any Participant from or to an entity participating in this Plan, whether he be an Employee of the Employer or a Participating Employer, shall not affect such Participant's rights under the Plan, and all amounts credited to such Participant's Account as well as his accumulated service time with the transferor or predecessor, and his length of Participation in the Plan shall continue to his credit.

    d.      Any expenses of the Plan which are to be paid by the Employer or borne by the Trust Fund shall be paid by each Participating Employer in the proportion that the Employer shall specify.

10.3    <u>Designation of Agent</u>.  Each Participating Employer shall be deemed to be a part of this Plan; provided, however, that with respect to all of its relations with the Trustee, the ESOP Trustee and Committee for the purpose of this Plan, each Participating Employer shall be deemed to have designated irrevocably the Employer as its agent.  Unless the context of the Plan clearly indicates the contrary, the word "Employer" shall be deemed to include each Participating Employer as related to its adoption of the Plan.

10.4    <u>Employee Transfers</u>.  It is anticipated that an Employee may be transferred between Participating Employers; and in the event of any such transfer, the Employee involved shall carry with him his accumulated service and eligibility.  No such transfer shall effect a termination of employment hereunder, and the Participating Employer to which the Employee is transferred shall thereupon become obligated hereunder with respect to such Employee in the same manner as was the Participating Employer from whom the Employee was transferred.

10.5    <u>Participating Employers Contribution</u>.  Any contribution or Forfeiture subject to allocation during each Plan Year shall be allocated among all Participants of all Participating Employers in accordance with the provisions of this Plan.

10.6    <u>Amendment</u>.  Amendment of this Plan shall be made by the Employer only and may be done at any time without the consent of any Participating Employer.

10.7    <u>Discontinuance of Participation</u>.  Any Participating Employer shall be permitted to discontinue or revoke its participation in the Plan. The Plan shall thereafter transfer or deliver Trust Fund assets allocable to the Participants of such Participating Employer, as determined by the Committee, to such new Plan as shall have been designated by such Participating Employer, in the event that it has established a separate qualified plan for its Employees.  If no successor is designated, the Plan shall retain such assets for the Employees of said Participating Employer pursuant to the provisions hereof.

**ARTICLE XI**
**PLAN ADMINISTRATOR**

11.1    <u>Employer</u>.  Functions generally assigned to the Employer shall be discharged by the officers of the Employer or delegated and allocated as provided herein.  Except as hereinafter provided, the Board of Directors of the Employer may delegate or redelegate and allocate and reallocate to one or more persons or to a committee of persons jointly or severally, and whether or not such persons are directors, officers, or employees, such functions assigned to the Employer hereunder as it may from time-to-time deem advisable.

The Board of Directors of the Employer shall have the exclusive authority, which authority may not be delegated:

a.    To appoint or remove any Trustee or ESOP Trustee; to appoint or remove members of the Committee; or to appoint or remove an Investment Manager;

b.    To determine the Employer's discretionary contribution under Section 3.1 hereunder; to reduce, suspend or discontinue contributions to the Plan; to direct the Trustee or ESOP Trustee to return an Employer contribution that was made by mistake or which is not deductible;

c.    To consent to the adoption of the Plan by affiliated employers; to designate Affiliates; to establish conditions and limitations upon such adoption of the Plan by affiliated employers; and

d.    To cause the Plan to be merged with another plan and to transfer assets and liabilities between the Plan and another.

11.2   **Plan Administrator/Administrative Committee.**   The Administrator, for purposes of Section 3(16)A of the Act, shall be the Employer. The Board of Directors of the Employer may appoint a Committee consisting of such members as may be determined from time-to-time, and who shall act on behalf of the Employer and serve at its pleasure. Members of the Committee shall serve without compensation, but their reasonable expenses shall be an expense of the administration of the Trust Fund and shall be paid from and out of the Fund, except to the extent the Employer, in its discretion, directly pays such expenses.   The Committee may elect such officers as the Committee may decide upon.

If there shall at any time be three (3) or more members of the Committee serving hereunder who are qualified to perform a particular act, the same may be performed, on behalf of all, by a majority of those qualified, with or without the concurrence of the minority.   No person who failed to join or concur in such act shall be held liable for the consequences thereof, except to the extent that liability is imposed under the Employee Retirement Income Security Act of 1974. The Committee shall:

a.    Determine all questions relating to the eligibility of Employees to participate or remain a Participant hereunder;

b.    Compute, certify, and direct the Trustee or ESOP Trustee with respect to the amount and the kind of benefits to which any Participant shall be entitled hereunder;

c.    Authorize and direct the Trustee or the ESOP Trustee with respect to all nondiscretionary or otherwise directed disbursements from the Plan;

d.    Maintain all necessary records for the administration of the Plan;

e.    Require Participants to apply in writing on forms provided by the Committee for benefits hereunder, and to provide satisfactory evidence respecting such matters as date of birth, marital status, and such other pertinent information as may be deemed necessary to the determination of any issue to be decided;

    f.      Have discretionary power to construe and interpret the Plan, to supply any omissions therein, to reconcile and correct any errors or inconsistencies, to make and publish rules for regulation of the Plan, to decide any questions in the administration and application of the Plan, including all questions relating to the individual rights of Participants, and to make equitable adjustments for any mistakes or errors in the administration of the Plan. Benefits under the Plan will be paid only if the Committee, in its discretion, determines that the applicant is entitled to them.

    g.     Compute and certify to the Employer and to the Trustee or the ESOP Trustee from time-to-time the sums of money necessary or desirable to be contributed to the Trust Fund;

    h.     Consult with the Employer and the Trustee or the ESOP Trustee regarding the short and long-term liquidity needs of the Plan in order that the Trustee or the ESOP Trustee can exercise any investment discretion in a manner designed to accomplish specific objectives;

    i.      Assist any Participant regarding his rights, benefits, or elections available under the Plan;

    j.      Carry out the claims review procedure for notifying Participants and Beneficiaries under Section 11.7 or 11.8; and

    k.     Perform such other acts as may be necessary for the proper administration of the Plan.

    l.      As authorized hereunder, direct the Trustee, ESOP Trustee or Custodian with respect to investments as recommended by the Plan's investment advisor or otherwise.

All action or distributions made by the Committee in good faith shall not be subject to review by anyone, but shall be final, binding and conclusive on all persons interested under the Plan.

**11.3**    <u>Records and Reports</u>.

    a.     The Committee shall keep a record of allocations taken and shall keep all other books of account, records, and other data that may be necessary for proper administration of the Plan and shall be responsible for supplying all information and reports to the Internal Revenue Service, Department of Labor, Participants, Beneficiaries and others, as required by law.

    b.     To enable the Committee to perform its functions, the Employer shall supply full and timely information to the Committee on all matters relating to the Compensation of all Participants, their Hours of Service, their Years of Service, their retirement, death, disability, or termination of employment, and such other pertinent facts as the Committee may require; and the Committee shall advise the

Trustee or the ESOP Trustee of such of the foregoing facts as may be pertinent to the Trustee's or ESOP Trustee's duties under the Plan.

The Committee may rely upon such information as is supplied by the Employer and shall have no duty or responsibility to verify such information.

c.    All expenses of administration may be paid out of the Trust Fund unless paid by the Employer.   Such expenses shall include any expenses incident to the functioning of the Committee, including, but not limited to, fees of accountants, counsel, and other specialists, and other costs of administering the Plan.   Until paid, the expenses shall constitute a liability of the Trust Fund.   However, the Employer may reimburse the Plan for any administration expense incurred pursuant to the above.   Any administration expense paid to the Plan as a reimbursement shall not be considered as an Employer contribution.

11.4   Appointment of Advisor.  The Committee, the Trustee or the ESOP Trustee may appoint counsel, specialists, and advisors, and other persons as the Committee, the Trustee or the ESOP Trustee deems necessary or desirable in connection with the Administration of the Plan.

11.5   Conflict of Interest.  If any officer or employee of the Employer, any member of the Board of Directors of the Employer, any member of the Committee or any Trustee to whom authority has been delegated or redelegated hereunder shall also be a Participant in the Plan, he shall have no authority as such officer, employee, member or Trustee with respect to any matter specially affecting his individual interest hereunder (as distinguished from the interests of all Participants and Beneficiaries or a broad class of Participants and Beneficiaries), all such authority being reserved exclusively to the other officers, employees, members or Trustees as the case may be, to the exclusion of such Participant; and such Participant shall act only in his individual capacity in connection with any such matter.

11.6   Claims Procedure.  Claims for benefits under the Plan may be filed with the Committee on forms supplied by the Employer.  Written notice of the disposition of a claim shall be furnished to the claimant within 90 days (45 days if the claim is disability based) after the application thereof is filed.  In the event the claim is denied, the reasons for the denial shall be specifically set forth in the notice in language calculated to be understood by the claimant; pertinent provisions of the Plan shall be cited; and, where appropriate, an explanation as to how the claimant can perfect the claim will be provided. In addition, the claimant shall be furnished with an explanation of the Plan's claims review procedure.

11.7   General Claims Review Procedure.  Any Employee, former Employee, or Beneficiary of either, who has been denied a benefit by a decision of the Committee pursuant to Section 11.6 shall be entitled to request the Committee to give further consideration to his claim by filing with the Committee (on a form which may be obtained from the Committee) a request for a hearing.  Such request, together with a written statement of the reasons why the claimant believes his claim should be allowed, shall be filed with the Committee no later than sixty (60) days after receipt of the written notification provided for in Section

11.6.  The Committee shall then conduct a hearing within the next sixty (60) days, at which the claimant may be represented by an attorney or any other representative of his choosing and at which the claimant shall have an opportunity to submit written and oral evidence and arguments in support of his claim.

At the hearing or prior thereto upon five (5) business days written notice to the Committee, the claimant or his representative shall have an opportunity to review all documents in the possession of the Committee which are pertinent to the claim at issue and its disallowance. Either the claimant or the Committee may cause a court reporter to attend the hearing and record the proceedings.  In such event, a complete written transcript of the proceedings shall be furnished to both parties by the court reporter; and the cost of such transcripts shall be borne by the party causing the court reporter to attend the hearing.  The Plan Committee shall fairly and deliberately consider all evidence presented by the Participant in support of his claim for benefits, but shall be guided solely by the provisions of the Plan in rendering a final decision.  Such final decision as to the allowance of the claim shall be made by the Committee within sixty (60) days of receipt of the appeal, unless there has been an extension of sixty (60) days communicated in writing to the claimant.  Such final decision shall be written in a manner calculated to be understood by the claimant and shall include specific reasons for the decision and specific references to the pertinent Plan provisions on which the decision is based.

11.8    Disability Claims Review Procedure.  Any Employee, former Employee, or Beneficiary of either, who has been denied a disability-based benefit by a decision of the Committee pursuant to Section 11.6 shall be entitled to request the Employer to give further consideration to his claim by filing with the Employer (on a form which may be obtained from the Employer) a request for a hearing.  Such request, together with a written statement of the reasons why the claimant believes his claim should be allowed, shall be filed with the Employer no later than one hundred eighty (180) days after receipt of the written notification provided for in Section 11.6.  The Employer shall then conduct a hearing within the next forty-five (45) days, at which the claimant may be represented by an attorney or any other representative of his choosing and at which the claimant shall have an opportunity to submit written and oral evidence and arguments in support of his claim.

At the hearing or prior thereto upon five (5) business days written notice to the Employer, the claimant or his representative shall have an opportunity to review all documents in the possession of the Employer which are pertinent to the claim at issue and its disallowance. Either the claimant or the Employer may cause a court reporter to attend the hearing and record the proceedings.  In such event, a complete written transcript of the proceedings shall be furnished to both parties by the court reporter; and the cost of such transcripts shall be borne by the party causing the court reporter to attend the hearing.  The Employer shall fairly and deliberately consider all evidence presented by the Participant in support of his claim for benefits, but shall be guided solely by the provisions of the Plan in rendering a final decision.  Such final decision as to the allowance of the claim shall be made by the Employer within forty-five (45) days of receipt of the appeal, unless there has been an extension of forty-five (45) days communicated in writing to the claimant.  Such final decision shall be written in a manner calculated to be understood by

the claimant and shall include specific reasons for the decision, specific references to the pertinent Plan provisions on which the decision is based, a statement that the Claimant is entitled to receive, upon request are free of charge, reasonable access to, and copies of, all documents, records and other information relevant to the claim, and a statement indicating the Claimant's right to file a lawsuit upon completion of the claims review process. The claims review shall not afford deference to the initial adverse benefit determination and will be conducted by an individual who is not part of the Committee, nor the subordinate of any Committee member.

## ARTICLE XII
## CONCERNING THE TRUSTEES

12.1    Terms and Conditions of the Trustee Obligations. The terms and conditions of the Trust as it pertains to the Trustee shall be contained in a separate agreement between the Trustee and the Employer.

12.2    Provisions Relating to the ESOP Trustee. The remaining provisions of this Article shall apply to the ESOP portion of the Plan.

   a.    Investment. As directed by the Committee, the Plan's investment advisor or other investment fiduciary, the ESOP Trustee shall invest the ESOP Trust assets in Qualifying Employer Securities or any other investment permitted by the Plan's Investment Policy Statement; provided, however, that the ESOP Trust Assets shall be primarily invested in Qualifying Employer Securities. The ESOP Trustee shall cause any ESOP Trust Assets not subject to proper direction to be deposited in an interest bearing bank account.

   b.    ESOP Trustee's Powers. As directed by the Committee, the ESOP Trustee shall have the authority and power to:

      1.    Buy any securities or other property to be held in the ESOP Trust for cash or other consideration and on any terms deemed appropriate;

      2.    Sell any securities or other property in the ESOP trust for cash or other consideration and on any terms deemed appropriate. Any sale of Qualifying Employer Securities by the ESOP Trustee shall be for no less than adequate consideration at the date of the sale;

      3.    Subject to subsection 12.2.d, vote any stock, including Qualifying Employer Securities, bonds or other securities held in the ESOP Trust, in person or by proxy;

      4.    Give general or specific proxies or powers of attorney with or without powers of substitution;

      5.    Deposit such Qualifying Employer Securities or other securities in any voting trust, or with any protective or like committee, or with the ESOP Trustee or with depositories designated thereby;

6.    Exercise any options, subscription rights and conversion privileges;

7.    Sue, defend, compromise, arbitrate or settle any suit or legal proceeding or any claim due it or on which it is liable;

8.    Contract or otherwise enter into transactions between itself as ESOP Trustee and the Employer, its subsidiaries and shareholders or any of them;

9.    Collect and receive any and all monies, securities or other property of whatsoever kind or nature due or owing or belonging to the ESOP Trust, and to give full discharge and acquittance therefor;

10.   Perform all acts that the ESOP Trustee shall deem necessary and appropriate and exercise any and all powers and authority of the ESOP Trustee under the Plan;

11.   Exercise any of the powers of an owner with respect to Qualifying Employer Securities and other securities or other property comprising the ESOP Trust Assets. Either the Employer or the Committee may authorize the ESOP Trustee to act on any matter or class of matters with respect to which direction or instruction to the ESOP Trustee by the Committee is called for hereunder without specific direction or other instruction from the Committee.

c.    Taxes.  The ESOP Trustee shall have the power to pay any tax levied against the ESOP Trust.

d.    Voting Employer Stock.  All Qualifying Employer Securities held by the ESOP Trust shall be voted by the ESOP Trustee in accordance with directions of the Participants and/or Beneficiaries with respect to any voting shares of Qualifying Employer Securities allocated to their Employer Stock Accounts.  With respect to the matters referred to in the previous sentence, any unallocated shares held by the ESOP Trust shall be voted by the ESOP Trustee in accordance with instructions from the Committee. Fractional shares shall be voted on a combined basis to the greatest extent possible to reflect directions of voting Participants and Beneficiaries.

Voting rights passed through to Participants shall include, but not be limited to, voting on any corporate matter which involves the voting of such shares with respect to the approval or disapproval of any corporate merger or consolidation, recapitalization, reclassification, liquidation, dissolution, sale of substantially all assets of a trade or business, or such similar transaction as the Secretary may prescribe in regulations.

e.    Nominees.  The ESOP Trustee may register any securities or other property held by it hereunder in its own name or in the name of its nominees with or without the addition of words indicating that such securities are held in a fiduciary capacity,

and may hold any securities in bearer form, but the books and records of the ESOP Trustee shall at all times show that all such investments are part of the ESOP Trust.

f.   Records.   The ESOP Trustee shall keep accurate and detailed accounts of all investments, receipts and disbursements and other transactions hereunder, and all accounts, books and records relating thereto shall be open to inspection by any person designated by the Committee or the Employer at all reasonable times. The ESOP Trustee shall maintain such records, make such computations (except as concerns Employer and Employee Contributions), and perform such ministerial acts as the Committee may from time to time request.

g.   Reports.   Within sixty (60) days after the end of each taxable year of the Employer, or the removal or resignation of the ESOP Trustee, and as of any other date specified by the Committee, the ESOP Trustee shall file a report with the Committee. This report shall show for each participating Employer all purchases, sales, receipts, disbursements, and other transactions effected by the ESOP Trustee during the year or period for which the report is filed, and shall contain an exact description, the cost as shown on the ESOP Trustee's books, and the market value as of the end of such period of every item held in the Trust and the amount and nature of every obligation owed by the Trust. The Employer shall have the right to audit all reports of the ESOP Trustee.

h.   Fiduciary Duties.   (1) The ESOP Trustee, in the exercise of each and every power or discretion vested in them by the Plan, shall be governed by the principle that no discrimination in favor of highly compensated employees who are Participants from time to time hereunder shall result and shall (subject to the applicable provisions of the Act) discharge their duties with respect to the Plan solely in the interest of the Participants and Beneficiaries and

1.   for the exclusive purposes of:

(i)   providing benefits to Participants and their beneficiaries; and,

(ii)   defraying reasonable expenses of administering the Plan;

2.   with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; and

3.   in accordance with the Plan, insofar as the Plan is consistent with the provisions of ERISA.

(2) Except as may be expressly permitted by law, the ESOP Trustee nor shall not permit the Plan to engage, directly and indirectly, in any of the following transactions with a disqualified person (as defined in Section 4975 of the Code):

104

1.    sale or exchange, or leasing, of any property between the Plan and a disqualified person;

2.    lending of money or other extension of credit between the Plan and a disqualified person;

3.    furnishing of goods, services or facilities between the Plan and a disqualified person;

4.    transfer to, or use by or for the benefit of, a disqualified person of the income or assets of the Plan;

5.    act by a disqualified person who is a fiduciary whereby he deals with the income or assets of the Plan in his own interest or for his own account; or

6.    receipt of any consideration for his own personal account by any disqualified person who is a fiduciary from any party dealing with the Plan in connection with a transaction involving the income or assets of the Plan.

i.    <u>Distributions</u>.

1.    The ESOP Trustee shall make distributions from the ESOP Trust at such times and in such manner to the persons entitled thereto under the Plan as the Committee directs in writing. Any undistributed part of a Participant's Account shall be retained in the ESOP Trust until the Committee directs its distribution. Any portion of a Participant's Account to be distributed in cash shall be paid by the ESOP Trustee, mailing its check to the person entitled to receive the distribution at that person's address of record. If a dispute arises as to who is entitled to or should receive any benefit or payment, the ESOP Trustee may withhold or cause to be withheld such payment until the dispute has been resolved.

In the event the ESOP Trustee is required to make a distribution in cash for which no funds are available, the Employer shall either make a cash contribution to the Trust or purchase a sufficient number of shares of Qualifying Employer Securities to provide the necessary cash assets; provided, however, the ESOP Trustee shall not be required to sell shares of Qualifying Employer Securities under this paragraph.

2.    Any Committee payment directions need not specify the purpose of the payments so directed, and the ESOP Trustee shall not be responsible in any way respecting the purpose, or propriety of such payments.

3.    No interest of any Participant or Beneficiary under the Plan shall be subject in any manner to anticipation, sale, transfer, assignment or encumbrance, whether voluntary or involuntary, and no attempt to so anticipate, sell, transfer, assign or encumber the same shall be valid or

recognized by the ESOP Trustee, nor shall any Plan Account be in any way liable for, or subject to, the debts, contracts, liabilities or torts of any person entitled to the same, except to such an extent as may be ordered under a Qualified Domestic Relations Order, as provided for in the Plan. If the ESOP Trustee is notified by the Committee that any such Participant or Beneficiary has been adjudicated bankrupt or has purported to anticipate, sell, transfer, assign, or encumber any Plan Account, voluntarily or involuntarily, the ESOP Trustee shall if so directed by the Committee, hold or apply such Account or any part thereof to or for the benefit of such Participant or Beneficiary in such manner as the Committee shall direct.

4.    In the event that any distribution or payment directed by the Committee shall be mailed by the ESOP Trustee to the person specified in such direction at the latest address of such person filed with the Committee, and shall be returned to the ESOP Trustee because such person cannot be located at such address, the ESOP Trustee shall promptly notify the Committee of such return.  Upon the expiration of sixty (60) days after such notification, such direction shall become void, and unless and until a further direction by the Committee is received by the ESOP Trustee with respect to such distribution or payment, the ESOP Trustee shall thereafter continue to administer the Trust as if such direction had not been made by the Committee. The ESOP Trustee shall not be obligated to search for or ascertain the whereabouts of any such person.

5.    The ESOP Trustee shall have the responsibility for the withholding of income taxes from ESOP distributions, for the payment of withheld income taxes on ESOP distributions to the Internal Revenue Service, and for notification to Participants of their right to elect not to have income tax withheld from ESOP distributions.

j.    Signatures.  All communications required hereunder from the Employer or the Committee to the ESOP Trustee shall be in writing, signed by an officer of the Employer or a person authorized by the Committee to sign on its behalf.  The Committee shall authorize one or more individuals to sign, on its behalf, all communications required hereunder between the Committee and the ESOP Trustee. The Employer and the Committee shall at all times keep the ESOP Trustee advised of the names and specimen signatures of all members of the Committee and the individuals authorized to sign on behalf of the Committee. The ESOP Trustee shall be fully protected in relying on any such communication and shall not be required to verify the accuracy or validity thereof unless it has reasonable grounds to doubt the authenticity of any signature.  If after request the ESOP Trustee does not receive instructions from the Committee on any matter in which instructions are required hereunder, subject to the provisions of Sections 12.2.a. and 12.2.b hereof, the ESOP Trustee shall act or refrain from acting as it may determine.  All communications required hereunder from the ESOP Trustee shall be in writing, signed by the ESOP Trustee.  The ESOP Trustee may

authorize one or more ESOP Trustees to sign on its behalf all communications and authorizations.

k.  Expenses.  The ESOP Trustee may employ suitable agents and counsel who may be counsel for the Employer.  The Employer shall pay all expenses in connection with the design, establishment, or termination of the ESOP portion of the Plan.  The ESOP Trust shall pay all costs of administering the ESOP portion of the Plan, unless such expenses are paid by the Employer.  However, normal brokerage charges, commissions, taxes and other costs incident to the purchase and sale of securities which are included in the cost of securities purchased, or charged against the proceeds in the case of sales, shall be charged to and paid out of ESOP Trust Assets.  Any expenses paid by the ESOP Trust shall be reasonable and necessary.  The ESOP Trust shall not pay, directly or indirectly, any commissions with respect to the purchase of Qualifying Employer Securities.  The ESOP Trustee shall be entitled to compensation as may be agreed upon in writing, from time to time, between the Committee and the ESOP Trustee; provided, however, that no person serving as a fiduciary who already receives full-time pay from the Employer shall receive any compensation from the Plan, except for reimbursement of expenses properly and actually incurred. In the event the ESOP Trustee has insufficient cash to pay ESOP Trust expenses, the Employer shall either make a cash contribution to the ESOP Trust, pay the expense directly or purchase a sufficient number of shares of Qualifying Employer Securities to provide the necessary cash assets; provided, however, the ESOP Trustee shall not be required to sell shares of Qualifying Employer Securities under this paragraph.

l.  Amendment and Termination.  The Employer shall have the right at any time, by a written instrument duly executed and acknowledged and delivered to the ESOP Trustee, to modify, alter or amend this Section, in whole or in part, and to terminate the ESOP Trust, in accordance with the express provisions of the Plan.  The Employer shall have the right, to the extent not prohibited by law, to amend this Section retroactively.  In no event, however, shall the duties, power or liabilities of the ESOP Trustee hereunder be changed without its prior written consent.

m.  Exclusive Benefit.  Subject to the provisions of Section 13.11, at no time shall any part of the ESOP Trust Assets revert to or be recoverable by the Employer or by any participating Employer or be used for or be diverted to purposes other than for the exclusive benefit of Participants and their Beneficiaries.  However, the Committee may, by notice in writing to the ESOP Trustee, direct that all or part of the Trust Assets be transferred to a separate or successor ESOP Trustee or ESOP Trustees under a Trust instrument which is for the exclusive benefit of such Participants and their Beneficiaries and meets the requirements of Section 401(a) of the Code, and thereupon the ESOP Trust Assets, or any part thereof, together with any outstanding loans and accrued interest attributable thereto, shall be paid over, transferred or assigned to said separate or successor ESOP Trustee or ESOP Trustees free from the ESOP Trust created hereunder.

107

n.    <u>Resignation or Removal of ESOP Trustee/ Appointment of Ancillary ESOP Trustee or Independent Fiduciary</u>.

    1.    Any ESOP Trustee may resign at any time upon thirty (30) days written notice to the Employer. Any ESOP Trustee may be removed at any time by the Employer upon thirty (30) days written notice to the ESOP Trustee; provided, however, that the Employer may remove an ESOP Trustee immediately upon termination of an ESOP Trustee's employment with the Employer. Upon the receipt of instructions or directions from the Employer or the Committee with which the ESOP Trustee is unable or unwilling to comply, that ESOP Trustee may resign upon notice, in writing, to the Employer or the Committee, given within a reasonable time, under the circumstances then prevailing, after the receipt of such instructions or directions, and notwithstanding any other provisions thereof; in that event, that ESOP Trustee shall have no liability to the Employer, or any person interested herein for failure to comply with such instructions or directions. Upon resignation or removal of any ESOP Trustee, the Employer shall appoint a successor ESOP Trustee (or ESOP Trustees). The successor ESOP Trustee shall have the same powers and duties as are conferred upon the ESOP Trustee hereunder, and the ESOP Trustee shall assign, transfer and pay over to such successor ESOP Trustee all the moneys, securities and other property then constituting the ESOP Trust Assets, together with such records or copies thereof as may be necessary to the successor ESOP Trustee.

    2.    The ESOP Trustee shall not be required to make any transfer of assets to a successor ESOP Trustee or ESOP Trustees unless and until it has been indemnified to its satisfaction against any expenses and liabilities both with respect to such transfer and with respect to any of its acts as ESOP Trustee prior to such transfer (except such expenses or liabilities due to or arising from its willful misconduct or gross negligence).

**ARTICLE XIII**
**MISCELLANEOUS**

13.1    <u>Participant's Rights</u>. This Plan shall not be deemed to constitute a contract between the Employer and any Participant or to be consideration or an inducement for the employment of any Participant or Employee. Nothing contained in this Plan shall be deemed to give any Participant or Employee the right to be retained in the service of the Employer or to interfere with the right of the Employer to discharge any Participant or Employee at any time regardless of the effect which such discharge shall have upon him as a Participant of his Plan.

13.2    <u>Alienation</u>.

a.   No benefit which shall be payable out of the Trust Fund to any person (including a Participant or his Beneficiary) shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, or charge, and any attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber, or charge the same shall be void; and no such benefit shall in any manner be liable for, or subject to, the debts, contracts, liabilities, engagements, or torts of any such person, nor shall it be subject to attachment or legal process for or against such person, and the same shall not be recognized by the Trustee, except to such extent as may be required by law.

b.   This provision shall not apply to a "qualified domestic relations order" defined in Code Section 414(p), and those other domestic relations orders permitted to be so treated by the Committee under the provisions of the Retirement Equity Act of 1984.  The Committee shall establish a written procedure to determine the qualified status of domestic relations orders and to administer distributions under such qualified orders.  Further, to the extent provided under a "qualified domestic relations order," a former spouse of a Participant shall be treated as the spouse or surviving spouse for all purposes under the Plan.

c.   Except, however, Section 13.2.a above shall not apply to the extent a Participant or Beneficiary is indebted to the Plan, for any reason, under any provision of this Plan Agreement and at the time distribution is to be made to or for his or his beneficiary's benefit, such proportion of the amount to be distributed as shall equal such indebtedness shall be paid to the Plan, at the direction of the Committee, to apply against or discharge such indebtedness.

Prior to making a payment, however, the Participant or Beneficiary must be given written notice by the Committee that such indebtedness is to be deducted in whole or part from his Account.  If the Participant or Beneficiary does not agree that the indebtedness is a valid claim against his Vested Participant's Account, he shall be entitled to a review of the validity of the claim in accordance with procedures provided in Sections 11.6 and 11.7.

d.   Section 13.2.a shall not apply to an offset to a Participant's accrued benefit against an amount that the Participant is ordered or required to pay the Plan with respect to an order, judgment or decree issued, or a settlement entered into, on or after August 5, 1997, in accordance with Sections 401(a)(13)(C) and (D) of the Code.

13.3   Gender and Number.  Wherever any words are used herein in the masculine, feminine or neuter gender, they shall be construed as though they were also in another gender in all cases where they would so apply; and whenever any words are used herein in the singular or plural form, they shall be construed as though they were also used in the other form in all cases where they would so apply.

13.4   Legal Action.  In the event any claim, suit, or proceeding is brought regarding any Trust or the Plan established hereunder to which the Trustee, the ESOP Trustee, the Committee

or the Employer may be a party, and such claim, suit, or proceeding is resolved in favor of the Trustee, the ESOP Trustee, the Committee or the Employer, they shall be entitled to be reimbursed from the Plan for any and all costs, attorney's fees, and other expenses pertaining thereto incurred by them for which they shall have become liable.

13.5   Prohibition Against Diversion of Funds.

a.   Except as provided below, it shall be impossible by operation of the Plan or of any Trust, by termination of either, by power of revocation or amendment, by the happening of any contingency, by collateral arrangement or by any other means, for any part of the corpus or income of any trust fund maintained pursuant to the Plan or any funds contributed thereto to be used for, or diverted to, purposes other than the exclusive benefit of Participants, retired Participants or their Beneficiaries.

b.   In the event the Employer shall make an excessive contribution under a mistake of fact pursuant to Section 403(c)(2)(A) of the Act, the Employer may demand repayment of such excessive contribution at any time within one (1) year following the time of payment; and the Trustees shall return such amount to the Employer within the one (1) year period. Earnings of the Plan attributable to the excess contributions may not be returned to the Employer, but any losses attributable thereto must reduce the amount so returned.

13.6   Bonding.  Every Fiduciary, except a bank or an insurance company, unless exempted by the Act and Regulations thereunder, shall be bonded in an amount not less than 10% of the amount of the funds such Fiduciary handles; provided, however, that the minimum bond shall be $1,000 and the maximum bond shall be $1,000,000.

The amount of funds handled shall be determined at the beginning of each Plan Year by the amount of funds handled by such person, group, or class to be covered and their predecessors, if any, during the preceding Plan Year, or if there is no preceding Plan Year, then by the amount of the funds to be handled during the then current year.  The bond shall provide protection to the Plan against any loss by reason of acts of fraud or dishonesty by the Fiduciary alone or in connivance with others.  The surety shall be a corporate surety company as such term is used in Section 412 of the Act; and the bond shall be in a form approved by the Secretary of Labor. Notwithstanding anything in this Plan Statement to the contrary, the cost of such bond shall be an expense of and may, at the election of the Committee, be paid from the Trust Fund or by the Employer.

13.7   Receipt and Release for Payments.   Any payment to any Participant, his legal representative, Beneficiary, or to any guardian or committee appointed for such Participant or Beneficiary in accordance with the provisions of this Plan Statement, shall, to the extent thereof, be in full satisfaction of all claims hereunder against the Trustee and the Employer, either of whom may require such Participant, legal representative, Beneficiary, guardian, or committee, as a condition precedent to such payment, to execute a receipt and release thereof in such form as shall be determined by the Trustee or Employer.

13.8    Named Fiduciaries.  The Employer and the Board of Directors of Advance Trading, Inc., the Committee, the Trustees, any Participant directing investments in his own Account (except as provided in Section 404(c) of ERISA) and any Investment Manager appointed hereunder shall be named fiduciaries for the purpose of Section 402(a) of the Act.  The named fiduciaries shall have only those specific powers, duties, responsibilities, and obligations as are specifically given them under this Plan Statement.

Each named fiduciary warrants that any directions given, information furnished, or action taken by it shall be in accordance with the provisions of this Plan Agreement, authorizing or providing for such direction, information or action.  Furthermore, each named fiduciary may rely upon any such direction, information or action of another named fiduciary as being proper under this Plan Statement and is not required under this Plan Statement to inquire into the propriety of any such direction, information or action.  It is intended under this Plan Statement that each named fiduciary shall be responsible for the proper exercise of its own powers, duties, responsibilities and obligations under this Plan Statement.  No named fiduciary guarantees the Trust fund in any manner against investment loss or depreciation in asset value.  Any person or group may serve in more than one fiduciary capacity.

13.9    Service of Process.  In the absence of any designation to the contrary by the Employer, the Secretary of the Employer is designated as the appropriate and exclusive agent for the receipt of service of process directed to the Plan in any legal proceeding, including arbitration, involving the Plan.

13.10   Headings.  The headings and subheadings of this Plan Agreement have been inserted for convenience of reference and are to be ignored in any construction of the provisions hereof.

13.11   Return of Contributions.   Notwithstanding any provisions to the contrary, any Contribution by the Employer to the Trust Fund is conditioned upon the deductibility of the Contribution by the Employer under the Code; and, to the extent any such deduction is disallowed, the Employer may, within one (1) year following a final determination of the disallowance, whether by agreement with the IRS or by final decision of a court of competent jurisdiction, demand repayment of such disallowed Contribution; and the Trustee shall return such Contribution within one (1) year following the disallowance.  If any Contribution is made due to a mistake of fact, such Contribution may be returned to the Employer if such Contribution is returned within one (1) year thereafter and if the amount returned does not exceed the amount of the mistaken Contribution.

13.12   Uniformity.  All provisions of this Plan shall be interpreted and applied in a uniform, nondiscriminatory manner.

13.13   Limitation of Liability and Indemnification.

1.      Subject to the provisions of the Act, the Board of Directors of the Employer, the Committee and the members thereof, the ESOP Trustee and any other employee of the Employer who performs Plan administration

functions (the "Indemnitees") shall not be liable for any expense or liability hereunder unless due to or arising from fraud, dishonesty or misconduct. The Indemnitees shall not be liable for the making, retention or sale of any Plan investment or reinvestment, nor for any loss to or diminution of Plan Assets, nor for any action which any Indemnitee takes or refrains from taking which any Indemnitee deems in good faith to be in the best interests of the Plan. The ESOP Trustee shall not be required to pay interest on any part of the ESOP Trust Assets which are held uninvested pursuant to the Committee's direction. No Indemnitee shall be required to be bonded except to the extent required by law. The ESOP Trustee shall not be responsible in any way for the adequacy of the ESOP Trust to meet or discharge any or all liabilities under the Plan or for the proper application of distributions or other actions taken on the direction of the Committee.

2.     To the extent not covered by insurance, the Employer shall defend, indemnify and save harmless the Indemnitees from and against any and all loss resulting from liability to which any Indemnitee may be subjected by reason of any act or omission (except willful misconduct or gross negligence) in his official capacity in the administration of the Plan, including all court costs and other expenses reasonably incurred in the Indemnitee's defense, in case the Employer fails to provide such defense.

*Signature Page Follows*

## ARTICLE XIV

## CONSTRUCTION OF AGREEMENT

This instrument shall be construed and enforced according to the Act, the Code and the laws of the State of Illinois, other than its laws respecting choice of law, to the extent not preempted by the Act.

**IN WITNESS WHEREOF,** the undersigned hereby execute this instrument to be effective as of January 1, 2017.

**ADVANCE TRADING, INC.**

By: _____

Its: _____PRESIDENT_____

**ESOP TRUSTEE:**

**BREMER TRUST, N.A.**

By: _____

Its: _____Executive Vice President____

## APPENDIX A

## Qualified Domestic Relations Orders

### SECTION 1
### General Matters

Terms defined in this Plan Statement shall have the same meanings when used in this Appendix.

1.1  General Rule.  The Plan shall not honor the creation, assignment or recognition of any right to any benefit payable with respect to a Participant pursuant to a domestic relations order unless that domestic relations order is a qualified domestic relations order.

1.2  Alternate Payee Defined.  The only persons eligible to be considered alternate payees with respect to a Participant shall be that Participant's spouse, former spouse, child or other dependent.

1.3  DRO Defined.  A domestic relations order is any judgment, decree or order (including an approval of a property settlement agreement) which relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child or other dependent of a Participant and which is made pursuant to a state domestic relations law (including a community property law).

1.4  QDRO Defined.  A qualified domestic relations order is a domestic relations order which creates or recognizes the existence of an alternate payee's right to (or assigns to an alternate payee the right to) receive all or a portion of the Account of a Participant under the Plan and which satisfies all of the following requirements.

1.4.1  Names and Addresses.  The order must clearly specify the name and the last known mailing address, if any, of the Participant and the name and mailing address of each alternate payee covered by the order, or provide for such information to be provided confidentially to the Plan.

1.4.2  Amount.  The order must clearly specify the amount or percentage of the Participant's Account to be paid by the Plan to each such alternate payee or the manner in which such amount or percentage is to be determined.

1.4.3  Payment Method.  The order must clearly specify the number of payments or period to which the order applies.

1.4.4  Plan Identity.  The order must clearly specify that it applies to this Plan.

1.4.5  Settlement Options.  Except as provided in Section 1.4.8 of this Appendix, the order may not require the Plan to provide any type or form of benefits or any option not otherwise provided under the Plan.

1

1.4.6   Increased Benefits.  The order may not require the Plan to provide increased benefits.

1.4.7   Prior Awards.  The order may not require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order previously determined to be a qualified domestic relations order.

1.4.8   Exceptions.  Notwithstanding Section 1.4.5 of this Appendix.

(a)   The order may require payment of benefits be made to an alternate payee before the Participant has separated from Service, under either of the following:

(i)   If the order requires payment as of a date that is on or after the date on which the Participant attains (or would have attained) the earliest payment date described in Section 1.4.10 of this Appendix, or

(ii)   If the order requires (A) that payment of benefits be made to an alternate payee in a single lump sum as soon as is administratively feasible after the order is determined to be a qualified domestic relations order, and (B) provides that the payment of such single lump sum fully and permanently discharges all obligations of the Plan to the alternate payee.

(b)   The order may require that payment of benefits be made to an alternate payee as if the Participant had retired on the date on which payment is to begin under such order (but taking into account only the present value of benefits actually accrued).

(c)   The order may require payment of benefits to be made to an alternate payee in any form in which benefits may be paid under the Plan to the Participant.

1.4.9   Deemed Spouse.  Notwithstanding the foregoing:

(a)   The order may provide that the former spouse of a Participant shall be treated as a surviving spouse of such Participant for the purposes of Article VII of the Plan Statement (and that any subsequent or prior spouse of the Participant shall not be treated as a spouse of the Participant for such purposes), and

(b)   The order may provide that, if the former spouse has been married to the Participant for at least one (1) year at any time, the surviving former spouse shall be deemed to have been married to the Participant for the one (1) year period ending on the date of the Participant's death.

1.4.10  Payment Date Defined.  For the purpose of Section 1.4.8 of this Appendix, the earliest payment date means the earlier of:

(a)   The date on which the Participant is entitled to a distribution under the Plan; or

(b)   The later of (i) the date the Participant attains age fifty (50) years, or (ii) the earliest date on which the Participant could begin receiving benefits under the Plan if the Participant separated from service.

# SECTION 2
## Procedures

2.1    <u>Actions Pending Review</u>.  During any period when the issue of whether a domestic relations order is a qualified domestic relations order is being determined by the Committee, the Committee shall cause the Plan to separately account for the amounts which would be payable to the alternate payee during such period if the order were determined to be a qualified domestic relations order.

2.2    <u>Reviewing DRO's</u>.  Upon the receipt of a domestic relations order, the Committee shall determine whether such order is a qualified domestic relations order.

2.2.1  <u>Receipt</u>.  A domestic relations order shall be considered to have been received only when the Committee shall have received a copy of a domestic relations order which is complete in all respects and is originally signed, certified or otherwise officially authenticated.

2.2.2  <u>Notice to Parties</u>.  Upon receipt of a domestic relations order, the Committee shall notify the Participant and all persons claiming to be alternate payees and all prior alternate payees with respect to the Participant that such domestic relations order has been received.  The Committee shall include with such notice a copy of this Appendix.

2.2.3  <u>Comment Period</u>.  The Participant and all persons claiming to be alternate payees and all prior alternate payees with respect to the Participant shall be afforded a comment period of thirty (30) days from the date such notice is mailed by the Committee in which to make comments or objections to the Committee concerning whether the domestic relations order is a qualified domestic relations order. By the unanimous written consent of the Participant and all persons claiming to be alternate payees and all prior alternate payees with respect to the Participant, the thirty (30) day comment period may be shortened.

2.2.4  <u>Initial Determination</u>.  Within a reasonable period of time after the termination of the comment period, the Committee shall give written notice to the Participant and all persons claiming to be alternate payees and all prior alternate payees with respect to the Participant of its decision that the domestic relations order is or is not a qualified domestic relations order. If the Committee determines that the order is not a qualified domestic relations order or if the Committee determines that the written objections of any party to the order being found a qualified domestic relations order are not valid, the Committee shall include in its written notice:

     (i)    The specific reasons for its decision;

     (ii)   The specific reference to the pertinent provisions of this Plan Statement upon which its decision is based;

     (iii)  A description of additional material or information, if any, which would cause the Committee to reach a different conclusion; and

(iv)     An explanation of the procedures for reviewing the initial determination of the Committee.

2.2.5   <u>Appeal Period</u>.  The Participant and all persons claiming to be alternate payees and all prior alternate payees with respect to the Participant shall be afforded an appeal period of sixty (60) days from the date such an initial determination and explanation is mailed in which to make comments or objections concerning whether the original determination of the Committee is correct.  By the unanimous written consent of the Participant and all persons claiming to be alternate payees and all prior alternate payees with respect to the Participant, the sixty (60) day appeal period may be shortened.

2.2.6   <u>Final Determination</u>.  In all events, the final determination of the Committee shall be made not later than eighteen (18) months after the date on which first payment would be required to be made under the domestic relations order if it were a qualified domestic relations order.  The final determination shall be communicated in writing to the Participant and all persons claiming to be alternate payees and all prior alternate payees with respect to the Participant.

2.3     <u>Final Disposition</u>.  If the domestic relations order is finally determined to be a qualified domestic relations order and all comment and appeal periods have expired, the Plan shall pay all amounts required to be paid pursuant to the domestic relations order to the alternate payee entitled thereto.  If the domestic relations order is finally determined not to be a qualified domestic relations order and all comment and appeal periods have expired, benefits under the Plan shall be paid to the person or persons who would have been entitled to such amounts if there had been no domestic relations order.

2.4     <u>Orders Being Sought</u>.  If the Committee has notice that a domestic relations order is being or may be sought but has not received the order, the Committee shall not (in the absence of a written request from the Participant) delay payment of benefits to a Participant or Beneficiary which otherwise would be due.  If the Committee has determined that a domestic relations order is not a qualified domestic relations order and all comment and appeal periods have expired, the Committee shall not (in the absence of a written request from the Participant) delay payment of benefits to a Participant or Beneficiary which otherwise would be due even if the Committee has notice that the party claiming to be an alternate payee or the Participant or both are attempting to rectify any deficiencies in the domestic relations order.

**SECTION 3**
**Processing of Award**

3.1     <u>General Rules</u>.  If a benefit is awarded to an alternate payee pursuant to an order which has finally determined to be a qualified domestic relations order, the following rules shall apply.

3.1.1   <u>Source of Award</u>.  If a Participant shall have a Vested interest in more than one Account under the Plan, the benefit awarded to an alternate payee shall be withdrawn from the Participant's Accounts in proportion to his Vested interest in each of them.

4

3.1.2   <u>Effect on Account</u>.  For all purposes of the Plan, the Participant's Account (and all benefits payable under the Plan which are derived in whole or in part by reference to the Participant's Account) shall be permanently diminished by the portion of the Participant's Account which is awarded to the alternate payee.

3.1.3   <u>After Death</u>.  After the death of an alternate payee, all amounts awarded to the alternate payee which have not been distributed to the alternate payee and which continue to be payable shall be paid in a single lump sum distribution to the personal representative of the alternate payee's estate as soon as administratively feasible unless the qualified domestic relations order clearly provides otherwise.  The Participant's beneficiary designation shall not be effective to dispose of any portion of the benefit awarded to an alternate payee unless the qualified domestic relations order clearly provides otherwise.

3.1.4   <u>In-Service Benefits</u>.  The in-service distribution and the loan provisions of Article VII of this Plan Statement shall not be applicable to the benefit award to an alternate payee.

3.2   <u>Segregated Account</u>.  If the Committee determines that it would facilitate the administration or the distribution of the benefit awarded to the alternate payee or if the qualified domestic relations order so requires, the benefit awarded to the alternate payee shall be established on the books and records of the Plan as a separate account belonging to the alternate payee.

3.3   <u>Former Alternate Payees</u>.  If an alternate payee has received all benefits to which the alternate payee is entitled under a qualified domestic relations order, the alternate payee will not at any time thereafter be deemed to be an alternative payee or prior alternate payee for any substantive or procedural purpose of this Plan.

**APPENDIX B**
**ADVANCE TRADING, INC. 401(K) PLAN AND ESOP**

**PLAN LOAN PROCEDURES**

1.      Loan Application Procedure.   The Plan Loan Program shall be administered by the
Committee. Loans may be applied for at any time by a Participant by submitting a written
application to the Committee in a form prescribed by the Committee setting forth:

        (a)      the amount requested;

        (b)      the payment terms requested;

        (c)      the security offered for the loan;

        (d)      the purpose of the loan proceeds.

The Committee may require the Participant to provide such additional documentation as it
determines necessary. Based on the application, the Committee shall set the terms of the loan and
so advise the Participant.

2.      Loan Criteria.   The Committee will grant loans to any Participant requesting same,
provided all loans shall be a minimum amount of $1,000 and a maximum amount equal to the
amount set forth in Code §72(p)(2).

3.      Loan Purpose.  Loans may be made for any lawful purpose.

4.      Ordering of Accounts.   A loan shall be charged against the borrower's accounts in the
following order:

> Employee Contribution Account (After-Tax)
> Rollover/Transfer Account
> Employer Contribution Account
> Employer Qualified Non-Elective Contribution Account
> Employer Matching Account
> Employee Deferral Account (Before-Tax)
> Employee Deferral Account (Roth)

No loan shall be charged against any account until the funds available for loans in any prior
account in such order have been exhausted. Loans may not be made from or charged to
Company Stock Accounts.

5.      Interest.  Each loan shall bear interest on the unpaid principal balance at one percent over
the 10-year U.S. Treasury bond rate at the beginning of the month in which the loan is made.

6.      Documentation.   The borrower shall execute a customary form of promissory note and
security agreement, which documents in the aggregate shall:

(a)     Create in the Plan a valid first lien against the borrower's entire right, title and interest in and to the accounts in the Plan;

(b)     Provide for a maturity date not to exceed five years from the date of the note; provided, however, that, if the Committee determines, at the time that the loan is made, that the proceeds of such loan are to be used for the purpose of acquiring or constructing a house, apartment, condominium or mobile home which is used, or is intended to be used within a reasonable time after the loan is made, as the principal residence of the borrower, then the note may provide for a maturity date not to exceed ten (10) years from the date of the note;

(c)     Provide for payments of principal and interest in equal installments of such frequency, not less frequently than quarterly, in such minimum amounts and for such maximum period as the Committee prescribes from time to time by uniform rule;

(d)     Provide that upon default in payment or otherwise, and upon the borrower's death, the unpaid indebtedness shall be accelerated and that the date on which repayment of any remaining part of such unpaid indebtedness is due may be extended, and interest shall continue to accrue, to such date as the borrower or beneficiary shall be eligible to receive a distribution from the Plan.  A grace period shall apply to all payments, which shall be the close of the calendar quarter following the calendar quarter in which payment is due.

(e)     Provide that each Participant who is employed by an Employer shall execute an appropriate document under which the Employer is authorized to deduct from the Participant's pay the amount of payments due under the terms of any such loan, and each borrower shall provide such other documents as may from time to time be required under uniform rules prescribed by the Committee.  The Committee may require any borrower to execute a Uniform Commercial Code Financing Statement.  If the borrower is a Participant, the Participant's spouse shall execute a consent to any loan, which consent shall acknowledge that any outstanding balance of the loan will be satisfied as provided in these procedures and shall waive any of such spouse's rights to the Participant's accounts to the extent inconsistent with any such satisfaction.

(f)     Each loan shall be a loan by the Plan, but for trust accounting purposes the loan shall be deemed made from the borrower's own accounts, and the note executed by the borrower shall be deemed to be an asset of such accounts. Upon making a loan, the borrower's account or accounts from which the loan is made shall be reduced by an amount equal to the principal balance of the loan, effective as of the most recent valuation date prior to the month in which the Committee commences processing the loan, and a loan account shall be established for the borrower with an initial balance equal to the principal amount of such loan.  All such loan accounts shall be excluded for purposes of determining and allocating the net earnings (or losses) of the Plan.  A borrower's repayments of principal and payments of interest shall be credited to the accounts from which the loan

2

proceeds were obtained in reverse of the order in which the loan amount was taken from such accounts until the amount borrowed from each such account has been fully replaced.

7.    <u>Security</u>.   All loans must be adequately secured by up to fifty percent (50%) of a Participant's non-forfeitable accrued benefit.

**ADVANCE    TRADING,   INC.   401(k) PLAN AND ESOP**

By _____
    for the Committee